1

1          UNITED STATES DISTRICT COURT
                DISTRICT OF NEVADA
2      BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4   UNITED STATES OF AMERICA,          :
                                       :
5         Plaintiff,                   :
                                       : No. 3:15-cr-00015-LRH-VPC
6      vs.                             :
                                       :
7   SHAUN JERMAINE ESTES,              :
                                       :
8         Defendant.                   :
                                       :
9   _____

10

11        TRANSCRIPT OF EVIDENTIARY HEARING (Day 1)
                (Pages 1 through 174)
12

13                     March 30, 2016

14

15                   Reno, Nevada

16

17

18

19

20

21   Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
                            Certified Realtime Reporter
22                          400 South Virginia Street
                            Reno, Nevada  89501
23                          (775) 329-0132

24

25

2

1                        A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    MEGAN RACHOW
     Assistant United States Attorney
5    100 West Liberty Street
     Suite 600
6    Reno, Nevada 89501
     (775) 784-5438
7    megan.rachow@usdoj.gov

8

9

10   FOR THE DEFENDANT:

11   LAUREN D. GORMAN
     Assistant Federal Public Defender
12   201 West Liberty Street
     Suite 102
13   Reno, Nevada 89501
     (775) 784-5369
14   lauren_gorman@fd.org

15

16   BIRAY DOGAN
     Assistant Federal Public Defender
17   201 West Liberty Street
     Suite 102
18   Reno, Nevada 89501
     (775) 321-8486
19   Biray_dogan@fd.org

20

21

22

23

24

25

```
 1                  RENO, NEVADA, MARCH 30, 2016, 1:36 P.M.

 2                              --oOo--

 3                     P R O C E E D I N G S

 4

 5              THE COURT:  Good afternoon.  Have a seat,

 6      please.

 7              COURTROOM ADMINISTRATOR:  Today is the date and

 8      time for evidentiary hearing regarding motion to suppress,

 9      document number 38, in criminal case 3:15-cr-15-LRH-VPC,

10      United States of America versus Shaun Jermaine Estes.

11              Lauren Gorman and Biray Dogan are present on

12      behalf of the defendant.

13              Megan Rachow is present on behalf of the

14      government.

15              THE COURT:  Okay.  The Court has before it the

16      motion to suppress which has been filed, and we set this

17      matter for a hearing today.  The burden is on the

18      government.

19              Ms. Rachow, are there any preliminary matters

20      that we need to address before we get started?

21              MS. RACHOW:  I don't believe so, Your Honor.

22      But I do believe the parties will be invoking the Rule of

23      Exclusion.

24              THE COURT:  All right.

25              MS. GORMAN:  Your Honor, we would just ask for
```

4

1    an additional order for the witnesses, especially after

2    they testify, to not discuss the case with each other.

3                THE COURT:  All right.  The Court will impose

4    both of those restrictions.  Anyone who expects that they

5    may be a witness in this matter will be required to wait

6    outside the courtroom.  They also should not be discussing

7    their testimony with any other persons other than counsel

8    for the -- their respective counsel.

9                And after any witnesses testify, there similarly

10   should be no discussion between other persons who may be

11   witnesses in this matter.

12               So I'll invoke the rule and along with those

13   restrictions at this time.

14               Are there any witnesses in the courtroom?

15               MS. RACHOW:  Yes, Your Honor.

16               And the government's first witness is going to

17   be Detective Kurup.  If the Court is ready for the

18   government to proceed.

19               COURTROOM ADMINISTRATOR:  Please raise your

20   right hand.

21               You do solemnly swear that the testimony you

22   shall give in the cause now before the Court shall be the

23   truth, the whole truth, and nothing but the truth, so help

24   you God?

25               THE WITNESS:  I do.

1              COURTROOM ADMINISTRATOR:  Please be seated.

2              THE WITNESS:  Thank you.

3              COURTROOM ADMINISTRATOR:  Please state your name

4    and spell your name for the record.

5              THE WITNESS:  Madhu Kurup, M-a-d-h-u K-u-r-u-p.

6              COURTROOM ADMINISTRATOR:  Please tell us your

7    city and state of residence.

8              THE WITNESS:  Reno, Nevada.

9              COURTROOM ADMINISTRATOR:  Thank you.

10             THE COURT:  All right.  Ms. Rachow, go ahead,

11   please.

12             MS. RACHOW:  Thank you, Your Honor.

13                         MADHU KURUP

14            called as a witness on behalf of the

15       Government, was examined and testified as follows:

16                      DIRECT EXAMINATION

17   BY MS. RACHOW:

18   Q.   Sir, how are you employed?

19   A.   Pardon me, ma'am?

20   Q.   How are you employed?

21   A.   I'm a -- with the Amtrak Police Department.  I'm a

22   detective.

23   Q.   How long have you been with Amtrak?

24   A.   Four years.

25   Q.   And the entirety of your four-year career with

1    Amtrak, have you been a detective?

2    A.    No, ma'am.

3    Q.    What did you start off as?

4    A.    As a patrol officer.

5    Q.    How long were you with patrol?

6    A.    About a year.

7    Q.    Now, Amtrak isn't really an organization that we

8    work with very often.  Can you tell us what your job duties

9    are as -- with being a detective with Amtrak?

10   A.    Yes, ma'am.  As far as Amtrak is concerned, any

11   crime committed along my area of responsibility that

12   pertains to the railroads or Amtrak trains, I go out on,

13   investigate, and proceed further follow-up needed or

14   charges need to be drawn or filed for.

15   Q.    And do you work with local law enforcement?

16   A.    Yes, ma'am.

17   Q.    Now, how many, if you can give an estimate, are

18   employed as detectives with Amtrak?

19   A.    Roughly about 40 or 50.

20   Q.    Are you the only one in our area?

21   A.    Yes, ma'am.

22   Q.    And what other areas do you cover?

23   A.    I am responsible for Nevada, Utah, and Wyoming.

24   Q.    And what kind of training have you received?

25   A.    I've gone through the police academy, Municipal

1    Police Academy in Pennsylvania.

2              I've gone through separate training with the

3    warrant -- First Judicial District Warrant Unit in

4    Philadelphia, numerous law enforcement trainings as far as

5    basics requirements to yearly upkeep, and also with

6    narcotics, tactical response trainings in Pennsylvania and

7    various other areas.

8    Q.    Now, with mentioning training from both Pennsylvania

9    and I believe you said maybe Maryland, or did I mishear

10   you?

11   A.    Yes, ma'am.  Maryland also.

12   Q.    Have you worked in law enforcement prior to your

13   employment with Amtrak?

14   A.    Yes.

15   Q.    And can you tell us --

16              THE COURT:  Excuse me a second.  Madam Clerk,

17   can you turn up the volume a little bit on our speaker

18   system?

19              COURTROOM ADMINISTRATOR:  Sure.

20              THE COURT:  All right.  Thank you.

21   BY MS. RACHOW:

22   Q.    And, sir, I had asked about your prior law

23   enforcement employment prior to working with Amtrak.

24   A.    Yes, ma'am.  I've worked in Philadelphia, and I've

25   also -- in Philadelphia, Pennsylvania, and also in Elkton,

8

1   Maryland.

2   Q.    And how long were you with those departments?

3   A.    Approximately four years each.

4   Q.    Are you familiar with the security measures taken by

5   Amtrak?

6   A.    Yes, ma'am.

7   Q.    And can you explain what those security measures

8   would be?

9   A.    Amtrak employs anywhere from uniform patrol to

10  canine units to mobile units, baggage screening units,

11  on-board screening units, and also detectives, plainclothes

12  or not.

13  Q.    Are passengers given any sort of notification about

14  the type of security measures Amtrak puts into place?

15  A.    Yes, ma'am.  There's information on their ticket

16  sleeve, and there's also signs along -- around every

17  station.

18  Q.    Now, sir, if I could have you provided with the

19  government's exhibits.

20        And if you could please turn to Exhibit 3 and

21  Exhibit 4A and 4B.  Are you familiar with those documents?

22  A.    Yes, ma'am.

23  Q.    And how are you familiar with those documents?

24  A.    These are the signs that are put up, and I believe

25  that's put up in the Reno station at Amtrak.

1    Q.    And would that be in reference to 4A and 4B?

2    A.    Yes.

3    Q.    And as far as Exhibit 3, are you familiar what's

4    contained in the Exhibit 3?

5    A.    Yes.  There's the ticket sleeve that once the

6    tickets are purchased they're slid into.  And --

7    Q.    Is that what --

8    A.    Yes.

9    Q.    -- Exhibit 3 is --

10   A.    Yes, I just --

11   Q.    -- it's the ticket --

12   A.    I just wanted to make sure the picture wasn't

13   anything more than the sleeve was.  Sorry.  Yes.

14   Q.    Thank you.  And are these true and accurate copies

15   of both a ticket sleeve and the photos of the signs posted

16   in the Reno --

17   A.    Yes, ma'am.

18   Q.    -- station?

19   A.    Yes.

20            MS. RACHOW:  I'd move for the admission of

21   Government's 3 and 4A and 4B.

22            MS. GORMAN:  Your Honor, I'll object with

23   respect to -- I don't think that enough foundation has been

24   laid with respect to the Reno ones.  I don't know exactly

25   where they are.  They look like they're inside.  And it

1    looks like this case involves a short stop on the platform.

2              So I don't think there's been a foundation laid

3    as to where these signs are and whether Mr. Estes has

4    actually received them.  We don't know --

5              MS. RACHOW:  Your Honor, that goes to argument,

6    not to admissibility.

7              THE COURT:  Well, it will go to admissibility if

8    there's no evidence of anyone having exposure to these.

9              What I'll do is I'll reserve the ruling at this

10   time.

11             MS. RACHOW:  Thank you.  As far as 3, though, is

12   3 admitted?

13             THE COURT:  Which one?

14             MS. RACHOW:  3 would be the ticket sleeve.

15             MS. GORMAN:  Your Honor, I'll just again note

16   it -- I don't know if there's been foundation about the

17   kind of ticket that Mr. Estes had or whether he would have

18   received a sleeve.  So I just don't know if that's been met

19   yet.

20             THE COURT:  All right.  The Court will reserve

21   ruling on that one as well.

22   BY MS. RACHOW:

23   Q.   And, sir, are you familiar with the ticketing

24   practices of Amtrak?

25   A.   Yes, ma'am.

1    Q.    And can you explain that when somebody receives a

2    ticket from Amtrak, such as when they go to a station to

3    pick up their ticket, can you tell us what kind of

4    documentation they receive?

5    A.    Yes, ma'am.  They receive a -- they receive a

6    printed out ticket showing their destination, where they're

7    starting from, where their final destination is to.  Maybe

8    multiple tickets.  It depends on what type of trip they're

9    taking.  And then it's placed into the sleeve.

10   Q.    And this is -- and the sleeve as exhibited in --

11   A.    Yes, in --

12   Q.    -- Exhibit 3?

13   A.    -- Exhibit 3, yes.

14   Q.    And this is standard procedure for Amtrak?

15   A.    Yes.

16   Q.    So when somebody would go to pick up their ticket,

17   they would receive their ticket, and it would be in this

18   ticket sleeve?

19   A.    Yes.

20          MS. RACHOW:  Your Honor, with that I would move

21   for the admission of Government's 3.

22          THE COURT:  All right.  I --

23          MS. GORMAN:  I believe there's --

24          THE COURT:  Go ahead.

25          MS. GORMAN:  It's just the same objection.  I

1    don't know if there's been any foundation as to whether

2    this ticket was picked up at the Amtrak station, whether it

3    was just purchased online.

4            I just -- I don't know if it's relevant

5    necessarily to this case at this point.

6            THE COURT:  Would you like to voir dire the

7    witness relative to alternative means by which this may or

8    may not have been attached with the ticket?

9            MS. GORMAN:  I think that would be appropriate,

10   Your Honor.

11           THE COURT:  All right.

12                    VOIR DIRE EXAMINATION

13   BY MS. GORMAN:

14   Q.    Detective Kurup, are there different ways people can

15   purchase tickets from Amtrak trains?

16   A.    Yes, ma'am.  You can buy the tickets that are

17   printed and put in the sleeves, and you can also do it

18   online where it is a paper printout.  Does not look like

19   this sleeve, does not come with the tickets, it's just a

20   paper ticket with bar code on it.

21           So when you enter the train -- it will have your

22   reservation and everything written on there.  And then

23   there's a small square bar code that the conductors can

24   scan, the same way they can scan your regular ticket.  So

25   you can use that or a regular ticket.

1    Q.    Okay.  Thank you.

2          And do you know in this case whether the ticket

3    was purchased online?

4    A.    Yes, ma'am, I do know it was not purchased online.

5    Q.    And how do you know that?

6    A.    Because he had a -- it was a printed out ticket that

7    comes in one of these sleeves.

8          MS. GORMAN:  So I think that's sufficient for

9    voir dire, Your Honor.

10         THE COURT:  All right.  It will be admitted.

11         (Government's Exhibit 3 received into

12         evidence.)

13              DIRECT EXAMINATION (CONTINUED)

14   BY MS. RACHOW:

15   Q.    And, sir, just to be clear, we haven't gotten to the

16   specifics of this case, we were just talking about the

17   general security measures that Amtrak puts into place and

18   how passengers are notified about these security measures;

19   is that correct?

20   A.    Yes, ma'am.

21   Q.    But you did testify that Mr. Estes had printed out

22   tickets.  Were they attached to a ticket sleeve?

23   A.    Yes.

24   Q.    Now, with Government's 3 being admitted, if I could

25   turn your attention to the language under "Security."

1     A.     Yes, ma'am.

2     Q.     And could you please tell us what -- and please read

3     that into the record what Amtrak notifies their passengers

4     of regarding the security measures in place.

5     A.     The entire --

6     Q.     The entire security paragraphs.

7     A.     "Amtrak has undertaken heightened security

8         measures for the benefit of our customers.  Among

9         these measures, Amtrak customers are required to

10        provide acceptable identification and

11        purchasing/obtaining tickets -- when

12        purchasing/obtaining tickets, whether in stations

13        or on board trains, or checking baggage."

14              MS. GORMAN:  Your Honor, I'm just going to

15    object on the hearsay basis at this point.

16              MS. RACHOW:  Your Honor, this is in evidence.

17              THE COURT:  Well, it's in evidence.  And because

18    it's in evidence, I'll let him read the portion that we're

19    talking about.

20              THE WITNESS:  "Acceptable forms of

21        identification include a valid driver's license,

22        passport, government agency ID and other specific

23        forms of identification.  Ask agent for details.

24              "Amtrak has in place a range of

25        behind-the-scenes and front-line security measures

1     aimed at improving passenger rail security, some of

2     which are conducted on an unpredictable or random

3     basis.  These include uniformed police officers and

4     K-9 units in stations and on trains, mobile

5     Security Teams, checked baggage screening, on-board

6     screening, security cameras and investments in

7     state-of-the-art security technology.  Passengers

8     may also be randomly selected to show

9     identification aboard trains, even after they've

10    shown identification earlier when obtaining their

11    tickets.

12         "Please be advised that randomly selected

13    passengers and their baggage, handbags, backpacks,

14    or other personal items may be screened or

15    inspected.  The inspection will be completed as

16    quickly as possible, usually less than a minute, in

17    a manner designed to respect passenger privacy as

18    much as possible.  Passengers failing to consent to

19    security procedures will be denied access to trains

20    and refused carriage, and a refund will be offered.

21         "For their safety and security, passengers

22    should remember to be aware of their surroundings,

23    to keep all personal items secure and in close

24    proximity, and not to approach or pet police dogs.

25    Any suspicious activity or unattended luggage

16

1          should be reported to Amtrak Police or personnel,

2          or by calling 1-800-331-0008."

3     Q.    Thank you.

4              Now, as in regard to the pictures in 4A and 4B,

5     are you familiar with the sign contained in those pictures?

6     A.    Yes, ma'am.

7     Q.    And are you familiar with the location of that

8     sign --

9     A.    Yes, ma'am.

10    Q.    -- in the Reno station?

11    A.    Yes.

12    Q.    Are you familiar with other Amtrak stations?

13    A.    Yes, a couple other.  A few.

14    Q.    Are you familiar with the Chicago station?

15    A.    Yes.

16    Q.    And does the Chicago station have this identical

17    poster or picture regarding the security displayed in the

18    Chicago station?

19    A.    Yes.  In numerous areas.

20    Q.    And these signs are universal throughout Amtrak?

21    A.    Yes.

22    Q.    So a sign in the Reno office would be the same as a

23    sign in the Chicago office?

24    A.    Yes.

25              MS. RACHOW:  With that I'd move for the

1    admission of 4B.

2              MS. GORMAN:  Your Honor, again I'm just going to

3    object.  Also, this sign looks like it's inside.  And this

4    entire encounter took --

5              THE COURT:  No.  It's --

6              MS. GORMAN:  -- place on the platform.

7              THE COURT:  It's not admissible at this time.

8    Further foundation would be necessary.

9    BY MS. RACHOW:

10   Q.    Sir, with this sign, is it directed to passengers?

11   A.    Yes.

12   Q.    And what type of information is contained in the

13   sign?

14             MS. GORMAN:  Your Honor, I'm objecting to

15   hearsay at this point.  I mean, we haven't established

16   where the sign is, if Mr. Estes --

17             THE COURT:  Sustained.

18             MS. GORMAN:  -- could see it.

19   BY MS. RACHOW:

20   Q.    Sir, are you aware if this sign is universal with

21   Amtrak?

22   A.    Yes.

23   Q.    And is this sign placed in all Amtrak stations?

24   A.    Yes.

25   Q.    Across the country?

1    A.    Yes.

2    Q.    This same exact sign?

3    A.    Yes.

4    Q.    And what is the basis or what is the purpose of this

5    sign?

6    A.    To advise that -- what passengers may be

7    encountering as far as security checks, what type of

8    security checks, what type of Amtrak Police presence they

9    may see.

10   Q.    And this --

11   A.    For security purposes.  Sorry.

12   Q.    I'm sorry.  And the sign is displayed in every

13   station?

14   A.    Yes.

15         MS. GORMAN:  Your Honor, asked and answered.

16         THE COURT:  This has been asked and answered,

17   Ms. Rachow.  You're going to have to tie it to exposure to

18   this particular defendant if you want to get it in

19   evidence.

20         MS. RACHOW:  Thank you, Your Honor.  I'll move

21   on.

22   BY MS. RACHOW:

23   Q.    And does Amtrak have a policy regarding travelling

24   with firearms?

25   A.    Yes, they do.

1   Q.    And can you tell us about that.

2   A.    Yes.  It has to be reported at least 24 hours prior

3   to travel.  It can only travel in checked-in baggage.  It

4   has to be in an approved case, hard-shell case, and locked.

5   It cannot contain ammunition.  It cannot be loaded.

6             And they also have to fill out a declaration

7   also when checking in.

8   Q.    And if a passenger is found to be in violation of

9   the firearms policy, can they be removed from the train?

10  A.    Yes.

11  Q.    And would a violation of firearms policy be carrying

12  a firearm in your carry-on luggage?

13  A.    Yes.

14  Q.    Were you on duty December 4th of 2014?

15  A.    Yes, ma'am.

16  Q.    And what were your job duties?

17  A.    I was working an interdiction detail, drug

18  interdiction detail.

19  Q.    What does that mean?

20  A.    That means I work with the Northern Nevada

21  Interdiction Task Force, and we look for people

22  transporting illegal contraband or the profits made

23  currency-wise across the --

24  Q.    Profits made from illegal --

25  A.    From the --

1    Q.    -- contraband?

2    A.    -- sales of illegal contraband, yes.

3    Q.    Have you had any specialized training regarding

4    working interdiction on the trains?

5    A.    Most of the training is on the job.  Also attended

6    conferences, the INIA conference.

7    Q.    What is that?

8    A.    International Narcotics Interdiction Association.

9    Q.    And how often is that training held?

10    A.    That is yearly.

11    Q.    And how many years have you gone?

12    A.    I have only gone once.

13    Q.    What type of information is given at this type of

14    training?

15    A.    All types of -- information regarding drug

16    interdiction on trains, busses, planes, parcels.

17    Q.    And as part of the training, do they tell you what

18    indicators to look for?

19    A.    Yes.

20    Q.    And does Amtrak participate in joint interdiction

21    teams across the country?

22    A.    Yes, ma'am.

23    Q.    Why is Amtrak a member of joint interdiction teams?

24    A.    Because they believe in stopping the flow of illegal

25    contraband through the trains, which is evident.

1    Q.    When you say it's evident, what do you mean?

2    A.    From the amount of seizures we get across the -- not

3    just in Reno, but we have teams in California and Florida,

4    New York, New Jersey, DC, Texas.  And all of the -- we see

5    seizures of all types of illegal contraband and profits

6    made.

7    Q.    How long have you been working interdiction on the

8    trains?

9    A.    Three years.

10   Q.    Has it all been in Reno area?

11   A.    Yes, ma'am.

12   Q.    And what is the first step you perform when you

13   would start an interdiction investigation?

14   A.    Check the train manifest.

15   Q.    And what is the train manifest?

16   A.    The train manifest, when you print it up, initially

17   it is a list of all the passengers on board.  And then from

18   that point on, I check further depending on -- we check --

19   or, sorry, I, I check the rooms, the people travelling and

20   the passengers.

21   Q.    I'm going to back you up just one step.

22   A.    Uh-huh.

23   Q.    So when you run the manifest for the passengers, you

24   get the name of everybody who is on board the train; is

25   that correct?

1    A.    That's correct.

2    Q.    And you mentioned something about rooms.  Why would

3    that be important to you?

4    A.    Because rooms, they have more privacy, more chances

5    to hold luggage, if they want to conceal it from other

6    people, won't be bothered as much.  And so we check the

7    rooms.  We check the passengers in the room.

8    Q.    And do you check every single passenger on the

9    manifest?

10   A.    In the rooms, yes.

11   Q.    And what are you looking for?

12   A.    Different indicators.  Depending on last-minute cash

13   purchases, close to travel, third-party purchases.  Let's

14   see.  Last-minute cash.  Couple days prior.  Closer.

15   Third-party purchases.  Excuse me.  Unattended stations,

16   where there's no personnel or anybody there, where they can

17   just get onto the train and continue their travel without

18   being bothered.

19   Q.    And do you also look to see whether a ticket is one

20   way or round trip?

21   A.    Yes.

22   Q.    Why are these things that you've mentioned, why are

23   you looking specifically for these?

24   A.    These are the indicators that we found consistent

25   with people that travel on Amtrak with the purpose of, you

1    know, transporting illegal contraband or the profits made

2    from the sales of them.

3    Q.    And during your trainings, are you given indications

4    that these are the type of indicators that you should be

5    looking for?

6    A.    Yes.

7    Q.    And that's from an international interdiction

8    association?

9    A.    Yes.  Along with on-the-job training.

10   Q.    When you say on-the-job training, what does that

11   mean as regards to these indicators in the manifest?

12   A.    When I arrived in Reno the gentlemen that were

13   already working interdiction, learning from them, and then

14   running the manifest myself and seeing that these

15   indicators do actually show -- hold true.

16   Q.    And when you say they hold true, when you flag a

17   reservation that has these certain indicators, what is your

18   next step?

19   A.    We attempt to contact the person.

20   Q.    And have you done any other sort of background on

21   the person at this point?  Like, have you been able to pull

22   a photograph for them or run their criminal history?

23   A.    For the westbound morning train, not really.

24   Q.    And why not on the westbound morning train?

25   A.    Just the time restraint that we have for the most

1    part.

2    Q.    And the train that Mr. Estes was on that we're

3    discussing today, was that the westbound morning train?

4    A.    Yes, ma'am.

5    Q.    What is the average number of passengers on a

6    manifest?

7    A.    On an average day, anywhere from 100 to 200

8    passengers.

9    Q.    And out of that 100 to 200 passengers, how many

10   reservations that you review have had these indicators?

11   A.    At the most, five to six.

12   Q.    So out of the 100 to 200 people, at the most you'd

13   have five to six that have these indicators?

14   A.    Yes, ma'am.

15   Q.    Now, once you've made the decision that this is a

16   person that you want to do a follow-up investigation on,

17   what do you do?

18   A.    We attempt to make contact with them at the room.

19   Q.    And why at the room?

20   A.    That's where we know them to be as where the

21   manifest would show.  That's the room they're staying in.

22   Q.    And if there isn't anybody in that room by the time

23   you approach the room, what do you do?

24   A.    Then we go down to the platform because when the

25   train comes in to Reno, the train stops, passengers come

1    off for a breath of fresh air, smoke a cigarette, whatever

2    the case may be, just to stretch their legs.

3    Q.    Is there an average length of the stop in Reno?

4    A.    No.  It changes because the train schedule,

5    sometimes it's not on time.

6    Q.    Now, going back to December 4th of 2014, did you run

7    the manifest for the westbound Amtrak train, which would be

8    Number 5?

9    A.    Yes.

10   Q.    And did the Shaun Estes reservation draw your

11   attention?

12   A.    Yes, ma'am.

13   Q.    If you could please turn to Exhibit 2.

14         Are you familiar with Government's Exhibit 2?

15   A.    Yes, ma'am.

16   Q.    And how are you familiar with this document?

17   A.    This was the reservation that was pulled for Shaun

18   Estes.

19   Q.    Is this a true and accurate copy of the reservation

20   you were able to pull for Shaun Estes on December 4th of

21   2014?

22   A.    Yes, ma'am.

23   Q.    And are there notes on this particular reservation?

24   A.    There are.

25   Q.    Are you familiar with the notes on that reservation?

1    A.    Yes.

2    Q.    And what are those notes in relation to?

3    A.    The -- Mr. Estes' name is circled.  The name

4    Christina Rogers is circled.  That is the person, as far as

5    Amtrak is concerned, that purchased the ticket.

6          The other notes that are written, December 2nd

7    is circled.  That's the date of travel from Chicago.  And

8    later on down the road, I believe the notes were made for

9    about -- we -- we were under the assumption that he

10   traveled from Chicago to begin --

11   Q.    I'm going to stop you.

12         Are you familiar with these notes?

13   A.    Yes.

14   Q.    Do you know who wrote these notes?

15   A.    Yes.

16   Q.    And would it have been your partner, Detective

17   Moore, that wrote these notes?

18   A.    That is correct.

19   Q.    And are the items that are noted on this particular

20   reservation, are those the factors that you look for when

21   looking to see if there's a passenger you want to do a

22   follow-up conversation with?

23   A.    That's correct.

24         MS. RACHOW:  I would move for the admission of

25   Government's 2.

1          MS. GORMAN:  Your Honor, I would just -- I think

2     just some clarity.  If I could voir dire him on the notes

3     on the ticket because --

4               THE COURT:  Go ahead.

5                    VOIR DIRE EXAMINATION

6     BY MS. GORMAN:

7     Q.    So, Detective Kurup, there's notes on this printout;

8     is that correct?

9     A.    That's correct.

10    Q.    So were these notes made on the actual piece of

11    paper?

12    A.    Yes.

13    Q.    That was the printout?

14    A.    Yes.

15    Q.    So I'm going to direct you to just looking at the

16    copy with the reference notes.  It looks like the writing

17    is outside of the page, like these were notes made -- so

18    it's your testimony that these were notes made on the

19    actual printout of this piece of paper?

20    A.    Yes.

21              MS. GORMAN:  Your Honor, we'll --

22              THE COURT:  Well, it's obvious that they weren't

23    on the original.  You can attempt to clear it up.

24              I'm inclined to admit it with the exclusion of

25    the notes, which the Court would treat as excluded until

1      that's clarified.  But I think the reservation form is

2      sufficiently identified to be -- and the routine

3      information on there has been sufficiently identified.

4                   MS. GORMAN:  I agree, Your Honor.  But with

5      respect to the notes written on it, it's -- I mean, we

6      would object to that, and that's the form of the exhibit.

7                   THE COURT:  I'll admit it subject to further

8      clarification concerning the notes and other information

9      that's on the exhibit.

10                  (Government's Exhibit 2 (absent the notes)

11                  received into evidence.)

12                  MS. RACHOW:  Thank you, Your Honor.

13                      DIRECT EXAMINATION (CONTINUED)

14     BY MS. RACHOW:

15     Q.    And, sir, is it fair to say that this is a

16     photograph of the actual printout of the reservation?

17     A.    Yes.

18     Q.    And there are items that are behind the photocopy?

19     A.    Yes.

20     Q.    And is that the entirety of the document, including

21     what -- the notes are not necessarily on the document

22     itself, they may be above the document on a separate piece

23     of paper?

24     A.    Yes.

25     Q.    And with that -- Your Honor, Court's indulgence.

1          Your Honor, to complete the record, if I could

2     have the witness look at 2A, which has just been shown to

3     the defense.

4          This is not a Bates stamped copy, but this is an

5     actual printout of the reservation that was used in the

6     photograph --

7          MS. GORMAN:  Your Honor, I'm going to object,

8     just on a discovery violation.  We never received it.  We

9     received the photograph of it, which was actually hard for

10    us to work with.  But we never had an original printout

11    provided in discovery at all during this case.

12          THE COURT:  All right.

13          Ms. Rachow?

14          MS. RACHOW:  Your Honor, I don't have the Bates

15    stamped copy because I printed things out separately.

16          The information has been provided to the defense

17    in the photograph, which is an accurate copy of this.  We

18    can just go off the exhibit --

19          THE COURT:  The only issue --

20          MS. RACHOW:  -- that's been previously marked --

21          THE COURT:  -- on Exhibit 2 are the notes.  I

22    don't know who put those notes there.  I don't know why

23    they're there.  I suspect the witness probably knows that.

24    Why don't you just ask him that.

25          And the exhibit's admitted anyway.  I just

1    indicated that as to the notes I will treat them as

2    excluded until they've been made admissible.

3    BY MS. RACHOW:

4    Q.    Sir, do you know who made the notes?

5    A.    Yes, ma'am.  Detective Moore.

6    Q.    And is he your partner?

7    A.    Yes, ma'am.

8    Q.    Are you familiar with those notes?

9    A.    Yes, ma'am.

10   Q.    And since the document has been admitted, with the

11   exception of the notes, can we go through the type of

12   information that is on this exhibit?

13   A.    Yes.

14   Q.    Now, you mentioned indicators before; correct?

15   A.    Yes, ma'am.

16   Q.    And that Mr. Estes' reservation had specific

17   indicators that you were looking for?

18   A.    That's correct.

19   Q.    Can you tell us what they are as displayed in that

20   exhibit?

21   A.    Yes.  One was the date it was purchased was a few

22   days prior to travel.  The other one is why Christina

23   Rogers' name is circled, third-party purchase.  She lives

24   in --

25              MS. GORMAN:  Your Honor, I'm just going to --

1    this witness has to testify based on his personal

2    knowledge.  And now he's reading Detective Moore's notes.

3    So I'm just going to object based on --

4              THE COURT:  Well, he's --

5              MS. GORMAN:  -- I don't think this witness --

6              THE COURT:  -- reading from what's been

7    admitted.  And I'll allow it for that purpose.

8              THE WITNESS:  She lives --

9              MS. RACHOW:  Your Honor, is this -- I'm sorry.

10   BY MS. RACHOW:

11   Q.    Sir, just to clarify, you were the one who reviewed

12   Mr. Estes' reservation; correct?

13   A.    That's correct.

14   Q.    And this is a photocopy of his reservation?

15   A.    That's correct.

16   Q.    And you noted indicators on Mr. Estes' reservation

17   that led you to believe you needed to talk to him a little

18   bit further?

19   A.    Yes.

20   Q.    And so you are testifying about your own personal

21   observations from the indicators on this exhibit?

22   A.    That's correct.

23   Q.    And you were talking about the Christina Rogers'

24   information?

25   A.    Yes.

1     Q.    Can you please --

2     A.    Chris --

3     Q.    -- tell us what you were looking at?

4     A.    One being a third-party purchase, the second

5    Christina Rogers lives in -- I'm sorry, but I can't -- due

6    to the copy, what part of Pennsylvania she lives in, but

7    she lives in Pennsylvania.  It's not an area that he was

8    travelling in either.

9          Again, the date it was purchased, the amount it

10   was purchased for.

11    Q.    Why is the amount that it was purchased for of

12   interest to you?

13    A.    It's quite a large amount when flying would have

14   been more convenient and cheaper.  So it's just an

15   indicator to ask for.

16    Q.    During the years that you've been working

17   interdiction, as well as your training and experience, has

18   it been common to find people with contraband who had

19   similar indicators on their tickets?

20    A.    Yes.

21    Q.    And how much did this one-way ticket cost?

22    A.    $970.

23    Q.    Did you decide to make contact with Mr. Estes?

24    A.    Yes.

25    Q.    And why did you decide to make contact with him?

1    A.    Because the indicators that were on his reservation.

2    Q.    Had you run a criminal history check of Mr. Estes?

3    A.    No.

4    Q.    And did you have a DMV search done of Mr. Estes?

5    A.    No.

6    Q.    Did you have a photograph --

7    A.    No.

8    Q.    -- of Mr. Estes?

9          Did you have any idea who Mr. Estes was?

10   A.    No, ma'am.

11   Q.    How did you go about approaching Mr. Estes?

12   A.    Once we were on the platform, the train came in and

13   people came out, I observed Mr. Estes out there smoking a

14   cigarette.

15   Q.    And just for the record, you're calling him

16   Mr. Estes, but you did not know he was Mr. Estes at the

17   time?

18   A.    No, I did not.  I'm sorry.  No.

19   Q.    From Mr. Estes' reservation did you know where he

20   was seated on the train?

21   A.    Yes.

22   Q.    And what car he was located in?

23   A.    He was in the 531 car, room number 10.

24   Q.    So the train pulls into the station.  People get off

25   the train.  What happens next?

1   A.      Then we would go up to the room to make contact with

2   the person because that's the -- where we think the best

3   chance of where they would be.

4   Q.      And that's because you've never met this person and

5   you don't know who they are?

6   A.      That's correct.

7   Q.      In this case was Mr. Estes in the room?

8   A.      No.

9   Q.      And what did you do next?

10  A.      Saw Mr. Estes outside smoking the cigarette, smoking

11  a cigarette.  Or the individual right there.  And I

12  contacted him.  I approached him.  I showed him my badge

13  because I was in a plainclothes capacity.

14  Q.      And I'm going to stop you right there.

15          You're out on the platform at this point; is

16  that correct?

17  A.      That's correct.

18  Q.      Are there other people around?

19  A.      Yes.  Detective Moore, Officer Hill was somewhere

20  around there, and other passengers that came off the train

21  and passengers trying to get on the train.

22  Q.      Who is Officer Hill?

23  A.      Officer Hill is a canine officer for Reno.

24  Q.      And had you called the canine officer to be at the

25  station?

1     A.     He regularly comes to the station with us.

2     Q.     And when you are working at the passenger manifest,

3     do you speak to the canine officer in any way?

4     A.     No.

5     Q.     And while you were out on the platform, were you

6     standing with the canine officer?

7     A.     No.

8     Q.     And is the canine officer in uniform?

9     A.     Yes.

10    Q.     Now, you mentioned you're in a plainclothes unit.

11    What does that mean?

12    A.     We work a plainclothes capacity; so we're in regular

13    street clothes.

14    Q.     And why is that?

15    A.     It's so we don't cause too much attention.  We keep

16    the interaction consensual.  It's not embarrassing for this

17    person we're speaking to.

18               MS. GORMAN:  Your Honor, I'm going to object.

19    Consent is a legal term.  I'm just going to ask that the

20    witness stick to the actual facts that he can describe.

21               THE COURT:  That's a fair objection.  Sustained.

22               Let me caution you, Detective Kurup, just

23    describe the action that you take.

24               THE WITNESS:  Yes, sir.

25               When I decide to make contact with somebody, I

1   approach.  I introduce myself.  Since we are in plain

2   street clothes, I shortly produce my badge.  It's clipped

3   on my hip.  I take it out, put in it my hand.  I show it to

4   the individual, and then I place it right back and cover it

5   back up.

6   BY MS. RACHOW:

7   Q.    And do you introduce yourself?

8   A.    Yes.

9   Q.    And what type of voice are you using?  What tone?

10  A.    Same voice I'm using here.  Just a normal tone.

11  Q.    Do you display a firearm?

12  A.    No.

13  Q.    Do you display any other police attire?

14  A.    No.

15  Q.    After you display your badge, do you keep your badge

16  out?

17  A.    No, ma'am.  I clip it right back on my belt and then

18  cover it back up with my shirt or sweatshirt.

19  Q.    Now, you work with a partner; is that correct?

20  A.    Yes.

21  Q.    And why do you work with a partner?

22  A.    For safety reasons.  And also that part of the task

23  force, it's different agencies involved so --

24  Q.    Who was your partner on December 4th?

25  A.    Detective Moore.

1    Q.    Now, when you made contact with this individual, who

2    is later identified as Mr. Estes, did you know where

3    Detective Moore was?

4    A.    Yes.  He was about several feet back and off to the

5    side.

6    Q.    So he wasn't with you speaking with Mr. Estes?

7    A.    No, he was not.

8    Q.    And I believe you stated that you don't recall

9    exactly where the canine officer was?

10   A.    No.  He's usually out of sight.

11   Q.    When you approached this male on the platform, did

12   you know it was Mr. Estes?

13   A.    No, I did not.

14   Q.    After you made contact with him, what did you say to

15   him?

16   A.    Again, I introduced myself.  I asked if I may speak

17   with him.

18   Q.    And did he make any response?

19   A.    He said yes.  He replied yes.

20   Q.    Do you recall if he was on the phone?

21   A.    No, he was smoking a cigarette.

22   Q.    After he agreed to speak with you, what did you do

23   next?

24   A.    I then asked -- I then asked him if I could see his

25   train ticket and form of ID.

1    Q.    And did you threaten him in any way?

2    A.    No.

3    Q.    Did you ask him just like you're testifying here

4    today?

5    A.    Yes, ma'am.

6    Q.    And did he agree to show you his train ticket and

7    his ID?

8    A.    He did.

9    Q.    Did you review those items?

10   A.    Yes.

11   Q.    And at that point were you able to identify him as

12   Mr. Estes?

13   A.    Yes.

14   Q.    Do you see Mr. Estes here today in court?

15   A.    Yes, I do.

16   Q.    Can you please state where Mr. Estes is located and

17   what he's wearing?

18   A.    He's sitting with the two defense attorneys, and

19   he's wearing, I believe, orange-color shirt.

20              MS. RACHOW:  May the record reflect the

21   witness's identification of the defendant?

22              THE COURT:  The record will so show.

23   BY MS. RACHOW:

24   Q.    After you reviewed Mr. Estes' ticket and his ID,

25   what did you do with those items?

1    A.    I gave it back to him.

2    Q.    So as soon as you looked at them, you gave them back

3    to him?

4    A.    Yes, ma'am.

5    Q.    You did not keep them?

6    A.    No, ma'am.

7    Q.    What did you say next to Mr. Estes?

8    A.    I advised Mr. Estes as to the purpose of my contact.

9    Q.    And what is that?  What did you say to him?

10   A.    The fact that we look for people transporting

11   illegal contraband across the train or the profits made

12   from sale of illegal contraband.

13   Q.    Did you explain to him why you specifically were

14   talking to him?

15   A.    Yes, I explained these are some of the indicators

16   that we're looking for and that his reservation had some of

17   those indicators.

18   Q.    Did you talk to him about the specific indicators?

19   A.    Yes.  About the one-way travel, he purchased it a

20   couple days before, the fact it was a third-party purchase.

21   Q.    And is this something you commonly do with people

22   you're interacting with?

23   A.    Yes, ma'am.

24   Q.    Do people usually respond when you mention the third

25   party purchased the ticket?

1   A.    Yes, ma'am.  If it's somebody that they know,

2   they'll say, oh, that's so and so, as a relative, as a

3   wife, husband, some type of relative, and they'll be able

4   to tell me who it is and such.  They'll usually offer up

5   the information.

6   Q.    Did Mr. Estes give you any information about his

7   reservation?

8   A.    No, ma'am.

9   Q.    Did he say anything to you?

10  A.    He advised that he wasn't in possession of anything

11  illegal.

12  Q.    And how was the conversation at this point?  Was the

13  voices raised?  Was there anything threatening on your

14  part?

15  A.    No.  My voice wasn't raised.  Mr. Estes' voice

16  wasn't raised.  It was just a normal conversation.

17  Q.    Were you standing in a way that would allow

18  Mr. Estes to leave if he chose to?

19  A.    Absolutely.

20  Q.    Now, after Mr. Estes told you that he wasn't in

21  possession of anything illegal, what did you do?

22  A.    I then asked Mr. Estes if it was okay if we searched

23  his room and his luggage.

24  Q.    And do you do that on pretty much every contact you

25  have when you're running an interdiction investigation?

1    A.    Yes.

2    Q.    And what did Mr. Estes say?

3    A.    He said no.

4    Q.    Did you notice anything about his demeanor that

5    would lead you to believe he was scared?

6    A.    No.

7    Q.    Intimidated?

8    A.    No.

9    Q.    Was he making eye contact with you?

10    A.    Yes.

11    Q.    What was the next thing you did?

12    A.    I then advised him of the next step we take is,

13    which we would call in a canine to do a scan of the room or

14    the hallway, and that if the canine alerted on the room

15    that we would seize the items and obtain a search warrant

16    for them.

17    Q.    And why did you tell him this?

18    A.    That's the next step that we take.  We just advise

19    them that's what we would do.

20    Q.    Was it to try to coerce him in any way?

21    A.    No, ma'am.

22    Q.    Did he express any interest about the canine?

23    A.    He said he wanted to watch the scan, when the dog

24    did a scan of the hallway and of the room.

25    Q.    And did you -- what did you say to him in response

1    to that?

2    A.    We agreed.

3    Q.    So what happened next?

4    A.    Before we started the scan, I know that Mr. Estes'

5    room was open.  So we asked him, "Would you like to leave

6    the door open or would you like to close it?"  He advised

7    he wanted it closed.  And then --

8    Q.    And was that done?

9    A.    Yes.  Prior to the scan, yes.

10   Q.    And was the canine officer already on the scene?

11   A.    Yes.

12   Q.    So there was no delay in having the canine?

13   A.    No, ma'am.

14   Q.    And is this something you typically do on a daily

15   basis?

16   A.    Yes, ma'am.

17   Q.    Now, when the canine is deployed, do you recall

18   where you were located?

19   A.    Yes.  When we come up the steps to the second level

20   of the car, right at the top of the steps, there's a little

21   bit of space, a little bit more leeway.  That way we could

22   stand up there and not black -- block the flow of traffic,

23   for any passengers to move along.

24            And so myself and Detective Moore were there.

25   And Mr. Estes was there also.

1    Q.    And just to be clear, Mr. Estes had asked if he

2    could come up and watch?

3    A.    Yes.

4    Q.    Did you restrict Mr. Estes' movement in any way?

5    A.    No, ma'am.

6    Q.    And where were you standing in relation to

7    Mr. Estes?

8    A.    I believe I was standing in front of him, closer

9    towards the hallway.

10   Q.    And did you try to stay out of Mr. Estes' personal

11   space?

12   A.    Yes.

13   Q.    And did you block Mr. Estes in any way?

14   A.    No, ma'am.

15   Q.    Could you see where your partner was?

16   A.    Yes.

17   Q.    And where was Detective Moore?

18   A.    He was across from me.

19   Q.    And was he blocking Mr. Estes in any way?

20   A.    No, ma'am.

21   Q.    Had you taken Mr. Estes' phone?

22   A.    No, ma'am.

23   Q.    Were you looking through Mr. Estes' phone?

24   A.    No, ma'am.

25   Q.    What were you doing?

1    A.    Watching the scan.

2    Q.    And how long did the scan take?

3    A.    Approximately about a minute, maybe a minute and a

4    half.

5    Q.    Now, can you delay the train leaving if you want to

6    conduct a canine search?

7    A.    Yes.

8    Q.    And did you do that in this case?

9    A.    No, ma'am.

10   Q.    This was still during the normal scheduled stop of

11   this train?

12   A.    Yes, ma'am.

13   Q.    After the canine did the scan, did the canine

14   officer remain on scene?

15   A.    No, ma'am.

16   Q.    Did they immediately leave the train?

17   A.    Yes.

18   Q.    And did you have further conversation with

19   Mr. Estes?

20   A.    Detective Moore advised Mr. Estes that -- about what

21   happened with the canine scan.  He --

22   Q.    And what happened?

23   A.    He told Mr. Estes that the canine showed interest in

24   the room.  And Mr. Estes told us that he had a small

25   personal-use amount of marijuana in the room.  And then I

1    asked him again if I may search the room.  And he agreed.

2    Q.    Why did you ask him again for consent to search?

3    A.    Just asked him because -- now that we knew that

4    there was marijuana in there.

5    Q.    And he told you that he had a small amount of

6    marijuana?

7    A.    Yes.

8    Q.    Did you threaten him again or say anything along the

9    lines of the fact that the dog had shown interest so you

10   were going to get a warrant and seize his items?

11   A.    No, ma'am.

12   Q.    Is the only time you mentioned anything about the

13   canine, if the canine alerted, and if there -- you would do

14   an application for a search warrant, was that prior to the

15   canine deployment?

16   A.    Yes, ma'am.

17   Q.    And you are confident you did not tell him --

18             MS. GORMAN:  Your Honor, asked and answered.

19             MS. RACHOW:  Your Honor, this is a very

20   important point.  And I just want to make sure we're all

21   very clear.

22             THE COURT:  I think it is clear.

23             MS. RACHOW:  Thank you, Your Honor.

24   BY MS. RACHOW:

25   Q.    You asked Mr. Estes' permission to search.  And what

1    did he say?

2    A.    He said, yes.  He agreed.

3    Q.    And what happened next?

4    A.    I followed Mr. Estes back to the room.  When we got

5    to the room, the -- I observed there was a red duffel bag

6    on top, on the top bed.  There was two separate beds.

7    Q.    Now, you are going back to the room with Mr. Estes.

8    Have you detained him in any way?

9    A.    No, ma'am.

10   Q.    Do you have handcuffs on him?

11   A.    No, ma'am.

12   Q.    Have you told him he must come with you?

13   A.    No, ma'am.

14   Q.    And where is he in relation to you when you guys are

15   walking back towards the room?

16   A.    He is in front of me.

17   Q.    When you guys get to the room, is he the one who

18   opens the door?

19   A.    Yes, ma'am.

20   Q.    And then you mentioned you saw this red bag?

21   A.    Yes.

22   Q.    On the top bunk?

23   A.    Yes, ma'am.

24   Q.    What happened then?

25   A.    Mr. Estes grabbed the bag, put it back onto the

1    bottom -- onto the bottom bunk.  Then he removed a

2    gray-in-color Zales jewelry box and opened it and gave me

3    the small bag of weed, of marijuana.

4    Q.    Where did he remove the Zales bag from?

5    A.    From one of the side pockets.

6    Q.    Of the red bag?

7    A.    Yes, of the red duffel bag.

8    Q.    But to be clear, he was the one who removed the bag?

9    He was the one who opened the bag?

10   A.    Yes, ma'am.

11   Q.    After he showed you the marijuana, what did you do?

12   A.    I continued on with -- oh, I put the marijuana down,

13   placed it right back on the box, and just moved it to the

14   side, and continued on with the search.

15   Q.    Did you tell Mr. Estes anything about the small

16   amount of marijuana?

17   A.    No.  Not at the time.

18   Q.    Did you tell him he was under arrest?

19   A.    No.

20   Q.    Did you put him in handcuffs?

21   A.    No.

22   Q.    Did you tell him that you were going to kick him off

23   the train?

24   A.    No.

25   Q.    Now, when you went into the bag, what did you find?

1    A.    I found personal items, clothing.  And then one of

2    the items was a blue pair of jeans, PD something brand of

3    jeans.

4          In the front left pocket I found a Sig Sauer 9

5    millimeter handgun, one with the magazine inserted into it.

6    There was no round chambered in it.

7          And at that point I advised Detective Moore of

8    what I found and told him that -- and told Mr. Estes that

9    he was in violation of the Amtrak firearms policy because

10   there was nothing on his record about saying that he

11   checked in a firearm or registered a firearm with Amtrak

12   travelling.

13   Q.    And when earlier you were talking about the Amtrak

14   firearms policy, you were very clear that if a person is

15   going to be carrying with a firearm they need to have a

16   declaration form filled out?

17   A.    Yes.

18   Q.    And when you were running the passenger manifest,

19   were you able to see or tell if any of the reservations

20   would have had a firearm declaration?

21   A.    Yes.

22   Q.    And Mr. Estes did not?

23   A.    No, ma'am.

24   Q.    So this was a violation of the firearms policy?

25   A.    Yes.

1    Q.    Was the decision made that he was going to be

2    removed from the train?

3    A.    Yes, ma'am.

4    Q.    And why was he going to be removed from the train?

5    A.    For the violation of the firearms policy.

6    Q.    Is that within your discretion to do as a detective

7    with Amtrak?

8    A.    Yes, ma'am.

9    Q.    Where was Detective Moore at this point?

10   A.    Detective Moore was outside -- near the outside of

11   the room at this point.

12   Q.    And what happened now that you found this firearm

13   and you have this violation of the policy?

14   A.    We were going to remove him from the train, so we

15   made sure that all of his items were taken with him to

16   remove from the train.  And we were going to go

17   downstairs -- Detective Moore suggested we go downstairs

18   and talk to him because that's where we were going to exit

19   the train from.

20   Q.    Has anything about the manner that -- in which

21   you're speaking to Mr. Estes changed at this point?

22   A.    No.

23   Q.    Have you threatened to arrest him?

24   A.    No.

25   Q.    Are you -- do you have him detained?

1    A.    No.

2    Q.    Have you handcuffed him?

3    A.    No.

4    Q.    And you said that Detective Moore suggested that you

5    went downstairs?

6    A.    Yes.

7    Q.    And could you hear Mr. Estes' response?

8    A.    Mr. Estes agreed.  I don't know exactly what he

9    said.

10   Q.    And did you remove Mr. Estes' items from his room?

11   A.    Yes.

12   Q.    When you got downstairs, what happened?

13   A.    We went downstairs and Detective Moore was speaking

14   with Mr. Estes.  Detective Moore ran -- checked with the

15   local RPD system, or had them check NCIC to see if

16   Mr. Estes had any wants or warrants, which he did not.  And

17   dispatch advised Detective Moore that Mr. Estes had a prior

18   felony.

19   Q.    With that, had you been able to exit the train?

20   A.    At that point no.

21   Q.    And why could you not exit the train?

22   A.    The train had already been moving.

23   Q.    Now, prior to receiving a records check that

24   Mr. Estes had a previous felony conviction, was Mr. Estes

25   in handcuffs?

1    A.    No.

2    Q.    Was he under arrest?

3    A.    No.

4    Q.    Was Mr. Estes speaking with you and Detective Moore?

5    A.    Yes.

6    Q.    Did he appear to be scared of you?

7    A.    No.

8    Q.    And Mr. Estes is a fairly large person; is that

9    true?

10   A.    Yes.

11   Q.    After it was determined that he was a convicted --

12   or that he had a prior conviction for a felony, what

13   happened?

14   A.    Then he was placed under arrest.  He was put into

15   handcuffs.

16   Q.    And where were you all at this point?

17   A.    At the same -- in the same lower level, near the

18   exit of the bottom level of the car.

19   Q.    How was the train going to be stopped so you all

20   could get off?

21   A.    I contacted the conductor and let him know that the

22   train had to be stopped as soon as possible.  We stopped in

23   Verdi.

24   Q.    Now, while you're all on the train, has anyone read

25   Mr. Estes his Miranda rights?

1     A.    No.

2     Q.    Are you speaking to Mr. Estes?

3     A.    At this point?

4     Q.    Yes.

5     A.    No.

6     Q.    And this is after he's been arrested, just to be

7     clear?

8     A.    Yes.

9     Q.    Do you ask him any questions?

10    A.    No.

11    Q.    Does Mr. Estes make any statements?

12    A.    Mr. Estes, at one point, I know, advised that he --

13    the gun was for personal protection.  He purchased it from

14    a pawn shop in Arkansas for about $200, I believe.

15    Q.    And did you ask him any follow-up questions?

16    A.    No.

17    Q.    Was the train stopped?

18    A.    Yes.

19    Q.    And where did the train stop?

20    A.    In Verdi.

21    Q.    What happened when the train stopped in Verdi?

22    A.    We exited the train.  We were met by Officer Welch.

23    And I believe Officer Hill was there also.  And Officer

24    Welch was going to be transporting Mr. Estes back.

25    Q.    And is that common procedure?

1    A.    Yes, in a situation like this.

2    Q.    Was Mr. Estes given his Miranda rights after you all

3    had gotten off the train?

4    A.    Yes.

5    Q.    Were you the one who did that?

6    A.    No.

7    Q.    Could you hear your partner doing that?

8    A.    Yes.

9    Q.    And could you hear Mr. Estes' response?

10    A.    He advised that he understood his Miranda rights.

11    Q.    Did he agree to speak with Officer -- or, excuse me,

12    Detective Moore?

13    A.    Yes.   He -- he's talked to Detective Moore about

14    where he purchased the firearm from.

15    Q.    How would you describe Mr. Estes' demeanor at this

16    point?

17    A.    Still a normal tone.

18    Q.    Did he appear to be calm?

19    A.    Yes.

20    Q.    And after Detective Moore was finished speaking with

21    Mr. Estes, was Mr. Estes transported to the jail?

22    A.    Yes.

23         MS. RACHOW:  I don't have any further questions.

24    Thank you.

25         THE COURT:  All right.

54

1          Cross-examination?

2              MS. GORMAN:  Pardon me, Your Honor?

3              THE COURT:  Pardon?

4              MS. GORMAN:  I thought you said something, Your

5      Honor.

6              THE COURT:  I said "Cross-examination?"

7              MS. GORMAN:  Oh, okay.  That would make a lot of

8      sense.

9                          CROSS-EXAMINATION

10     BY MS. GORMAN:

11     Q.    Good afternoon, Detective Kurup.

12     A.    Good afternoon.

13     Q.    So, Detective, the government asked you in her

14     direct examination about the folding that encases tickets

15     on Amtrak.

16     A.    Yes, ma'am.

17     Q.    Is that correct?

18     A.    Yes, that's correct.

19     Q.    Okay.  So then according to that small print that

20     you read to this Court, if passengers don't want to be

21     searched, they have a right to a refund; is that right?

22     A.    That's correct.

23     Q.    Okay.  I mean, they also have the option to leave

24     the train?

25     A.    That's correct.

55

1    Q.    And that's Amtrak's policy?

2    A.    Yes.

3    Q.    At any point in this case, did you ever offer

4    Mr. Estes a refund?

5    A.    No.

6    Q.    Okay.  Did you ever advise him that he had the right

7    to leave this train?

8    A.    He always knew that he had the right to move

9    about --

10   Q.    I'm not --

11   A.    -- freely.

12   Q.    So I'm going to ask you a very specific question --

13   A.    Okay.

14   Q.    -- and I'm going to ask that you answer that

15   question.

16   A.    Okay.

17   Q.    Did you advise Mr. Estes that he had the right to

18   leave this train?

19   A.    No.

20   Q.    Okay.  Thank you.

21         So, Detective, were you trained that the Fourth

22   Amendment governs your interaction with passengers on

23   Amtrak?

24   A.    Yes.

25   Q.    Okay.  Were you trained that the Fifth Amendment

1   governs your interaction with passengers on Amtrak?

2   A.    How so, ma'am?  I'm --

3   Q.    The Fifth Amendment?

4   A.    Could you --

5   Q.    The right not to incriminate yourself, one.

6   A.    That's correct.

7   Q.    So you were trained about that?

8   A.    Yes.

9   Q.    Okay.  And you understand that that -- those govern

10  your interaction with citizens?

11  A.    Yes.

12  Q.    Okay.  Now, you're on the Northern Nevada Drug

13  Interdiction Task Force?

14  A.    Yes.

15  Q.    And part of your job is then to investigate and

16  arrest people travelling on Amtrak with drugs or drug

17  money?

18  A.    Yes.

19  Q.    Now, I want to talk to you about the indicators on

20  the ticket that you use to decide who to target for

21  investigation.

22          So you testified that you look at ticket

23  information to decide who to target for your investigation;

24  is that right?

25  A.    That is who I want to speak to, yes.

1    Q.    Yes.  And one of those indicators you look for is a

2    cash purchase?

3    A.    Yes.

4    Q.    And the reason you look for cash purchases is

5    because cash is not traceable?

6    A.    That's correct.

7    Q.    And another indicator would be purchase of a ticket

8    immediately prior to boarding?

9    A.    Yes.  It's another indicator.

10   Q.    Or starting a trip at an unmanned station?

11   A.    That's correct.

12   Q.    Now, you also observe people on the train and on

13   platforms; is that right?

14   A.    That's right.

15   Q.    And an indicator might be being excessively nervous;

16   is that right?

17   A.    Among others it could be, depending on the factors.

18   Q.    So I'm just going to ask you whether being

19   excessively nervous is an indicator that you look for

20   sometimes?

21   A.    Sometimes, yes.

22   Q.    Okay.  So is reacting strangely to maybe the

23   presence of a drug canine, is that an indicator for you?

24   A.    Yes.

25   Q.    Now, are you aware of any research that connects

1   people's ticket purchasing behavior with their likelihood

2   of being a drug courier?

3   A.    Any research?

4   Q.    Any research?

5   A.    No, ma'am.

6   Q.    Okay.  Are you aware of any statistics that, for

7   example, X amount of people who use cash to buy a train

8   ticket are drug mules?

9   A.    No, ma'am.

10  Q.    And to your knowledge, does Amtrak collect data on

11  how many people who have one or more of these indicators

12  turn out to be drug couriers?

13  A.    Not to my knowledge.

14  Q.    Not to your knowledge.  Okay.

15        And, to your knowledge, does the Reno Police

16  Department collect data on this?

17  A.    I do not know.

18  Q.    Okay.  But you don't keep statistics on your own?

19  A.    No.

20  Q.    Okay.  And you have in the past identified people as

21  suspicious who have some of these indicators only to find

22  that they are not transporting contraband or money from

23  contraband sales?

24  A.    That's correct.

25  Q.    Now, you singled out Mr. Estes as suspicious because

1  of indicators on his reservation?

2  A.    That's correct.  That's why I decided to talk to

3  him.

4  Q.    Okay.  And those indicators made you suspicious he

5  might be a drug trafficker?

6  A.    Or some type of illegal contraband, yes.

7  Q.    Now, the first indicator was that Mr. Estes booked

8  his ticket on November 29th for travel beginning on

9  December 2nd; is that right?

10  A.    That's correct.

11  Q.    So that would be three days before travel?

12  A.    Yes.

13  Q.    Okay.  Now, I'm going to direct you to Exhibit 115.

14        Now, can you tell me what that is?  And I'll

15  give you a second to find it.

16  A.    It's from the Reno Police Department records and ID.

17  Q.    So 115 should be the ticket, the same ticket that

18  the government has shown you on direct, the ticketing

19  information for Mr. Estes.

20  A.    No.  Unless I'm -- oh, excuse me.  One second.  I'm

21  sorry.  Yes.  Yes.

22  Q.    Okay.  Now, is that the entirety of the information

23  you had about Mr. Estes before you targeted him for

24  investigation?

25  A.    This is the reservation I printed out, yes, for

1    Mr. Estes and had the indicators on it, yes.

2    Q.    Okay.  And so this shows that this is an emergency

3    exchange voucher; is that correct?

4    A.    At the very bottom of it -- no, it also shows

5    that -- at the very bottom you could see where it says "DS"

6    three times, what -- the monetary amount next to it, that

7    it was paid with a Discover Card.

8    Q.    So I understand --

9    A.    And underneath that there's an exchange.

10   Q.    -- it was paid with a Discover Card.

11         I'm just going to ask you whether this is an --

12   whether this ticket reflected that it was an emergency --

13   that there was an emergency exchange voucher?

14   A.    Yes.

15   Q.    Okay.  And that was issued because of a late train?

16   You can take a minute.

17   A.    Yes.

18   Q.    Okay.  So this doesn't actually even show the

19   whole --

20         THE COURT:  Let me interrupt a second.

21         What is an emergency exchange voucher?  And what

22   on this ticket indicates that there was one here?

23         THE WITNESS:  It says under -- at the very

24   bottom, it says -- under where the monetary values are, at

25   the very end, the last one for 589, that "EX," that's the

1    abbreviation for exchange voucher.

2            Also above midway under Ms. Rogers' address,

3    right underneath that, sir, is "Emergency Exchange Voucher"

4    with asterisks on both sides.

5            THE COURT:  And, again, what does that typically

6    indicate?

7            THE WITNESS:  If there was some issue with the

8    travel, whether -- for whatever reason.  If there was some

9    type of weather problem, problem with the train, you got

10   held over somewhere, Amtrak will, you know, in certain

11   situations, pay for your hotel, pay for your overnight

12   stay, and make arrangements for you to travel another time,

13   and give you an emergency voucher.

14           THE COURT:  Okay.  Thank you.

15           I'm sorry to interrupt.  I didn't know.

16           MS. GORMAN:  No.  No.  That's perfectly fine,

17   Your Honor.

18   BY MS. GORMAN:

19   Q.   So this is an emergency exchange voucher?

20   A.   Yes.

21   Q.   And it was issued because of a late train?

22   A.   Yes.

23   Q.   Okay.  So it actually doesn't even show the original

24   itinerary made by Mr. Estes, does it?

25   A.   No.

1    Q.    Okay.

2    A.    This is just what we print out.

3    Q.    So you didn't even know, when you were looking at

4    these indicators and you see this emergency exchange

5    voucher, what his actual itinerary was?  That he had

6    booked?

7    A.    As far as his travel is concerned?

8    Q.    Yes.  On the voucher it shows he was travelling from

9    Emeryville to -- Chicago to Emeryville?

10   A.    Yes, I see that.  Uh-huh.

11   Q.    So -- okay.  This doesn't actually show the original

12   itinerary that he had purchased, does it?

13   A.    No.

14   Q.    Okay.  So you didn't even know where he actually had

15   started from?

16   A.    No.  Unless it's listed in his history.

17   Q.    Okay.  Well, this is the information that you had at

18   the time?

19   A.    Yes.

20   Q.    Okay.  So you didn't even know where his -- what his

21   original itinerary was?

22   A.    No.

23   Q.    Okay.  So -- and this doesn't even show that he was

24   travelling from Little Rock, Arkansas; is that right?

25   A.    That is correct.

1    Q.    Okay.  So this is one of the indicators that you

2    list as one of the indicators that encouraged you to target

3    Mr. Estes for investigation?

4    A.    Is what?

5    Q.    Is this itinerary?

6    A.    Yes.

7    Q.    Okay.  Now, so the 11/29 purchase of the ticket,

8    could we agree that there could be many reasons why

9    somebody would want to book a ticket a few days before

10   travel?

11   A.    That's correct.

12   Q.    Okay.  It could be a family emergency?

13   A.    That's correct.

14   Q.    It could be not getting the money together on time?

15   A.    Yes.

16   Q.    And the second -- okay.  So that is the first

17   indicator, then, is this three-day-before-travel

18   information that you had from the emergency exchange

19   voucher; correct?

20   A.    No.  The first indicator that I noticed was the

21   third-party purchase was the first indicator.

22   Q.    So I'm sorry.  I am not trying to not track with

23   you.  That was one of the indicators?

24   A.    Yes, that was one of the indicators, yes.

25   Q.    Okay.  The first that I'm discussing?

1    A.    Yes, ma'am.  Yes.

2    Q.    Okay.  So the second -- my second indicator, just to

3    be clear, is that somebody else paid for Mr. Estes' ticket

4    in this case?

5    A.    That's correct, ma'am.

6    Q.    Okay.  And you knew that somebody else paid for

7    Mr. Estes' ticket because it was bought with a credit card;

8    right?

9    A.    Yes.

10   Q.    Okay.  So now you had pur- -- you testified that

11   purchasing tickets in cash is considered to be suspicious;

12   right?

13   A.    Yes.

14   Q.    Okay.  But a credit card is traceable?

15   A.    That is correct.

16   Q.    All right.  And when you see a credit card

17   reservation, you see the name of the credit card owner?

18   A.    That is correct.

19   Q.    Okay.  And their credit card number?

20   A.    Yes.

21   Q.    And the billing ZIP code?

22   A.    That's correct.

23   Q.    And in this case the purchaser was Christina Rogers?

24   A.    That's correct.

25   Q.    Okay.  So you don't know, and you didn't know at

1    that time, whether Christina Rogers was Mr. Estes' wife?

2    A.    No, I did not.

3    Q.    You didn't know if it was his aunt?

4    A.    No, ma'am.

5    Q.    Or his friend?

6    A.    No.

7    Q.    Okay.  But you had all that information about her?

8    A.    Yes.

9    Q.    So that's the second indicator here?

10   A.    Yes.

11   Q.    Okay.  Now, the third indicator is -- that you and

12   Detective Moore used in this case, is that Mr. Estes was

13   travelling from the eastern, I guess, half of the United

14   States to California?

15   A.    The fact that he's travelling from the Midwest to

16   California?

17   Q.    Well, I mean, clearly he wasn't travelling from the

18   Midwest.  But it was --

19   A.    As --

20   Q.    I'm just going to -- so I'm going to direct you,

21   then, to Exhibit 101.

22         So, now, isn't it true that one of the

23   indicators that you used was travelling from the Eastern

24   United States to the state of California?

25         And I'll just give you a minute to read that.

1          MS. RACHOW:  And, Your Honor, objection for the

2     record.  There's been no foundation as to how 101 would

3     refresh his recollection.  There's no indication that 101

4     was authored by this witness.  And this witness never

5     testified to anything about that being one of the factors

6     he looked for with Mr. Estes.

7          THE COURT:  Sus --

8          MS. GORMAN:  Your Honor, I'll lay --

9          THE COURT:  Well, the --

10         MS. GORMAN:  -- a more proper --

11         THE COURT:  -- is sustained.  But it's not being

12    offered yet.  And I'm not sure why you showed it to him.

13         MS. GORMAN:  So -- you're right, Your Honor.

14    I'm going to -- and I apologize.  I'm going to back up a

15    second.

16    BY MS. GORMAN:

17    Q.    Detective Kurup, can you tell me what Exhibit 101

18    is?

19    A.    I believe this is Detective Moore's supplement.

20    Q.    Okay.  So now does this -- is it a -- is it a

21    probable cause affidavit?

22    A.    Yes.

23    Q.    Okay.  And was it authored by your partner;

24    Detective Moore?

25    A.    Yes.

```
 1    Q.    Okay.  And does it pertain to this case?

 2    A.    Yes.

 3    Q.    Okay.  So -- and I'll just ask you, is one of the

 4    indicators that you use the fact that Mr. Estes was

 5    travelling to the state of California from Eastern United

 6    States somehow -- somewhere?

 7    A.    We do look at travel, yes, as far as distance-wise,

 8    from where you're coming from to where you're going to.

 9    Q.    So --

10    A.    Is it one of the -- oh, go -- sorry.

11    Q.    I'm just going to be clear.

12          Is it not an indicator for you that someone is

13    travelling from the east to California?

14    A.    It could be one of the indicators, yes.

15    Q.    Okay.  Was it an indicator in this case, for you?

16    A.    I went with the amount, the third-party purchase,

17    and how soon it was purchased before travel.  That was one

18    of the indicators that I had.

19    Q.    Were those the only indicators that you used in this

20    case?

21    A.    Yes.

22    Q.    Okay.  So those are the two indicators.

23          So for you, the eastern to California, not --

24    A.    It -- I have used those indicators before, yes.

25    Q.    But it was not used in this case?
```

1    A.    No.

2    Q.    Okay.  So, Officer, I'd like to talk to you about

3    the timeline of this investigation.

4          So you wrote a police report in connection with

5    this case; is that correct?

6    A.    That's correct.

7    Q.    Okay.  And I'm going to show you what's been marked

8    as Exhibit 102.

9          So is that your police report?

10   A.    Yes.

11   Q.    Okay.  So now turning to page 1, you have a really

12   specific time for when this incident was reported.  Can you

13   tell me what that time is?

14   A.    1200 hours.

15   Q.    So I'm going to direct you to page 1.  Pardon me.

16   I'm not sure if I said that.

17   A.    I thought you meant on the --

18   Q.    No, not the narrative portion.  Just page 1 --

19   A.    Sorry.

20   Q.    -- of the police report.  I apologize.

21   A.    Reported at 11:13.

22   Q.    Okay.  And that would have been the time that you

23   decided to target Mr. Estes for your investigation?

24   A.    It could have been.

25   Q.    So you wrote a really specific time on the police

1    report.

2    A.    Yes.  Okay.

3    Q.    Can you tell me why?

4    A.    That's usually when it's called in.

5    Q.    When it's called in.

6    A.    Yes.

7    Q.    And what do you mean by called in?  Can you tell the

8    Court what that means?

9    A.    Called in -- when Detective Moore calls in to

10   dispatch to retrieve a case number.

11   Q.    Okay.  And so 11:13 would be the time that Detective

12   Moore called in to dispatch?

13   A.    Yes.

14   Q.    Okay.  So I'm going to show you -- I'm going to ask

15   that you turn to Exhibit 107.  Can you tell me what that

16   is?

17   A.    Calls-for-service log for Reno PD.

18   Q.    So -- and can you tell the Court and just everybody

19   here, what is a call-for-service log?

20   A.    I do not know, as this is Reno PD stuff.

21   Q.    So you've -- have you never seen a -- so you've

22   never seen a dispatch log?

23   A.    No, not with Reno PD.

24   Q.    Okay.  But it's your testimony that 11:13 is when

25   Detective Moore called in?

70

1   A.    I believe so.

2   Q.    Okay.  And would you be surprised if it was

3   Detective Hill that had actually called in at 11:13?

4   A.    It could have been, depending on who was there.

5   Q.    Okay.  But it's your testimony you didn't talk to

6   Detective Hill before this encounter started?

7   A.    I did not speak to Officer Hill before the encounter

8   started.

9   Q.    Okay.  So -- but that's -- so 11:13 would be the

10  time somebody made a call in to dispatch; right?

11  A.    Yes.

12  Q.    And you were the one that input that into your own

13  police report?

14  A.    What's that?

15  Q.    And you were the one that put that into your police

16  report, 11:13?

17  A.    No.  I believe I put 12:00.

18  Q.    I'm just --

19  A.    Into the --

20  Q.    -- the first page of your police report?

21  A.    Sorry.

22        Yes, it's -- I believe it's an automated tab.

23  When you hit the button, the time of the call comes in --

24  Q.    Okay.  So somebody --

25  A.    -- or the information --

1    Q.    -- called --

2    A.    Yes.

3    Q.    -- dispatch about Mr. Estes at 11:13?

4    A.    About our encounter, yes.

5    Q.    Okay.  About your encounter with Mr. Estes.  Okay.

6         So I'm going to have you now turn to page 4 of

7    your police report.  Can you tell me according to your

8    narrative about what time you wrote this investigation

9    began?

10   A.    12.  1200 hours.

11   Q.    Okay.  And you specifically note in your report it

12   was approximately?

13   A.    Yes.

14   Q.    Okay.  And you do that because it can be 5, 10, 15

15   minutes off?

16   A.    Yes.

17   Q.    Okay.  Now, I'd like you to turn back to Defense

18   Exhibit 101, the probable cause affidavit.

19        And can you tell me what time Detective Moore

20   lists?

21        MS. RACHOW:  Objection.  This witness has

22   already testified this is not his report.  And asking him

23   to state into the record what some other witness said is

24   hearsay.

25        MS. GORMAN:  Your Honor, I'm not asking him to

1    state into the record.  I'm asking whether a time that was

2    written by his partner is accurate or not.

3              And I'm not sure what the actual legal basis of

4    the objection would be.  You don't need to author something

5    to be asked about it.

6              THE COURT:  You can ask him if he's aware what

7    time that Officer Moore would have called in, if he's

8    aware.

9    BY MS. GORMAN:

10   Q.    Are you aware what time Officer Moore reported this

11   incident beginning?

12   A.    No.

13   Q.    Okay.  Would you be surprised if it was 20 minutes

14   before you had reported it?

15   A.    Again, it just depends on what's going on at the

16   time, ma'am.  I would not be surprised.  It just depends.

17   Q.    Okay.  And because sometimes when you write the

18   time, it can be off?

19   A.    Sometimes, yes.

20   Q.    All right.  Now, Mr. Estes was the target of this

21   investigation, you've already testified, before he ever got

22   off this train; is that right?

23   A.    That we wanted to speak with him, yes.

24   Q.    Okay.  And you had testified on direct that you had

25   never discussed Mr. Estes with Officer Hill before?

1    A.    That's correct.

2    Q.    Before you called him out?

3    A.    That's correct.

4    Q.    Okay.  And that's still your testimony now?

5    A.    Yes.

6    Q.    So, Officer Kurup, you were armed; is that right?

7    A.    Yes.

8    Q.    Okay.  And you had your cover officer?

9    A.    Yes.

10   Q.    That was Detective Moore?

11   A.    Yes.

12   Q.    And was he armed, to the best of your knowledge?

13   A.    Yes.

14   Q.    Okay.  And he was a few feet away from you?

15   A.    Several.

16   Q.    And off to the side?

17   A.    Yes.

18   Q.    Okay.  And Officer Hill was on scene as well?

19   A.    Yes.

20   Q.    So can you tell me where exactly Officer Hill was?

21   A.    I do not know.  It's usually somewhere out of sight.

22   Q.    Somewhere out of sight?

23   A.    Yes.

24   Q.    Okay.  So you walked up to Mr. Estes?

25   A.    Yes.

1    Q.    Okay.  And you displayed your badge?

2    A.    Yes.

3    Q.    Okay.  And you identified yourself as a police

4    officer?

5    A.    Yes.

6    Q.    Okay.  And you asked him for his train ticket?

7    A.    Yes.

8    Q.    And you asked him for his photo identification?

9    A.    Yes.

10   Q.    Okay.  And Mr. Estes was smoking a cigarette when

11   you approached him?

12   A.    Yes.

13   Q.    Okay.  Now, did you -- now, Mr. Estes -- is it your

14   testimony Mr. Estes was not on the phone when you

15   approached him?

16   A.    Yes.

17   Q.    Okay.  And so you did not direct Mr. Estes to hang

18   up the phone?

19   A.    No, ma'am.

20   Q.    Okay.  And you didn't write anything about Mr. Estes

21   being on the phone in your police report?

22   A.    No, ma'am.

23   Q.    Is that correct?

24   A.    That's correct.

25   Q.    And have you been made aware that there -- that

1    there is a woman named Erika Dean who states that she was

2    on a phone call with Mr. Estes?

3    A.    Yes.

4    Q.    Okay.  So you have been made aware of that?

5    A.    Yes.

6    Q.    Okay.  Now, is it also your testimony that Mr. Estes

7    was never prevented from picking up his phone throughout

8    this entire encounter?

9    A.    Yes.

10   Q.    Okay.  And that the phone was not just ringing the

11   whole time?

12   A.    No.

13   Q.    Okay.

14   A.    Not to my knowledge.

15   Q.    So as part of your police reports, you write down

16   certain biographical information about people you arrest;

17   is that right?

18   A.    As pertaining to?

19   Q.    Biographical information.  Like about their phone

20   numbers, for example?

21   A.    Sometimes, yes.

22   Q.    Okay.  Well, in this case, then, can I direct you to

23   your police report.  It's Exhibit 102.

24   A.    Oh, okay.

25   Q.    Can you tell me what phone number you have written

1    down for Mr. Estes?

2            And just to make it quicker, it's on page 2

3    towards the top.

4    A.    702-272-8072.

5    Q.    So, Your Honor, as this Court is aware, we had -- we

6    did a motion to this Court for a subpoena for Mr. Estes'

7    phone records for that number.  And at this point, I'm

8    going to give copies to those exhibits to the government

9    and to the witness for further examination.  And we'll lay

10   a foundation.  But just my proffer to the Court.

11           THE COURT:  All right.

12           MS. GORMAN:  So, Your Honor, I just want the

13   record to reflect I'm going to hand a business record

14   affidavit to the Court, to the witness, and to the

15   government.

16           THE COURT:  The record will so show.

17           MS. GORMAN:  So, Your Honor, I'm just going to

18   give your courtroom deputy some time to --

19           So, Your Honor, may I proceed?

20           THE COURT:  Yes.  Go ahead.

21           MS. GORMAN:  So, Your Honor, first -- again, as

22   this Court knows, we did a 17(b) motion to the Court where

23   we laid out exactly, moment by moment, what Mr. Estes and

24   Erika Dean had said about their phone conversation.

25           And then this Court granted us a subpoena.  So

1    we've also obtained Exhibit 125.  That's a business record

2    affidavit for the entirety of the phone records that this

3    Court ordered that T-Mobile produce.

4            So we have a business record affidavit to

5    authenticate, then, Exhibit 126 is the entirety of the

6    records.  127 and 28, because the writing was so small and

7    we can't touch it because it's an original exhibit, we had

8    our paralegal essentially pull out just the -- I think it

9    was just maybe the hour around this encounter.

10           And there's one version which is color-coded

11   with an index, just for examination, and then the other

12   version is blank.  But those are all from the original

13   records.

14           THE COURT:  And the significance of the color

15   coding?

16           MS. GORMAN:  The significance of the color

17   coding is ease for cross-examination.  It's essentially a

18   demonstrative.

19           So we would move right now to have the records

20   introduced.  And then we'll use the demonstrative.  I think

21   it's easier for examination of a witness.

22           THE COURT:  All right.

23           Ms. Rachow?

24           MS. RACHOW:  Well, Your Honor, I would note that

25   the government has never received these.  And under the

1    rules of evidence when you intend to go by a declaration of

2    business records, you're supposed to give the adverse party

3    notice in writing a few days prior, at least, so the party

4    can make an objection if they need the live witness.

5             And in addition the government not being able to

6    review these, I don't know that what their paralegal has

7    produced prior to this hearing is accurate, since I've

8    never had the opportunity to look at it before this very

9    moment.

10             THE COURT:  Ms. Gorman?

11             MS. GORMAN:  So, Your Honor, no notice is

12    required.  This is impeachment.  It's also not hearsay.  We

13    have a business record affidavit.

14             And specifically we have these rules for

15    impeachment because when you have essentially objective

16    evidence of something, the only way -- I mean, we don't

17    know how a live witness is going to testify.  So in this

18    case if Detective Kurup had said yes, they were on the

19    phone -- I mean, this tracks minute by minute this

20    encounter.  And this is --

21             THE COURT:  Ms. --

22             MS. RACHOW:  Your Honor --

23             MS. GORMAN:  -- the phone number written in the

24    police report.

25             MS. RACHOW:  With all due respect, she's asked

1    Mr. Madhu Kurup about the phone number.  That's in the

2    record.  So clearly she knew that that was the phone number

3    he would acknowledge.

4              But realistically with the phone records, what's

5    she's impeaching him to?  The ringer may not have been on.

6    He stated he did not hear the phone ring.

7              MS. GORMAN:  So, Your Honor, obviously we have

8    not examined him yet and --

9              MS. RACHOW:  I'm sorry.  And, again, I don't

10   have an opportunity to look through the records to make

11   sure this is accurate because at the last minute I've been

12   handed God knows how many pages with extremely small

13   writing on it.  And I don't know that this is an accurate

14   representation in their example that they've pulled out.

15             THE COURT:  Okay.

16             MS. GORMAN:  So, Your Honor, we're happy to give

17   the actual -- the only relevant parts of the records are

18   about the six or seven lines that we actually pulled out.

19   And they're really easy to find.  It's all done by date and

20   time.  And we're happy to give the government a few minutes

21   with those records before we examine this witness.

22             THE COURT:  All right.  I'm going to allow --

23   because of the nature of the hearing, and that is a

24   judge-tried matter, I'm going to allow you to go ahead and

25   ask your questions.  But I want to caution you that he's

1    not qualified to testify as to what the records are or are

2    not.  Perhaps they do facilitate the course of your

3    cross-examination, and I respect that.  So you can ask

4    those questions that you feel that he would be competent to

5    answer.

6              MS. GORMAN:  Your Honor, I mean, we are prepared

7    to ask him about the times and what the records reflect.

8    And, of course, this -- I mean, there's substantive

9    evidence.  This Court can see it as well.  But I think it's

10   important that this witness at least be asked about it or

11   given a chance to --

12             THE COURT:  I'll allow --

13             MS. GORMAN:  It's impeachment.

14             THE COURT:  -- you to ask the questions that are

15   limited to the specific relevancy of this

16   particular matter.

17             MS. GORMAN:  Of course, Your Honor.

18             And just Court's indulgence for a moment.

19             THE COURT:  Yes.

20   BY MS. GORMAN:

21   Q.    So, Officer, I'd like to direct you to Exhibit 127.

22   So can I direct you to line 6780.

23             Can you tell me what the calling number is?

24   A.    702-272-8072.

25   Q.    Can you tell me if that's the same number that you

1    have written on your police report as Shaun Estes'

2    telephone number?

3    A.    That's correct.

4    Q.    So that was the calling number.  Can you tell me

5    then who the called number was?

6    A.    1-415-368-9164.

7    Q.    Okay.  Can you tell me the date?

8    A.    12/4/2014.

9    Q.    Is that the same date as this encounter you had with

10   Mr. Estes?

11   A.    That's correct.

12   Q.    Can you tell me the time?

13   A.    11:43:10.

14   Q.    Now, I'm going to ask you to look at the call -- or

15   the lines going down those calls.  Can you tell me -- can

16   you tell me about -- so just looking at the next line down,

17   was there another call to this number?

18        MS. RACHOW:  Your Honor, I'm going to object.

19   She's asking this witness to read this into the record.  He

20   does not have any personal knowledge.

21        If she's cross-examining him about whether or

22   not he heard the phone ring, that's one thing.  But she's

23   using him to read this into the record when he's never seen

24   this before and he did not prepare this record.  That's an

25   improper question.

1              MS. GORMAN:  Your Honor, I'm not entirely sure

2      what rule this violates.  We are allowed to ask him about

3      any piece -- or examine Mr. --

4              THE COURT:  Well, let me cut to the --

5              MS. GORMAN:  Mr. Kurup has now denied --

6              THE COURT:  Let me cut to the chase.  I'll allow

7      the questioning.

8              I'm going to admit the exhibit for purpose of

9      the hearing at this time subject to a motion challenging it

10     from the government that can be presented at the conclusion

11     of this hearing in the event the government is not

12     successful relative to this particular hearing.  But I want

13     to move this along.  I think this is admissible under the

14     records exception.

15             I don't know if there's a discovery violation or

16     not.  I haven't considered that.  But I can consider that

17     at a later time.  So I'll allow you to go forward with your

18     examination.  And you may do that.

19             MS. GORMAN:  Thank you, Your Honor.

20             THE COURT:  Exhibit 126, 127, 128, and 125 are

21     admitted, subject to the objection of the government and

22     later points and authorities that they may be entitled to

23     submit in the event that they deem it would be needed in

24     this case.

25

1            (Defendant's Exhibits 125, 126, 127, 128

2            conditionally received into evidence.)

3                MS. GORMAN:  Thank you, Your Honor.

4    BY MS. RACHOW:

5    Q.    So, Detective Kurup, again, you testified that there

6    was no phone ringing at the time that you were with

7    Mr. Estes; is that right?

8    A.    That's correct.

9    Q.    Okay.  So I'm going to just direct you, then, to the

10   next line down.

11           Can you tell me who the called number is -- what

12   the called number was?

13   A.    The which -- I apologize.  Which --

14   Q.    6781.

15   A.    6781.  Called number -- oh, called number is

16   702-272-8072.

17   Q.    Is that the same number that you have written down

18   as Mr. Estes' phone number?

19   A.    That's correct.

20   Q.    Can you tell me the date that call was made to

21   Mr. Estes' phone?

22   A.    12/4/2014.

23   Q.    Okay.  And can you tell me the time?

24   A.    11:45.

25   Q.    Okay.  And would you have been with Mr. Estes at

1    that time?

2    A.    Possibly.

3    Q.    Okay.  I'm just going to direct you to the next line

4    down, 6782.  Can you tell me who the called number was?

5         And it's okay if it's the same number.  And if

6    it's Mr. Estes, please --

7    A.    Oh, called number --

8    Q.    -- feel free just to say --

9    A.    -- is the --

10   Q.    -- Mr. Estes.

11   A.    It's the same number, yes.

12   Q.    Okay.  So it's Mr. Estes' --

13   A.    Mr. Estes' number --

14   Q.    Okay.

15   A.    The called number.

16   Q.    Okay.  And can you tell me, is the date the same?

17   A.    Yes.

18   Q.    And what time was that call made to Mr. Estes'

19   phone?

20   A.    A few seconds after the prior one you just asked me,

21   11:45:27.

22   Q.    Okay.  And then just looking at the times just to

23   save everybody -- and then everybody has these records.

24   What's the next time that a call was made to this number?

25   A.    11:45:31.

1    Q.    And what about the next time?

2    A.    11:46:54.

3    Q.    And what about the next time?

4    A.    11:47:07.

5    Q.    What about the next time a call was made to that

6    number?

7    A.    11:51:23.

8    Q.    And what about the next time?

9    A.    11:53:51.

10   Q.    Okay.  And I'm going to direct you to line 6788,

11   which is the next one down.  Can you tell me what the

12   calling number was?

13   A.    The calling number?

14   Q.    Yes.

15   A.    415-368-9164.

16   Q.    Okay.  And then going to the time, can you tell me

17   the time of that call?

18   A.    11:56:41.

19   Q.    Okay.  And then the next line down?

20   A.    It's the -- just the time?

21   Q.    Yeah.

22   A.    12:05.  12:00 o'clock and 5 seconds.

23   Q.    And were you with Mr. Estes at this time?

24   A.    Possibly.

25   Q.    Possibly.  Okay.  Can you tell me the next line down

1    what time that call was made?

2    A.    12:01:42.

3    Q.    And what about after that?

4    A.    12:02:04.

5    Q.    Okay.  So is it still your testimony that Mr. Estes

6    was not on the phone when you approached him?

7    A.    Yes.

8    Q.    Okay.  All right.

9              So, Your Honor, I'll move forward for now.

10             So Mr. Estes, he provided you his ticket and

11   identification on your request; is that right?

12   A.    That's correct.

13   Q.    Okay.  I would point you to or direct you to

14   Exhibits 103 and 104.

15             Did you have a chance to look at those exhibits?

16   A.    Yes.

17   Q.    103 and 104.

18   A.    Yes.

19   Q.    So those are Mr. Estes' ticket and ID; is that

20   right?

21   A.    That's correct.

22   Q.    Okay.  So now his ticket showed you he was

23   travelling from Little Rock, Arkansas; is that right?

24   A.    That's correct.

25   Q.    Okay.  And he had an Arkansas ID?

1    A.    That's correct.

2    Q.    Okay.  And did you have any indication that ID was

3    not valid?

4    A.    No, ma'am.

5    Q.    Okay.  And it showed he lived at an address in

6    Arkansas; is that right?

7    A.    I believe so.

8    Q.    And his -- you can take a moment.

9    A.    It's just it's blacked out.  That's all.

10   Q.    Okay.

11   A.    But, yes, it's an Arkansas ID; so I'm assuming, yes,

12   he lived in Arkansas.

13   Q.    Okay.  And the name on the ID matches the name on

14   Mr. Estes' ticket; is that right?

15   A.    His name is -- his first name is spelled differently

16   on the ticket.

17   Q.    On the ticket.  Is the last name the same?

18   A.    Yes.

19   Q.    Okay.  So -- okay.  Would living in Arkansas explain

20   why Mr. Estes was coming from Arkansas?

21   A.    Yes.

22   Q.    Okay.  So you didn't ask him why he was travelling

23   into California, did you?

24   A.    No, not at the time.

25   Q.    Okay.  Not at the time?

1    A.    No, I did not ask him if he -- why he was travelling

2    to California.

3    Q.    Okay.  And you didn't ask him who he was planning to

4    meet in California?

5    A.    No.

6    Q.    Okay.  Did you ask him about the person who bought

7    his ticket?

8    A.    No.

9    Q.    Okay.  Now, those answers might have provided

10   information that was relevant to these indicators we've

11   discussed; is that right?

12   A.    Yes.

13   Q.    Okay.  Now, you testified on direct examination you

14   never kept Mr. Estes' ticket and ID?

15   A.    Yes.

16   Q.    Okay.  And you completed a police report in

17   connection with this investigation; right?

18   A.    Yes.

19   Q.    Okay.  And this investigation was done December 4th,

20   2014?

21   A.    Yes.

22   Q.    Okay.  And that was about a year and a half ago?

23   A.    Yes.

24   Q.    Okay.  So since then you've been involved in other

25   investigations?

1    A.    Yes.

2    Q.    Okay.  Would it be fair to say hundreds?

3    A.    Yes.

4    Q.    Okay.  And you write these reports when events are

5    still fresh in your mind?

6    A.    Yes.

7    Q.    And you make sure that those police reports are

8    thorough?

9    A.    Yes.

10    Q.    And complete?

11    A.    Yes.

12    Q.    And accurate?

13    A.    Yes.

14    Q.    And you know that prosecutors rely on your police

15    reports to decide whether to charge a crime?

16    A.    Yes.

17    Q.    Or what crime to charge?

18    A.    Yes.

19    Q.    And whether your actions were constitutional?

20    A.    Yes.

21    Q.    Okay.  So -- and this report is complete, is it not?

22    A.    Yes.

23    Q.    Okay.  And it's accurate?

24    A.    Yes.

25    Q.    Okay.  Now, can you show me where in your police

1  report you write that you returned the ticket and ID to

2  Mr. Estes?

3  A.    Do you know what exhibit that is?

4  Q.    Yes.  Sorry.  102.

5  A.    Thanks.  I did not put that in my report.

6  Q.    Okay.  So it's not included in your report?

7  A.    No.

8  Q.    All right.  Now, Detective Kurup, his ID and ticket

9  were actually collected as evidence; is that right?

10  A.    That's correct.

11  Q.    Okay.  And photographs were taken of Mr. Estes'

12  ticket and ID?

13  A.    That's correct.

14  Q.    Okay.  Can you just tell me the circumstances, then,

15  when that ticket was taken from Mr. Estes?

16  A.    When the ticket was taken from him?

17  Q.    As --

18  A.    As evidence?

19  Q.    As evidence?

20  A.    After he was arrested.

21  Q.    So tell me exactly -- just walk me through it.

22        Who took that ticket and ID from Mr. Estes?

23  A.    I do not recall.

24  Q.    You don't recall?

25  A.    No.

1    Q.    Okay.  So do you know when it was taken?

2    A.    It was --

3    Q.    Can you just pinpoint the exact moment that ticket

4    and ID was taken back as evidence then?

5    A.    No.  It would be after he was put into handcuffs,

6    whether it was on that train or stepping off that train

7    when we were outside of the train.

8    Q.    So you don't know if it was you?

9    A.    No, I do not recall.

10    Q.    You don't know if it was Detective Moore?

11    A.    As far as retrieving it or taking the photo of it?

12    Q.    Retrieving it?

13    A.    Retrieving it, no.

14    Q.    Okay.  And do you remember who took the photograph?

15    A.    I did.  I took the photograph of the ID.

16    Q.    Okay.  So now you were -- you were investigating

17    Mr. Estes for transporting drugs or drug money?  Just to

18    back up to why you were here, or why you were with

19    Mr. Estes.

20    A.    Yes.

21    Q.    Or contraband?

22    A.    Yes.

23    Q.    Okay.  And being a drug trafficker is a crime?

24    A.    Yes.

25    Q.    Okay.  And it's a serious crime?

1    A.    Yes, ma'am.

2    Q.    Okay.  And you told Mr. Estes that you were

3    investigating him for being a drug trafficker?

4    A.    Excuse me?

5    Q.    You told Mr. Estes that you were investigating him

6    specifically for that, for being a drug trafficker; right?

7    A.    Yes.

8    Q.    Okay.  And you asked him whether he had drugs or

9    drug money?

10   A.    Yes.

11   Q.    Okay.  Now, you didn't tell him that he was free to

12   leave, did you?

13   A.    No, I did not.

14   Q.    Okay.  You didn't tell him he was free to end the

15   encounter?

16   A.    No, I did not.

17   Q.    Okay.  And you didn't tell him he wasn't obligated

18   to answer that question?

19   A.    That he wasn't obligated to answer --

20   Q.    That he -- yes.  You did not tell him that, did you?

21   A.    No.

22   Q.    Okay.  Now, in response to your question, he clearly

23   told you that he was not in possession of illegal

24   contraband or money made from the sale of illegal

25   contraband; is that right?

1    A.    That's right.

2    Q.    Okay.  Now, when Mr. Estes told you he wasn't

3    carrying drugs or drug money, he didn't act nervous, did

4    he?

5    A.    No.

6    Q.    Okay.  He didn't equivocate?

7    A.    No.

8    Q.    Okay.  And it's your testimony that his phone was

9    not constantly ringing when you were talking to him about

10   all this?

11   A.    That's correct.

12   Q.    Okay.  Now -- let's see.  So after Mr. Estes told

13   you he wasn't trafficking drugs or drug money, though, you

14   didn't end the encounter, did you?

15   A.    No.

16   Q.    Okay.  And you didn't offer him a refund?

17   A.    No.

18   Q.    Okay.  And you didn't walk away?

19   A.    No.

20   Q.    Okay.  So after he told you he wasn't trafficking

21   drugs, you just asked him for consent to search through his

22   room and luggage?

23   A.    That's correct.

24   Q.    Okay.  But Mr. Estes did not consent; is that right?

25   A.    That's correct.

1    Q.    Okay.  And so -- and he told you, "No, you cannot

2    search my room and luggage"; is that correct?

3    A.    Yes.

4    Q.    Okay.  And he has that right, doesn't he?

5    A.    Yes.

6    Q.    And he has that right under the Constitution?

7    A.    Yes.

8    Q.    Okay.  Under the Fourth Amendment.

9          And he clearly asserted that right to you?

10   A.    Yes.

11   Q.    Okay.  And, now, at this point you didn't tell him

12   he had a right to a refund, did you?

13   A.    No.

14   Q.    Okay.  And you didn't have the -- you didn't tell

15   him he had the right to a refund and then to leave the

16   train with his stuff?

17   A.    No.

18   Q.    Okay.  So when somebody asserts a right, is it your

19   practice to ask them again to waive that right?

20   A.    Is it my practice to ask them to waive the right

21   to --

22   Q.    If somebody asserts a right, a constitutional right,

23   is it your general practice to ask them again to waive it,

24   after they've already said, "I assert this right"?

25   A.    Right afterwards, no.

1    Q.    Right afterwards, no.

2    A.    No.

3    Q.    But you do ask them again?  You just wait some time?

4    I'm just trying to understand your --

5    A.    It depends --

6    Q.    -- response.

7    A.    -- on the circumstances, ma'am.

8    Q.    So sometimes it is your practice when somebody

9    asserts the right to ask them again to waive it?

10   A.    Yes.

11   Q.    Okay.  Now, after -- so after Mr. Estes refused

12   consent, it's still your testimony that he believed he was

13   free to end this encounter?

14   A.    Yes.

15   Q.    Okay.  So Mr. Estes could, if he wanted to, take out

16   his phone and make a phone call?

17   A.    Yes, absolutely.

18   Q.    And he could just move past you, go to his room, and

19   close the door?

20   A.    Yes.

21   Q.    Okay.  But that's not what happened, is it?

22   A.    I advised Mr. Estes that we were calling a police

23   canine in to do a scan.

24   Q.    Okay.  That's -- we'll get there.  Just answer my

25   question, please.

1          So after refusing consent, you didn't just let

2  him go about his business then?

3     A.    By --

4     Q.    So I'll just back up.  You advised him, after he

5  refused consent, you were going to get a police dog?

6     A.    Yes.

7     Q.    Okay.  And you also told him if the canine alerted

8  on his room, all of the items are going to be seized, and

9  you would get a search warrant?

10    A.    Yes.

11    Q.    Okay.  And then you contacted Officer Hill?

12    A.    Yes.

13    Q.    Okay.  And Officer Hill and his canine were already

14 at Amtrak?

15    A.    Yes.

16    Q.    Okay.  And Officer Hill had initiated the call to

17 dispatch actually -- were you aware that Officer Hill

18 himself had initiated a call to dispatch about 40 minutes

19 before this?

20    A.    No.

21    Q.    Okay.  So then you all board the train with

22 Mr. Estes; is that right?

23    A.    Officer Hill went -- he was up in the hallway first.

24    Q.    Okay.  So I'll just ask you to slow down and then

25 walk me through it.

97

1    A.    Okay.

2    Q.    So you -- so who boards the train then?

3    A.    We all board the train.

4    Q.    Who is "we all"?

5    A.    I'm sorry.  Officer Hill, myself, Detective Moore,

6    and Mr. Estes.

7    Q.    Okay.  So it's the three officers, the dog, and

8    Mr. Estes?

9    A.    Yeah.

10   Q.    Okay.  Now, okay.  So can you tell me where exactly

11   you were then on the train?  Right --

12   A.    Yes.

13   Q.    -- when you get on?

14   A.    Right when I get on?

15   Q.    Uh-huh.

16   A.    We were in the bottom level of the train, the entry

17   level of it.

18   Q.    Okay.  So then where did you go?

19   A.    Then we went upstairs.  There's a staircase that

20   leads to the upstairs level.

21   Q.    So where was Mr. Estes between these three officers?

22   Can you position him for me between you guys?

23   A.    I do not remember.  I know he wasn't in front of us.

24   Q.    Okay.

25   A.    So possibly behind us.

1   Q.    Okay.  So possibly behind.  So you don't actually
2   remember?
3   A.    I know he wasn't in front of us.  Behind us.  So he
4   would be towards the entrance of where we came in.  And we
5   would be closer to the staircase going up to the top level.
6   Q.    Okay.  Now, could you just describe the hallway of
7   the Amtrak station then that you're talking about?
8   A.    Of the station?
9   Q.    Uh-huh.  Or not of the station.  Of the train now
10  itself.
11  A.    Oh, there's about --
12  Q.    How big is it?
13  A.    Widthwise, I would say about a -- about, say, a few
14  feet widthwise.
15  Q.    A few, like two, ten?  I mean --
16  A.    No, about three, three or four feet.
17  Q.    Three or four feet?
18  A.    Yeah.
19  Q.    Okay.  So --
20  A.    Lengthwise, I couldn't tell you.  Over 10, 15
21  feet -- I mean, it's a pretty long hallway.
22  Q.    Okay.  So during this time when you're going up the
23  stairs, you didn't receive -- or Mr. Estes didn't -- his
24  phone wasn't ringing?
25  A.    Not to my knowledge, no.

1    Q.    And he didn't -- and so no officer, to your

2    knowledge, then, picked up his phone?

3    A.    No.

4    Q.    And no officer spoke to a woman?

5    A.    No.

6    Q.    Okay.  So now, at this point, then, Officer Hill is

7    deploying his canine along the hallway?

8    A.    After we come upstairs?

9    Q.    After you come upstairs?

10   A.    No.  We -- we asked Mr. Estes -- Mr. Estes' room was

11   open.  The door was open.  And we asked him before if he'd

12   prefer -- before we did the scan of the hallway, "Do you

13   prefer to have your door closed or door open?"  He said he

14   wanted it closed; so we closed it.

15   Q.    Mr. Estes -- when you first contacted him, he was on

16   the train platform; is that right?

17   A.    Yes.

18   Q.    Okay.  So your testimony is that his -- that he left

19   his sleeper car door just open?

20   A.    I believe so.  When we came up there, it was open.

21   Q.    Okay.  And you have a clear recollection that he

22   left that sleeper car room open?

23   A.    That he left it open?  No.  It was just open.

24   Q.    Okay.

25   A.    I don't --

1    Q.    So you don't actually know who opened it?

2    A.    No, I do not.

3    Q.    And actually those doors don't lock from the

4    outside, do they?

5    A.    No, they do not.

6    Q.    Okay.  So we don't know who left that door open?

7    A.    No, ma'am.

8    Q.    Okay.

9          So just Court's indulgence.

10          Okay.  So then at this point -- so Officer Hill

11   then -- so before Officer Hill deploys his canine, what

12   happens?

13   A.    The door is closed.  And then we make sure the

14   hallway is cleared so that nobody gets startled by the dog

15   or anything like that.  We make sure there's nobody in the

16   way so the dog could do a scan of the hallway.

17   Q.    Okay.  So you cleared out the hallway of other

18   people?

19   A.    There was nobody -- there was nobody there to begin

20   with.  But that's -- we just make sure that it's not going

21   to be blocked off or distracted or anything like that.  But

22   there was nobody in the hallway.

23   Q.    So then Mr. Estes is then just alone with you and

24   the other two officers?

25   A.    As far as I can recall, yes, in that hallway.

1    Q.    Okay.

2    A.    Along that opening by the staircase, yes.

3    Q.    Okay.  And Officer Hill, to be clear, he's in

4    uniform; right?

5    A.    That's correct.

6    Q.    Okay.  But all three of you are armed?

7    A.    Yes.

8    Q.    Okay.  So then Officer -- then Officer Hill deploys

9    his canine in the hallway.

10           And then do you -- so Detective Moore then tells

11   Mr. Estes that the canine showed interest in his room?

12   A.    That's correct.

13   Q.    Okay.  Now, Detective Moore didn't, to the best of

14   your recollection, Mirandize Mr. Estes before telling him

15   that the police canine showed interest in his room, did he?

16   A.    To the best of my knowledge, no.

17   Q.    Okay.  And you didn't Mirandize Mr. Estes?

18   A.    No.

19   Q.    Okay.  Now, minutes before Detective Moore then told

20   Estes that the dog showed interest in his sleeper car, you

21   had told Mr. Estes that if the dog alerted you would seize

22   all of his belongings and get a warrant; right?

23   A.    Yes.

24   Q.    And that was just minutes before?

25   A.    Yes.

1    Q.    Okay.  Now, Officer, you're aware there's a legal

2    difference between interest and alert; is that right?

3    A.    Yes.

4    Q.    Okay.  And you learned that as part of your training

5    and experience as a police officer?

6    A.    Yes.

7    Q.    Okay.  So did anybody explain that to Mr. Estes?

8    A.    I did not.

9    Q.    So you have no -- so you did not explain the legal

10   difference between interest and alert to Mr. Estes?

11   A.    No.

12   Q.    Okay.  And he had just been advised that if a dog

13   alerted you would get a warrant?

14   A.    If a dog alerted, yes.

15   Q.    Okay.  So it's your testimony that after Detective

16   Moore confronts Mr. Estes about the dog's interest in his

17   room, he advises he has a little piece of personal-use

18   marijuana?

19   A.    That's correct.

20   Q.    Okay.  So then at this point you ask Mr. Estes,

21   again, to consent to search?

22   A.    If I may search his room.

23   Q.    Which is, again, you asked him again for consent to

24   search his room?

25   A.    Yes.

1    Q.    Now, to be very clear, you asked Mr. Estes for

2    consent after Detective Moore told Mr. Estes that the dog

3    had showed interest in his sleeper car?

4    A.    Yes.  And also after Mr. Estes' statement, yes.

5    Q.    So after?

6    A.    After Detective Moore state -- yes.

7    Q.    Okay.  And you know that Estes had inserted his

8    right not to consent to a search before Detective Moore

9    told him about the canine's interest --

10   A.    That --

11   Q.    -- isn't that correct?

12   A.    That's correct.

13   Q.    Okay.  Now, you want your searches to be

14   constitutional; right?

15   A.    Yes, ma'am.

16   Q.    Okay.  And you know that a prosecutor may one day be

17   in a courtroom just like this and have to prove that

18   consent is freely and voluntarily given?

19   A.    That's correct.

20   Q.    Okay.  And has to be completely voluntary?

21   A.    Yes, ma'am.

22   Q.    Okay.  And it can't be the product of threats?

23   A.    Yes, ma'am.

24   Q.    Or coercion?

25   A.    Yes, ma'am.

1    Q.    Okay.  And Mr. Estes had already told you once he

2    didn't want you to conduct a search?

3    A.    That's correct.

4    Q.    Okay.  So now you work for Amtrak?

5    A.    Yes, ma'am.

6    Q.    Okay.  And you work with the Reno Police Department?

7    A.    Yes.

8    Q.    And you're familiar with permission to search forms,

9    aren't you?

10   A.    Yes.

11   Q.    Okay.  Does Amtrak have their own version too?

12   A.    Not to my knowledge, no.

13   Q.    Okay.  But you're familiar with permission to search

14   forms?

15   A.    Yes.

16   Q.    Can you tell me what those are?

17   A.    I believe it's a written form that you fill out

18   giving -- saying that you gave permission for law

19   enforcement personnel to search your items.

20   Q.    Okay.  Now, I'm going to show you what's been marked

21   as Exhibit 112.

22          Are you familiar with that form?

23   A.    No, ma'am.

24   Q.    Okay.  But you are familiar generally with

25   permission to search forms?

1    A.    Yes.

2    Q.    Okay.  And you elected not to use a permission to

3    search form; is that right?

4    A.    That's correct.

5    Q.    Okay.  And you chose not to have Mr. Estes

6    memorialize his consent in writing in any way?

7    A.    We did not -- we do not have this form with us

8    generally.

9    Q.    I'm just going to ask you that question again.

10         You chose not to have Mr. Estes memorialize his

11   consent in writing at all?

12   A.    That's correct.

13   Q.    Okay.  And so -- and if you had, that would be

14   something other than a police officer's word that could

15   prove that Mr. Estes ever consented?

16   A.    That's correct.

17   Q.    Okay.  And now do you have an audio recording

18   device?

19   A.    I do not.

20   Q.    Okay.  You do not.

21         Now, you were involved in a forfeiture case in

22   this courtroom; is that right?

23   A.    Which case is that?

24   Q.    A forfeiture case?  US versus $40,000?

25         MS. RACHOW:  Objection, relevance.

```
 1                MS. GORMAN:  Your Honor, as this Court knows,
 2   this Court ruled against Amtrak in a consent case months
 3   before this search happened.  I think it's important to
 4   know whether they elected to change their policy or not.
 5                Part of this Court's ruling in that case said
 6   that Amtrak wasn't -- didn't actually -- like they chose
 7   not to memorialize consent.  And that was part of this
 8   Court's ruling in that case.  And Detective Kurup was
 9   involved -- was an officer in that case.
10                THE COURT:  I'll allow you to ask him those
11   questions to that extent.  I don't want to get into the
12   other case in any way.
13                MS. GORMAN:  Understandable, Your Honor.
14   BY MS. GORMAN:
15   Q.    So you don't recall that you were ever involved in a
16   forfeiture case in this courtroom?
17   A.    Yes, I have been.
18   Q.    Okay.  And do you -- did you know that in that
19   case -- were you aware in that case that the Court found
20   that the government couldn't prove consent?
21   A.    Later on, yes.
22   Q.    Okay.  So you were made --
23   A.    Yes --
24   Q.    -- aware of that?
25   A.    -- I was made aware.
```

1    Q.    Were you aware one of the things that the Court

2    noted was that Amtrak detectives had just -- had not

3    memorialized consent at all?

4    A.    I was not.

5    Q.    Okay.

6           And I'll move on from that issue, Your Honor.

7           Okay.  So, now, you've testified that just

8    before your search you directed Mr. Estes to retrieve his

9    personal-use marijuana out of a bag?

10    A.    No.

11    Q.    Out of his bag?  No, you didn't?

12    A.    No.

13    Q.    So it's your -- okay.  So it's your testimony that

14    Mr. Estes just walked and reached his hand into a bag in

15    his room?

16    A.    After he retrieved the bag from the top bunk and put

17    it on the bottom one --

18    Q.    Okay.  And that --

19    A.    -- he retrieved the jewelry box with the marijuana

20    in it.

21    Q.    And that was not at your direction?

22    A.    No.

23    Q.    Now, this is a guy that you think might be a drug

24    trafficker?  So this is a guy, at this point, that you

25    think might be a drug trafficker?

1    A.    Possibly.

2    Q.    Okay.  And you've already asked him about weapons?

3    A.    Yes.

4    Q.    Okay.  And part of your job is to keep yourself

5    safe; is that right?

6    A.    Yes.

7    Q.    And to keep your cover officer safe?

8    A.    Yes.

9    Q.    And your canine officer?

10   A.    Yes.

11   Q.    Okay.  And so your testimony is that you let this

12   suspected drug trafficker go into his bag that later

13   contained a gun and take marijuana out?

14   A.    Yes.  When he -- when he went in to retrieve the bag

15   and put it down, this whole time his demeanor was fine, as

16   far as, you know, normal tone and everything, wasn't being

17   aggressive, or anything like that.  And he was still free

18   to move about.  He moved about to the room.  And --

19   Q.    And this is, pardon me, after you had asked his

20   consent to search his bag?

21   A.    Yes.

22   Q.    Okay.  So then you performed this search after this;

23   right?

24   A.    Yes.

25   Q.    Okay.  And then you find a firearm?

1    A.    Yes.

2    Q.    Okay.  So now you don't immediately Mirandize

3    Mr. Estes after you find the firearm; right?

4    A.    No, ma'am.

5    Q.    Okay.  And actually are you aware -- so Detective

6    Moore affirmatively represents that no state law has been

7    broken?

8    A.    At this time, no.

9    Q.    Okay.  But that was not true, was it?

10   A.    As far as the weapon?

11   Q.    Well, so you found marijuana; right?

12   A.    Yes.

13   Q.    Okay.  Now, that is against state law --

14   A.    It is --

15   Q.    -- is it not?

16   A.    -- but the -- but using officer discretion, we

17   wanted to see --

18   Q.    So I'm just going to ask you to answer my questions.

19   And I know it's --

20   A.    Oh, technical --

21   Q.    -- hard in court.

22   A.    Oh, sorry.

23   Q.    But so it was not true that no state law had been

24   broken?

25   A.    No.

1    Q.    Okay.  So but that is what Detective Moore told

2    Mr. Estes?

3    A.    Yes.

4    Q.    Okay.  So having told Mr. Estes that no state law

5    had been broken, then Detective Moore asked Mr. Estes if he

6    could speak to him downstairs?

7    A.    Yes.

8    Q.    Okay.  And then all of Mr. Estes' belongings are

9    removed from his room?

10   A.    Yes.

11   Q.    Okay.  So who packs up his belongings?

12   A.    I did.

13   Q.    Okay.  And who carries them?

14   A.    I did.

15   Q.    Okay.  So where is Mr. Estes?

16   A.    Mr. Estes is walking down to the lower level where

17   we originally were with Detective Moore.

18   Q.    Okay.  And then you, Detective Moore, and Mr. Estes

19   are together at the entry or lower level?

20   A.    Yes, ma'am.

21   Q.    Okay.  So and then Detective Moore calls Reno

22   dispatch?

23   A.    Yes.

24   Q.    Okay.  And they advised that Mr. Estes had a prior

25   felony?

1    A.    Yes.

2    Q.    Okay.  And then you place Mr. Estes in handcuffs?

3    A.    Yes.

4    Q.    Okay.  But you don't immediately Mirandize Mr. Estes

5    at this point either?

6    A.    No.

7    Q.    Okay.  So your testimony is that while in handcuffs,

8    but before Miranda, he then makes this unsolicited

9    statement about where he purchased the firearm; is that

10   right?

11   A.    Yes.

12   Q.    Okay.  Well, now, while Mr. Estes is in handcuffs on

13   the train, one of you takes photographs of Mr. Estes; is

14   that right?

15   A.    Yes, a picture of his face.

16   Q.    Okay.  Well -- and so you just took one picture of

17   his face?

18   A.    No.  There was other photos taken.

19   Q.    Okay.  I'm going to just show you -- Your Honor,

20   Defense Exhibit 116.

21              And I'm just going to ask you to look at B, I,

22   and J of those exhibits.  So these are photographs that are

23   taken on the train of Mr. Estes?

24   A.    Yes.

25   Q.    Okay.  And these were all taken before he was

1    Mirandized?

2    A.    Yes.

3    Q.    Okay.  And they're taken while he's in handcuffs?

4    A.    Yes.

5    Q.    Okay.  So who's taking these pictures of Mr. Estes?

6    A.    I did.

7    Q.    You did?

8    A.    Yes.

9    Q.    Okay.  So you're taking close-up pictures of his

10   hands in handcuffs?

11   A.    No.  Of his tattoos on his forearms.

12   Q.    Okay.  And his face?

13   A.    Yes.

14   Q.    And this is all on the train?

15   A.    Yes.

16   Q.    Okay.  And this is all before Miranda?

17   A.    Yes.

18   Q.    Okay.  So, now, Estes is not actually Mirandized

19   until he leaves this train in Verdi; is that right?

20   A.    Yes.

21   Q.    Okay.  And that's after the transport unit arrives?

22   A.    I believe so.

23   Q.    Okay.  And, again -- and you never asked Mr. Estes

24   also to sign a written waiver of his Miranda rights?

25   A.    No.  I did not Mirandize Mr. Estes.

1            MS. GORMAN:  Okay.  So, Your Honor, I'm going

2    to -- first, I'm going to move for admission of those three

3    pictures.

4            MS. RACHOW:  No objection.

5            THE COURT:  They are admitted.

6        (Defendant's Exhibits 116B, 116I, 116J

7        received into evidence.)

8            MS. GORMAN:  Thank you, Your Honor.

9            And I have no further questions for this witness

10    at this point.

11            THE COURT:  All right.  This is a good time for

12    a short break.  Let's reconvene at 3:40.

13            And I will alert you I will need to close this

14    down at 5:00 today if we haven't finished by then.

15            MS. RACHOW:  Your Honor, I don't believe it's

16    likely that we will finish by 5:00.  And I don't have an

17    objection -- I know Ms. Gorman has a witness from out of

18    state that she may want to put on out of order.  I don't

19    have an objection to the Court hearing that witness out of

20    order.

21            THE COURT:  All right.

22            MS. GORMAN:  I'll ask her.  Would the Court be

23    able to continue the hearing, just so I can tell her,

24    tomorrow morning if you want to avoid that?

25            THE COURT:  What's the schedule, Dionna?

114

1          (Discussion held off the record.)

2               THE COURT:  Let's take a short break.  Ten

3     minutes.

4          (Recess from 3:31 p.m. until 3:41 p.m.)

5               THE COURT:  All right.  Have a seat, please.

6               Redirect examination?

7               MS. RACHOW:  Thank you, Your Honor.

8                         REDIRECT EXAMINATION

9     BY MS. RACHOW:

10    Q.    Sir, I'd like to start with Defendants' Exhibit 127.

11    Do you have that in front of you?

12    A.    Yes.

13    Q.    Now, defense counsel went through this with calling

14    number, called number, and asked you repeatedly whether or

15    not Mr. Estes phone was ringing; is that correct?

16    A.    That's correct.

17    Q.    Are you familiar with cell phones?

18    A.    Yes, ma'am.

19    Q.    Can you put your cell phone on silent?

20    A.    Yes, ma'am.

21    Q.    Can you put it on vibrate?

22    A.    Yes.

23    Q.    And would both of those be perfectly plausible

24    explanations as to why you didn't hear the phone ring?

25    A.    Yes, ma'am.

1    Q.    Now, the one thing I'd like to point out, could you

2    please look over at the column on Exhibit 127 regarding the

3    phone call's duration?

4    A.    Yes.

5    Q.    Now, with all the calls starting at perhaps

6    11:45:25, which is 6781, how long was that call?

7    A.    One minute.

8    Q.    What about the next call?

9    A.    One minute.

10   Q.    The following call?

11   A.    One minute.

12   Q.    The next one?

13   A.    One minute.

14   Q.    The one after that?

15   A.    One minute.

16   Q.    The one after that?

17   A.    One minute.

18   Q.    The next one?

19   A.    Zero.

20   Q.    And the next one?

21   A.    Zero.

22   Q.    That one?

23   A.    Zero.

24   Q.    And the one after that?

25   A.    01.  One second.

1    Q.    And then the final one?

2    A.    20 seconds.

3    Q.    Now, does this record give any indication whether or

4    not a person answered the phone?

5    A.    No.

6    Q.    Does it give any indication whether or not this was

7    a voicemail message?

8              MS. GORMAN:  Your Honor --

9              THE WITNESS:  No.

10             MS. GORMAN:  -- objection, leading.

11             THE COURT:  I'll allow the question but caution

12   you, Ms. Rachow, to use direct questions.

13   BY MS. RACHOW:

14   Q.    And is there any information on these records that

15   would indicate when the time starts, such as when the phone

16   begins to ring?

17   A.    Not that I can see, no.

18   Q.    Now, I'd like to direct your attention to a report

19   which has been marked as Defense Exhibit 102.

20             Now, the format that this report is in, is this

21   an Amtrak format?

22   A.    No.

23   Q.    Is it a Reno Police Department format?

24   A.    Yes.

25   Q.    When you input your report, what do you do?

1    A.    Just input a -- whoever was involved, as far as

2    officers and suspects, narratives, evidence.

3    Q.    And with this, with the first three pages of your

4    report, pages 1 through 3 of 5, did you personally put in

5    that information?

6    A.    I do not recall.

7    Q.    And on page 4 of your report, the narrative, did you

8    input that information?

9    A.    Yes.

10   Q.    And with your narrative, did you give a date and

11   time?

12   A.    Yes.

13   Q.    And could you tell us what time that was?

14   A.    Approximately 1200 hours, 12:00 noon.

15   Q.    And is that based on your recollection of how this

16   event went?

17   A.    Yes.

18   Q.    And you did not call in to dispatch yourself?

19   A.    No.

20   Q.    And are you aware if other officers called in to

21   dispatch, or were you aware at the time that other officers

22   might have called into dispatch?

23   A.    No.  I just know that Detective Moore called

24   dispatch in reference to Mr. Estes, but that's it.

25   Q.    But you don't know when that was?

1     A.    No.

2     Q.    Now, when you were asked about whether or not it was

3   in your report that you returned Mr. Estes' driver's

4   license and his ticket -- do you remember that question?

5     A.    Yes.

6     Q.    And it was not in your report?

7     A.    No.

8     Q.    Are you confident that you returned those items to

9   him?

10    A.    Yes.

11    Q.    And why are you confident that you returned those

12  items to him?

13    A.    It's what we do every single time.

14    Q.    And if I could direct your attention to Government's

15  Exhibit 1.

16    A.    Yes.

17    Q.    Are you familiar with Government's Exhibit 1?

18    A.    Yes.

19    Q.    How are you familiar with Government's Exhibit 1?

20    A.    It's Mr. Estes' ticket.

21    Q.    Did you take this photo?

22    A.    I do not know.

23    Q.    Did somebody take this photo?

24    A.    Yes.

25    Q.    Involved in this investigation?

1    A.    Yes.

2    Q.    Do you know whose hand is in this photo?

3    A.    No.

4    Q.    Is this a true and accurate copy of the ticket that

5    Mr. Estes gave you?

6    A.    Yes.

7    Q.    And did you take this photograph, or did somebody --

8    I'm sorry.  I'm going to strike that.

9          When you initially made contact with Mr. Estes

10   and you asked him for his identification and his ticket,

11   did you take a photograph then?

12   A.    No.

13   Q.    When were the items photographed?

14   A.    After Mr. Estes was arrested.

15   Q.    And is there anything about this picture that leads

16   you to know that this picture was taken after Mr. Estes was

17   arrested?

18   A.    No.

19   Q.    When you were dealing with Mr. Estes, were you

20   wearing gloves?

21   A.    No.

22   Q.    Was Detective Moore wearing gloves?

23   A.    No.

24   Q.    Is the person holding the ticket wearing gloves?

25   A.    Yes.

1     Q.    And when are gloves typically put on?

2     A.    For a search of the person after arrest.

3     Q.    Now, when you explained to Mr. Estes that the next

4     step was going to be that the canine was going to be

5     deployed in the hallway, was the canine deployed in the

6     entire hallway?

7     A.    Yes.

8     Q.    Not just on Mr. Estes' room?

9     A.    No.

10    Q.    And Mr. Estes, did he want to be -- to watch, to

11    observe?

12              MS. GORMAN:  Whoa, Your Honor, it calls for

13    speculation.

14              THE COURT:  Sustained.

15    BY MS. RACHOW:

16    Q.    Did Mr. Estes say anything to you about wanting to

17    watch the dog?

18    A.    Yes.

19    Q.    And what did Mr. Estes say to you?

20    A.    He asked to watch the scan.

21    Q.    The scan?

22    A.    The dog being deployed in the hallway.

23    Q.    Now, on cross you testified that when you, the three

24    of you, went into the car and upstairs that you weren't

25    sure where Mr. Estes was?

1    A.    That's correct.

2    Q.    But you know for sure he was not in front of you?

3    A.    That's correct.

4    Q.    At any point when you were upstairs with Mr. Estes,

5    did you block the stairway that would have let Mr. Estes to

6    be able to leave?

7              MS. GORMAN:  Your Honor, objection, leading.

8              THE COURT:  I'll allow the question.

9    BY MS. RACHOW:

10   Q.    Sir, when you were upstairs with Mr. Estes, in any

11   way did you block the staircase?

12   A.    No.

13   Q.    Did you see anyone else block the staircase?

14   A.    No.

15   Q.    If Mr. Estes had chosen to leave, would you have

16   stopped him?

17   A.    No.

18   Q.    Now, you testified also during cross that sometimes

19   you will ask consent to search a second time?

20   A.    Yes.

21   Q.    And can you explain circumstances when that would

22   happen?

23   A.    As if -- after he advised that he had personal-use

24   marijuana in the room, that would be one reason why.  When

25   circumstances change, I ask again.

1    Q.    So when circumstances change?

2    A.    Yes.

3    Q.    And in this case, did you feel circumstances had

4    changed?

5    A.    Yes.

6    Q.    And what led you to ask Mr. Estes if you could

7    search his bag a second time?

8    A.    Because he advised us that he had personal-use

9    marijuana.

10   Q.    Did you tell him that he had to give you consent to

11   search his room?

12   A.    No.

13   Q.    Did you order him?

14   A.    No.

15   Q.    Did you threaten him?

16   A.    No.

17   Q.    During this entire contact with Mr. Estes, from the

18   beginning to the point where you go downstairs, after the

19   firearm is found, can you give us an estimate of how long

20   that took?

21   A.    Maybe 10 minutes.

22   Q.    During this entire perhaps 10 minutes, did

23   Mr. Estes' demeanor change at any point?

24   A.    No.

25   Q.    Would you describe him as cooperative?

1    A.    Yes.

2    Q.    Is it fair to say that when you ask people

3    questions, that they have lied to you before?

4    A.    Yes.

5    Q.    Is that common?

6    A.    Yes.

7              MS. RACHOW:  I don't have anything further.

8              THE COURT:  Recross?

9              MS. GORMAN:  Thank you, Your Honor.

10                  RECROSS-EXAMINATION

11   BY MS. GORMAN:

12   Q.    So, Officer, you testified that you have a cell

13   phone?

14   A.    That I have a cell phone?

15   Q.    Yes.

16   A.    Yes.

17   Q.    Okay.  Can you tell me what kind of cell phone it

18   is?

19   A.    It's a Samsung Galaxy Note 3.

20   Q.    Okay.  Does your Samsung Galaxy Note 3 -- can it

21   record?  Can it do an audio record?

22   A.    Yes.

23   Q.    Okay.  So you have the -- and did you have your

24   Samsung Galaxy 3 with you?

25   A.    Yes.

1    Q.    Okay.  And you -- did you choose at any point to

2    record any of this interaction?

3    A.    No.

4    Q.    Okay.  Now, you -- the prosecutor asked you about

5    the time of this encounter on your police report.

6         Now, you had previously testified that the --

7    when you wrote 12:00 on your police report, you could be

8    off by as much as 15 minutes; is that right?

9    A.    Yes.

10   Q.    Okay.  And you had also said that you were not

11   surprised, is that correct, that Detective Moore had

12   written 11:40 as the time of the interaction on his

13   probable cause affidavit?

14   A.    Yes.

15   Q.    Okay.  Now, you're -- obviously you're not familiar

16   with how T-Mobile keeps phone records, are you?

17   A.    No.

18   Q.    Okay.  And you don't know how the minutes work if a

19   call goes to voicemail, whether somebody gets -- how they

20   count that in terms of minutes?

21   A.    No, ma'am.

22   Q.    Okay.  But I'll specifically -- looking at Exhibit

23   127, I just want you to look at that.  The call on line

24   6780.

25   A.    Okay.

1    Q.    So I just want to be really clear.  Can you tell me

2    the time of that call?

3    A.    11:43:10.

4    Q.    Okay.  And you testified before it's at least

5    possible you were with Mr. Estes at that time; is that

6    right?

7    A.    Yes, possibly, yes.

8    Q.    And who made that call?  What number was the calling

9    number?

10   A.    702-272-8072.

11   Q.    And is that Mr. Estes' number, according to your

12   police report?

13   A.    Yes.

14   Q.    Okay.  Now, you just testified that you -- the

15   reason you recall that you didn't keep Mr. Estes' ticket is

16   because you do it every single time, you give it back every

17   single time?

18   A.    Yes.

19   Q.    Okay.  So you also testified, however, on

20   cross-examination that you don't remember who actually took

21   Mr. Estes' ticket when it was actually taken as evidence;

22   is that right?

23   A.    That's correct.

24   Q.    So you don't actually have a clear recollection of

25   that?

1    A.    That's correct.

2    Q.    So do you have an actual -- I understand that you

3    say that you return tickets all the time.  But do you have

4    then a clear, specific recollection in this time of

5    physically turning over Mr. Estes' ticket back to him?

6    A.    I would say right when I talked to him, after I

7    verify it's him, I hand it back.

8    Q.    And you know that because you always do it?

9    A.    Yes.

10   Q.    But you don't know, have, like, crystal clear

11   recollection of this specific --

12   A.    Crystal clear --

13   Q.    -- incident?

14   A.    -- recollection, no.

15   Q.    Okay.  Now, you also testified that Mr. Estes had

16   expressed that he wanted to watch the dog --

17   A.    Yes.

18   Q.    -- is that right?

19         Okay.  Can you just -- I'm just going to direct

20   you to your police report, 102.  Can you tell me where

21   Mr. Estes says that?

22   A.    I did not put in it my report.

23   Q.    And you previously testified that your reports are

24   complete; is that right?

25   A.    To my knowledge, yes.

1    Q.    And that they're accurate?

2    A.    Yes.

3    Q.    And it's been about a year and a half?

4    A.    Yes.

5    Q.    So you also -- the prosecutor just asked you about

6    where you were positioned on the staircase.  Now, would you

7    describe that staircase as narrow?

8    A.    Yes.

9    Q.    Okay.  And when Mr. Estes and the three officers

10   were getting on that train, was the train moving at any

11   point?

12   A.    No.

13   Q.    The train was still the entire time you were with

14   Mr. Estes on the train?

15   A.    When we got on the train?

16   Q.    I'm talking about the whole time you're on the train

17   with Mr. Estes, was the train moving?

18   A.    The entire time, no.  The train was not moving the

19   entire time.

20   Q.    Was it moving some of the time?

21   A.    Yes.

22   Q.    Okay.  And when you were with Mr. Estes, there is a

23   dog that's walking in the hallway in front of his room; is

24   that right?

25   A.    Yes.

1    Q.    And that room contained Mr. Estes' belongings;

2    right?

3    A.    Yes.

4    Q.    Okay.  Now, the prosecutor asked you about your

5    practice of asking people who waive rights again to waive

6    them.

7    A.    Yes.

8    Q.    Do you recall that?

9    A.    Yes.

10   Q.    Okay.  And you testified that it's when

11   circumstances change.

12   A.    Yes.

13   Q.    Okay.  So, now, I want to be really clear.  Was

14   Mr. Estes ambiguous when he told you that first time he

15   does not want you to search his things?

16   A.    He advised that he did not.  He said no.

17   Q.    So was there anything ambiguous about that?

18   A.    No.

19   Q.    Okay.  Now, you said that the circumstance had

20   changed when Mr. Estes told you he had some personal-use

21   marijuana?

22   A.    Yes.

23   Q.    Okay.  Now, your testimony is that Mr. Estes said

24   the personal-use marijuana after Detective Moore told him

25   that the dog was showing a lot of interest in his sleeper

1    car; is that right?

2    A.    Yes.

3    Q.    And minutes before Detective Moore told that to

4    Mr. Estes, you had told Mr. Estes that if a dog alerted you

5    would get a warrant and seize his things?

6    A.    Yes, if the dog alerted, yes.

7    Q.    Okay.  And that was the context that Mr. Estes then

8    said he had some personal-use marijuana?  That was what

9    happened before --

10   A.    That's what happened --

11   Q.    --is that right?

12   A.    -- before.  I don't know why he told us yes.

13   Q.    Okay.  I understand you -- well, but that happened

14   right before Mr. Estes told you about the marijuana?

15   A.    That -- yes.

16   Q.    Okay.  And just to be clear, you didn't Mirandize

17   him?

18   A.    No.

19   Q.    Didn't tell him he was free to leave?

20   A.    No.

21   Q.    Didn't tell him he was free to end this encounter?

22   A.    No.

23   Q.    Okay.

24              MS. GORMAN:  Your Honor, I have no further

25   questions.

1               THE COURT:  Any redirect, Ms. Rachow?

2               MS. RACHOW:  No, Your Honor.

3               THE COURT:  All right.  You may step down,

4      Detective Kurup.  Thank you.

5               THE WITNESS:  Thank you, sir.

6               MS. RACHOW:  Your Honor --

7               THE COURT:  Government's next witness.

8               MS. RACHOW:  Yes, Your Honor.  The government

9      calls Detective Moore.

10              Your Honor, if I could just ask on Defense

11     Exhibits 127 and 128, we don't have a list of what all the

12     codes are.  And if you look at the transaction type on page

13     2 of page 1, several of these incomings could be text

14     messages.  And we can't tell possibly what these things are

15     because we don't have the code --

16              MS. GORMAN:  Your Honor, we do have the --

17              MS. RACHOW:  -- of what the transactions are.

18              MS. GORMAN:  Sorry.  Your Honor, we do have

19     actually the codes.  And we talked to T-Mobile.  They said

20     there were, like, no text messages at all.  We have the

21     code.  I didn't think it was particularly helpful.  But I

22     have it.  And I can provide it to everybody.

23              THE COURT:  All right.  If you would do that,

24     please.

25              MS. GORMAN:  Thank you.

1          THE COURT:  And, Ms. Rachow, when you're

2    referring to the code, are you referring to what part of

3    the exhibit?

4          MS. RACHOW:  If you look on the page 2, it has

5    transaction types.  Usually when you get phone records, you

6    get a key from the phone company which will let you

7    distinguish what -- if it's an incoming text message, if

8    it's an outgoing text message, if it's a text, if it's some

9    other -- if there's -- you know, if it's a phone call.

10   There are more -- there are keys to these.

11         THE COURT:  All right.

12         MS. GORMAN:  And, Your Honor, we have it.  And

13   we can seek to introduce it.  I think it's pretty apparent

14   that it's -- because of the way the seconds work, that it's

15   not texts.  But we can do it on another --

16         THE COURT:  Let's supplement the exhibit because

17   that's a reasonable clarification.

18         All right.  So that will be made Exhibit 130?

19         COURTROOM ADMINISTRATOR:  Yes.

20         THE COURT:  And admitted.  Was it part of the

21   original package that was delivered by the phone company?

22         MS. GORMAN:  No, Your Honor.  These were during

23   examination if we needed them.  They were not at least very

24   helpful to me.

25         THE COURT:  All right.  They appear to be

 1    helpful to the Court and relevant.  I'll -- I think they're
 2    appropriately admitted.
 3            (Defendant's Exhibit 130 received into
 4            evidence.)
 5                COURTROOM ADMINISTRATOR:  Please raise your
 6    right hand.
 7                You do solemnly swear that the testimony you
 8    shall give in the cause now before the Court shall be the
 9    truth, the whole truth, and nothing but the truth so help
10    you God?
11                THE WITNESS:  I do.
12                COURTROOM ADMINISTRATOR:  Please be seated.
13                Can you please state your name and spell your
14    name for the record.
15                THE WITNESS:  Tony Moore.  T-o-n-y M-o-o-r-e.
16                COURTROOM ADMINISTRATOR:  Please tell us your
17    city and state of residence.
18                THE WITNESS:  Yerington, Nevada.
19                THE COURT:  Go ahead, please.
20                MS. RACHOW:  And, Your Honor, as one
21    housecleaning, can Detective Kurup be excused?  He has a
22    flight to catch tonight.
23                THE COURT:  Is there any reason why he shouldn't
24    be excused?
25                MS. GORMAN:  No, Your Honor.

| 1 | THE COURT:  All right.  He may be. |

```
 1              THE COURT:  All right.  He may be.

 2              MS. RACHOW:  Thank you, Your Honor.

 3                          TONY MOORE

 4              called as a witness on behalf of the

 5         Government, was examined and testified as follows:

 6                      DIRECT EXAMINATION

 7    BY MS. RACHOW:

 8    Q.    Sir, how are you employed?

 9    A.    With the Reno Police Department.

10    Q.    For how long have you been with RPD?

11    A.    Just under 20 years.

12    Q.    And what is your current assignment?

13    A.    Drug interdiction.

14    Q.    What does that mean?

15    A.    My assignment involves intercepting large amounts of

16    drugs or drug contraband travelling through the area or

17    into the area.

18    Q.    And do you work at a specific area?

19    A.    I do.  Reno.  The Reno, Washoe County area.

20    Q.    And do you work with a particular form of

21    transportation?

22    A.    Yes.  Amtrak and the Greyhound Bus line.

23    Q.    And you've been with your current assignment for

24    four years?

25    A.    Just under four years.
```

1   Q.    Has that entire four years been with the Amtrak and

2   the bus lines?

3   A.    Yes.

4   Q.    Do you have any specialized training regarding

5   interdiction?

6   A.    Yes, I do.

7   Q.    And can you tell us about that?

8   A.    Yes.  When I originally came into this assignment,

9   my partner gave me a lot of on-the-job training.  He is

10  currently an instructor with the International Narcotics

11  Interdiction Association.

12  Q.    And is that the premier organization that deals with

13  training interdiction officers?

14  A.    Yes.

15  Q.    Have you gone to any specialized trainings?

16  A.    Yes, I have.  For the past three years I've gone to

17  the INIA, or International Narcotics Interdiction

18  Association, Conference, which includes about 28 hours of

19  interdiction training.

20  Q.    And what types of things are you taught?

21  A.    Train interdiction, parcel interdiction, bus

22  interdiction, small airplanes.  Just a large variety of

23  subjects related to interdiction.

24  Q.    And is there anything specific to train interdiction

25  that they instruct you to look for?

1    A.    Yes.

2    Q.    And can you tell us about that?

3    A.    Basically we are looking for travelling

4    characteristics that have been found to be consistent with

5    persons transporting drug contraband.

6    Q.    And what are some of those indicators?

7    A.    It would be one-way travel across a very large

8    distance, the reservations being made just prior to

9    travelling, fictitious information, cash payments.

10    Q.    Do you look to see who purchases tickets?

11    A.    Yes.

12    Q.    And would that have any bearing on your review of

13    somebody's reservation?

14    A.    You know, it's -- if we're looking at a reservation,

15    it's just a name to us.

16    Q.    Do you check to see if it's the same person who has

17    the reservation as who bought the reservation?

18    A.    When we -- oh, on the reservation?

19    Q.    Yes.

20    A.    Absolutely, yes.

21    Q.    And why is that?

22    A.    Well, what we know to be common is a lot of

23    passengers travelling on the train are also the ones who

24    pay for their ticket.  It is a very common thing to see.

25          When we see that a passenger on a train, their

1    reservation was made or the ticket was paid for by someone

2    else, it's of interest to us.

3    Q.    And why is a one-way ticket something that flags

4    your attention?

5    A.    It's just what we've learned to be a common

6    travelling characteristic.

7    Q.    Now, obviously not everyone's reservation that has

8    these indicators turns out to have contraband; is that

9    true?

10   A.    That's correct.

11   Q.    But based on your four years -- your almost four

12   years of working interdiction, have a lot of these

13   indicators proven to be reliable?

14   A.    Yes.

15   Q.    How does an interdiction team work at Amtrak?

16   A.    Our day will start out, someone from our team will

17   check names off the manifest, look at reservation

18   information and look for some of these characteristics.

19        When the train arrives, we'll attempt to locate

20   these individuals and consensually speak to them.

21   Q.    Now --

22        MS. GORMAN:  Your Honor, I'll make the same

23   objection.  Consent is a -- that's your decision, Your

24   Honor, whether something is consensual.  And I would ask

25   the witness to not characterize interactions like that.

1           THE COURT:  All right.  Let's just move forward.

2     I don't think I need a ruling on that.

3     BY MS. RACHOW:

4     Q.    And, sir, are the manifests for the trains run every

5     single day?

6     A.    Yes.

7     Q.    And were they run on December 4th of 2014?

8     A.    Yes, they were.

9     Q.    Were you working that day?

10    A.    Yes.

11    Q.    How many trains come through Amtrak on a regular

12    day?  That Reno station.  I'm sorry.

13    A.    Two times.  A morning train, which is normally

14    travelling westbound, and an afternoon train, which is

15    travelling eastbound.

16    Q.    Were you working the morning of December 4th of

17    2014?

18    A.    Yes.

19    Q.    And prior to meeting the train, had the passenger

20    manifest been run?

21    A.    Yes.

22    Q.    And did somebody's reservation catch your attention?

23    A.    Yes.

24    Q.    And do you recall whose reservation that was?

25    A.    It -- there was one reservation that I recall, which

1    was for a passenger with the name Shaun Estes.

2    Q.    And do you recall why that reservation attracted

3    attention?

4    A.    It had some of the travelling characteristics that I

5    had mentioned.  I believe $970 was paid for travel one way

6    into Emeryville.

7    Q.    And why would that be significant?

8    A.    Well, it -- it -- it's what we learn to look for.

9    It's what we've been taught.  It's a consistent

10   characteristic from past -- individuals who we have

11   received or located drug contraband on.

12   Q.    And to be fair, this doesn't give you enough to make

13   any sort of arrest --

14   A.    No.

15   Q.    -- is that true?

16   A.    That's true.

17   Q.    So what is your next step?

18   A.    We will ask to talk to this person.

19   Q.    Now, with Mr. Estes' reservation attracting

20   attention, was the decision made to try to meet with

21   Mr. Estes?

22   A.    Yes.

23   Q.    Did you have any idea who Mr. Estes was prior to

24   meeting with him?

25   A.    No.

1    Q.    Did you know what he looked like?

2    A.    No.

3    Q.    Did you know where he was located on the train?

4    A.    Yes.  The first location we would look for him -- or

5    we looked for him was room 10 of train car 531.

6    Q.    And was that because that was on his reservation?

7    A.    Yes.

8    Q.    Is that the first step you usually take when trying

9    to make contact with one of these individuals whose

10   reservations you've flagged?

11   A.    Yes, it is.

12   Q.    And why is that?

13   A.    Well, that's the one location we know to be linked

14   to that reservation.  And it's a good possibility the

15   person might be at that location.

16   Q.    Now, with the morning train from Amtrak stopping in

17   Reno, is the amount of time that the train stops always the

18   same?

19   A.    No.

20   Q.    And what does that depend on?

21   A.    It depends -- well, the train is scheduled to leave

22   at 8:36 every day.  So if it shows up at 8:10, it will

23   leave at 8:36, unless there's something holding it up,

24   which would be passengers getting on or off.

25              If it shows up after 8:36, it will only be there

1    long enough to conduct train business, which would be

2    getting the crew on and off and the passengers on and off.

3    So they try to minimize the time that it's stopped.

4    Q.    And on December 4th was the train late?

5    A.    Yes, it was.

6    Q.    Was it several hours late?

7    A.    Yes.

8    Q.    Do you recall trying to make contact with Mr. Estes

9    at his room?

10   A.    Yes.

11   Q.    And was Mr. Estes there?

12   A.    No, he was not.

13   Q.    So what happened next?

14   A.    I had checked the room.  There was no one in there,

15   so I walked back down the hallway to the exit door that

16   leads out on to the concrete platform.  And I observed

17   Detective Kurup speaking to the gentleman with the orange

18   shirt on.

19            MS. RACHOW:  And for the record, may it be

20   reflected that the witness just identified the defendant?

21            THE COURT:  Yes.

22   BY MS. RACHOW:

23   Q.    Now, sir, you stated that you checked the room.  Was

24   the door open?

25   A.    I don't recall.

1  Q.    And could you have seen in the room if the door was

2  open?

3  A.    Yes.  But I -- I don't recall being able -- or

4  seeing what was in the room.  I just know no persons were

5  in there.

6  Q.    Would you have opened the door if the room would

7  have been closed?

8  A.    Never.

9  Q.    Never?

10  A.    No.  Definitely not.

11  Q.    Now, you mentioned Detective Kurup.  With the

12  interdiction team, do you work in pairs?

13  A.    Yes, we do.

14  Q.    And why do you work in pairs?

15  A.    It's a common policing principle, cover and contact.

16  Or if he needs assistance in any way and he's the one

17  making contact, I will assist him.  Or vice versa.

18  Q.    Now, what -- do you wear a uniform?

19  A.    No.

20  Q.    And what type of clothing do you wear?

21  A.    We wear plainclothes.  Looks very much like a

22  civilian would who is riding the train.

23  Q.    And is that the reason you wear plainclothes?

24  A.    Yes, we do.  It's to blend in and also not attract a

25  lot of attention.

1    Q.    And why don't you want to attract a lot of

2    attention?

3    A.    Well, it's to -- Amtrak's very customer-service

4    oriented.  And I -- some people, it's our experience, do

5    get a little bit nervous when the police are around,

6    whether we're talking to them or not.

7    Q.    Now, even though you're in plainclothes, do you

8    still have a badge?

9    A.    Yes.

10   Q.    And is that badge displayed?

11   A.    Not normally.  It's normally under our shirts or our

12   jackets.

13   Q.    And when would you choose to display the badge?

14   A.    When I identify myself to someone.

15   Q.    And why do you do that?

16   A.    So they know that they're speaking to a police

17   officer.

18   Q.    And are you armed?

19   A.    Yes.

20   Q.    And is your weapon visible?

21   A.    Never.

22   Q.    And you said never?

23   A.    Well, when we're contacting someone, never.

24        But if there would be a reason to display it, we

25   would.  But not normally would anyone know that we're even

1   armed.

2   Q.    Now, you mentioned that you saw Detective Kurup

3   speaking with the defendant?

4   A.    Yes.

5   Q.    What were you doing?

6   A.    I was standing back just so it wouldn't appear that

7   too many people around him are talking to him.

8   Q.    Talking to who?

9   A.    Mr. Estes.

10  Q.    Why was that important to you?

11  A.    Well, we want to -- we want to keep this

12  conversation as low key as possible.

13  Q.    And did you make sure that you were far enough from

14  Mr. Estes that you weren't crowding his space?

15  A.    Yes.

16  Q.    Was there a canine officer at the train station?

17  A.    Yes, there was.

18  Q.    And do you recall where the canine officer was?

19  A.    I do not recall exactly where he was.

20  Q.    But you know that he was there?

21  A.    Yes.

22  Q.    And is the canine officer in uniform?

23  A.    Yes.

24  Q.    And do you and Detective Kurup -- since you're

25  working interdiction, do you hang out with the canine

1    officer?

2    A.    Specifically when the trains --

3    Q.    When the trains have arrived?

4    A.    No, we actually separate ourselves.

5    Q.    And why do you do that?

6    A.    Just to remain less visible from the uniform

7    presence.

8    Q.    So hypothetically if someone were to have said that

9    in this case that you, Detective Kurup, and the canine

10   officer were speaking together and pointing at Mr. Estes --

11             MS. GORMAN:  Your Honor, objection, leading.

12             MS. RACHOW:  It's a hypothetical.

13             THE COURT:  Sustained.

14   BY MS. RACHOW:

15   Q.    Did you speak to the canine officer while Detective

16   Kurup was engaging with Mr. Estes?

17   A.    While I was standing in the door and Detective

18   Kurup --

19   Q.    You were still on the platform?

20   A.    No.

21   Q.    Did you ever point at the defendant?

22   A.    No.

23   Q.    Could you overhear what Detective Kurup was saying

24   to Mr. Estes?

25   A.    No.

1   Q.    So you were far enough away that you couldn't hear

2   their conversation?

3   A.    That's correct.

4   Q.    Did you observe Mr. Estes yourself?

5   A.    Yes, I did.

6   Q.    And did you see him on the phone?

7   A.    I did not see him on the phone.

8   Q.    At some point did you board the train?

9   A.    Yes, initially, when we were looking, when we were

10  checking room 10 to see if anyone was in there.

11  Q.    How about after Detective Kurup was speaking with

12  Mr. Estes?

13  A.    Yes.

14  Q.    And can you tell us how that came to be?

15  A.    Detective Kurup advised that we were going to deploy

16  a canine down the common hallway near to room 10.

17  Q.    Is that common?

18  A.    The hallway or --

19  Q.    To deploy the canine?

20  A.    Yes, it is.  It would be the next logical step if we

21  weren't given consent to check a room.

22  Q.    And do you do that on a daily basis?

23  A.    Yes.

24  Q.    Why would you run the dog after somebody denied

25  consent?

1    A.    That's what my training has taught me, and it's --

2    it really is the next logical step.  You know, it's a

3    common hallway, and we're interested to know about any

4    possible criminal activities, you know, associated with

5    these indicators.

6    Q.    Is it ever used as a threat, in your experience,

7    that you're going to deploy the canine?

8    A.    Never.  It's usually a state -- it's always a

9    statement of fact.

10   Q.    Now, in this specific case did you have any contact

11   with Mr. Estes?

12   A.    I did.

13   Q.    And can you tell us about that.

14   A.    After the canine was deployed in the common hallway,

15   I advised Mr. Estes that the canine showed a lot of

16   interest at his room.

17   Q.    Now, how -- so you're all upstairs.  The canine's

18   being deployed.  Do you recall where Mr. Estes was?

19   A.    He was standing at the top of the stairwell toward

20   the window.

21   Q.    And was somebody standing in the way or in between

22   him and the stairwell?

23   A.    Not that I recall.

24   Q.    Did you ask him to remain up there with you?

25   A.    I -- I -- no, I did not.

1    Q.    Did you tell him he had to stay up there with you?

2    A.    No.

3    Q.    And where were you in relation to where he,

4    Mr. Estes, was standing?

5    A.    I was standing at the -- it would be the west end of

6    the hallway next to the stairwell, just so passengers

7    wouldn't walk in and startle the canine.

8          And Mr. Estes was probably, and this is an

9    estimation, about five feet away from me to my rear toward

10   the window.

11   Q.    And did you do that on purpose?  As far as where you

12   were placed and where Mr. Estes was?

13   A.    You know, it -- I was under the impression he was

14   standing where he wanted to be.

15   Q.    And you were trying --

16          MS. GORMAN:  Your Honor, I'm just going to

17   object to that char- -- speculation.

18          THE COURT:  I'll allow him to testify to his

19   impression.  Overruled.

20   BY MS. RACHOW:

21   Q.    Did you see if Mr. Estes was on the phone?

22   A.    I don't ever recall him being on the phone.

23   Q.    Did you ever hear his phone ring?

24   A.    I don't recall.

25   Q.    Did you take his phone at any point?

1    A.    No.

2    Q.    Did you go through his phone?

3    A.    No.

4    Q.    Now, you stated to Mr. Estes that the dog had shown

5    a lot of interest in his room?

6    A.    Correct.

7    Q.    Did you say anything else?

8    A.    No.  I just basically relayed what I had observed to

9    Mr. Estes.

10   Q.    Did you tell him you were going to get a warrant?

11   A.    No.

12   Q.    Did you tell him you were going to seize his

13   belongings?

14   A.    No.

15   Q.    What did Mr. Estes say, if anything, in response to

16   your statement that the dog showed a lot of interest in his

17   room?

18   A.    You know, I don't recall what he said.  I did hear

19   him talking to Detective Kurup.

20   Q.    And where was Detective Kurup at this point?

21   A.    He was also at the top of the stairwell with

22   Mr. Estes.

23   Q.    Now, is this a fairly small area?

24   A.    Yes.  But it's large enough for passengers to move

25   past each other.

1  Q.    And did you hear Mr. Estes say that he wanted to

2  leave?

3  A.    No.

4  Q.    How was Mr. Estes' demeanor?

5  A.    Very calm and polite.

6  Q.    Did you have any impression that he might be scared

7  of you?

8  A.    No.

9  Q.    Intimidated?

10  A.    No.

11  Q.    Now, after -- you say that you didn't hear what

12  Mr. Estes had stated to Detective Kurup.  Did you hear the

13  next thing that Detective Kurup did?

14  A.    Well, at the time, Officer Hill and his dog, his

15  police canine Remy, they were deboarding the train.  So

16  after they went down the stairwell, Detective Kurup and

17  Mr. Estes walked toward the room.

18  Q.    Did you see who was leading?

19  A.    It was Detective Kurup.

20  Q.    Could you see what was happening at the room?

21  A.    I stood close enough to see what was occurring.  And

22  both Detective Kurup and Mr. Estes were in the room.

23  Q.    And could you see what was going on in the room?

24  A.    It appeared to me that they were searching.

25  Q.    Did you see Mr. Estes do anything as opposed to

1  Detective Kurup?

2  A.    Yes, I -- well, I saw him reach in the room.  I

3  couldn't exactly see what was going on in there.  And then

4  a short time later Detective Kurup advised me that there

5  was a handgun in the room.

6  Q.    Okay.  Now, you've mentioned that Officer Hill has

7  already left the train before Detective Kurup and Mr. Estes

8  walked back to the room; is that correct?

9  A.    That's correct.

10  Q.    Was there any other uniformed police presence on the

11  train --

12  A.    No --

13  Q.    -- car?

14  A.    No, there was none.

15  Q.    Were you aware of any other undercover police

16  officers on the train?

17  A.    None.

18  Q.    Now, after Detective Kurup advised you that there

19  was a firearm in Mr. Estes' luggage, what did you do?

20  A.    I -- I don't know the circ- -- at the time I didn't

21  know the circumstances of the handgun.  But I do know it's

22  against the policy of the train to have it on there.

23        I wanted to keep him calm, which he was.  And I

24  asked if he would speak to me downstairs.  And I explained

25  the handgun was in violation of an Amtrak policy.

1    Q.    Did you specifically say anything about there being

2    a violation of state law?

3    A.    As far as the handgun, yes.  Because I wanted to put

4    his mind at ease.  I didn't want him to think that just

5    because he had a handgun there was anything to worry about.

6    Q.    So at this point the only thing -- or the only issue

7    you're seeing is that Mr. Estes has a handgun in violation

8    of Amtrak policy?

9    A.    Correct.

10   Q.    And did you know that he would be removed from the

11   train from having a handgun in his luggage?

12   A.    You know, it's -- it's up to the train --

13   Q.    So that would be --

14   A.    -- employes.

15   Q.    I'm sorry.  That's an Amtrak decision?

16   A.    Yes, it is.

17   Q.    Not a Reno Police Department --

18              MS. GORMAN:  Your Honor --

19   BY MS. RACHOW:

20   Q.    -- decision?

21              MS. GORMAN:  -- objection.  She's continuously

22   leading this witness on direct.

23              THE COURT:  Sustained.

24   BY MS. RACHOW:

25   Q.    Sir, is it fair to say that policy decisions

1    regarding Amtrak are not -- well, sorry.

2              Who are the policy decisions regarding Amtrak

3    made by?

4    A.    Amtrak employees.

5    Q.    And you stated that you asked Mr. Estes if he would

6    go down?

7    A.    Yes.

8    Q.    Can you tell us about that?

9    A.    Yes.  I asked if he would speak to me downstairs

10   where we had more privacy.  And he agreed.

11   Q.    Did he -- what was his demeanor with you?

12   A.    Very calm.

13   Q.    What happened next?

14   A.    We walked downstairs.  I asked for his ID because I

15   would like to know if he's a prohibited person or not.  And

16   he did provide me with it.

17             A very short time later Detective Kurup came

18   downstairs with the bag.

19   Q.    And what did you do with Mr. Estes' ID?

20   A.    I called the Reno Police records division to check

21   if he had any warrants or a criminal history that would

22   prohibit him from possessing that handgun.

23   Q.    Were you able to get off of the train?

24   A.    No.  It had started moving about the same time that

25   the handgun was located or that I was notified and that we

1    were walking down the stairs.

2    Q.    And you stated there for a bit you were downstairs

3    with Mr. Estes, just the two of you?

4    A.    A very short amount of time, yes.

5    Q.    Did you have Mr. Estes -- what did you do with

6    Mr. Estes?  Did you --

7    A.    He was -- he stood down in this common area with me.

8    There's a hallway that leads to some bathrooms and then the

9    boarding area.  There's -- it's an open area with two

10   doors, one door on each side for passengers to enter and

11   exit.

12   Q.    Did you tell him he was under arrest?

13   A.    No.

14   Q.    At some point did you place him under arrest?

15   A.    Yes.

16   Q.    And can you tell us why?

17   A.    I learned that he was a prohibited person from Reno

18   Police records personnel.

19   Q.    Was this while you were still on the train?

20   A.    Yes.

21   Q.    And did you know if the train was going to be

22   stopped?

23   A.    At that point, yes.

24   Q.    Did you know where the train was going to be

25   stopped?

1    A.    Detective Kurup made arrangements with the conductor

2    to stop in Verdi, Nevada.

3    Q.    Is that a normal stop?

4    A.    No.

5    Q.    Now, you've placed Mr. Estes under arrest.  Do you

6    read him his Miranda rights?

7    A.    After we exited the train, yes.

8    Q.    He's under arrest while you're on the train with

9    him; correct?

10   A.    Yes, he is.

11   Q.    Did you write -- read him his Miranda rights at that

12   time?

13   A.    No.

14   Q.    Why not?

15   A.    There was a lot going on.  We were arranging to get

16   the train stopped and get him off safely.  And it just --

17   it didn't seem like the right forum for me to start

18   questioning him with all that going on.  Because we would

19   inevitably have an interruption when the train stopped.

20   Q.    Did he -- I'm sorry.  Did you ask him any questions?

21   A.    Prior to --

22   Q.    While you're still on the train?

23   A.    You know, I asked him for his driver's license.  He

24   made some statements when he heard -- I'm assuming -- okay.

25         While I was talking to RPD records he did make

1     some statements.  But I didn't ask him, you know, any

2     questions.

3     Q.    And what type of statements did he make?

4     A.    He made the statement that he had lawfully purchased

5     that handgun.

6     Q.    When you were talking to RPD records, what type of

7     information are you conveying?

8     A.    I will give them his identifying information, which

9     would be name, date of birth.  I'm not sure if I had his

10    social security number.  And I would have given them the

11    state ID number or license number that was on his ID.

12    Q.    And you're doing this out loud?

13    A.    Yes, on the phone.

14    Q.    Could people overhear you?

15    A.    Downstairs, I -- yeah.  I think if someone was

16    really trying to listen to what I was saying, they would be

17    able to hear me.

18    Q.    Now, after the train comes to a stop what happens?

19    A.    We deboarded.  And as we're awaiting for a transport

20    officer to arrive, I did advise him of his Miranda rights.

21    Because I -- you know, he seemed willing to talk.

22    Q.    When you say he seemed willing to talk, did you ask

23    him if he wanted to talk?

24    A.    After advising him of his Miranda rights, yes.

25    Q.    And did he answer you?

1    A.    He stated yes.

2    Q.    Did you ask him further questions?

3    A.    I did.  I asked him specifically about the lawful

4    purchase.  And he had described purchasing the handgun at a

5    pawn shop in Arkansas.

6    Q.    When did you finish your interview with him?

7    A.    After he mentioned that, he seemed very reluctant to

8    speak to me.  And I -- you know, I stopped speaking to him.

9    Q.    Was that a change from earlier in your encounter

10   with him?

11   A.    At the -- yes, I think so.

12   Q.    When he was making statements to you while you were

13   still on the train and you hadn't given him his Miranda,

14   did you ask him any follow-up questions?

15   A.    I actually said, you know, "I'm interested to hear

16   what you have to say, but I'll ask you those questions when

17   the time's right."  Those aren't my exact words, but that's

18   definitely what I indicated to him.

19   Q.    And did you do a report in this case?

20   A.    I did do a PC declaration.

21   Q.    If you could turn to the defense exhibit binder in

22   front of you.

23   A.    What number?

24   Q.    It's going to be tab 101.

25   A.    Okay.

1    Q.    Are you familiar with the documents in that tab?

2    A.    Yes, I am.

3    Q.    And how are you familiar with those documents?

4    A.    The top form is a booking sheet.  It's what we call

5    it.  And it has Mr. Estes' personal information as well as

6    his charges.  In the second page is the declaration

7    statement.

8    Q.    And did you complete the declaration statement?

9    A.    I did.

10   Q.    I'm going to direct your attention to the booking

11   sheet.  Does it give an offense date and time?

12   A.    Yes, it does.

13   Q.    And --

14   A.    And to me it looks like 12:00.

15   Q.    Do you use a 24-hour clock?

16   A.    Yes, we do.

17   Q.    So would that be 12:00 p.m.?

18   A.    Yes, 12:00 p.m.

19   Q.    Now, if you would look at your report, your probable

20   cause statement on page 2.  Is there a discrepancy in the

21   time?

22   A.    For the offense it being 12:00 and for my

23   declaration statement that says 1140 hours, that's -- those

24   two times are definitely different.  And I would say both

25   times are estimates.

1   Q.   Have you had an opportunity to review the dispatch

2   log prior to your testimony today?

3   A.   I have seen it, yes.

4   Q.   And with your 20 years with Reno Police Department,

5   are you familiar with the dispatch logs?

6   A.   Somewhat, yes.

7   Q.   In this case did you ever call dispatch?

8   A.   I did not.

9   Q.   That would generate a dispatch log; is that correct?

10  A.   In most cases it would.

11  Q.   And did you specifically review the dispatch log in

12  this case to see whether or not you had called?

13  A.   I -- you know, I did observe it, and I did not see

14  any -- anything on there that indicated that I called

15  dispatch.

16  Q.   When you called into records to run Mr. Estes'

17  identification and whether there were any wants and

18  warrants, how did you do that?

19  A.   With a cellular phone.

20  Q.   So that would not be reflected on the dispatch?

21  A.   No, it would not.  Those are two different offices

22  and buildings.

23  Q.   Are you familiar with the Reno Police Department

24  Tiburon reports?

25  A.   I am.

1    Q.    And are those generally the report formats you use?

2    A.    Yes, they are.

3    Q.    And do your partners on the Amtrak or in this

4    interdiction team use the Reno Police Department Tiburon

5    system?

6    A.    Yes, he does.

7    Q.    Are certain parts of Tiburon reports already

8    populated for you?

9    A.    Yes, they are.

10   Q.    And can you explain that for us?

11   A.    Tiburon will -- it's connect -- our reporting system

12   is connected to the dispatch system also.  So there's a

13   button on there.  It basically auto fills some fields.  And

14   it will populate some of the information, when you click on

15   that button, based on the actual dispatch call log.

16   Q.    So it -- if some one officer on scene calls dispatch

17   and starts a log, your Tiburon report is going to

18   incorporate from that dispatch call?

19   A.    Yes, that's very common.

20   Q.    Whether or not you were the individual who called

21   dispatch?

22   A.    Correct.  It's the case number that links the two.

23   Q.    Thank you.

24            MS. RACHOW:  I don't have any further questions.

25            THE COURT:  Cross-examination?

1           MS. GORMAN:  Thank you, Your Honor.

2                   CROSS-EXAMINATION

3    BY MS. GORMAN:

4    Q.    Good afternoon.  So, Detective Moore, you

5    testified -- so you're part of the High Intensity Drug

6    Trafficking Area Task Force?

7    A.    That's correct.

8    Q.    Okay.  And you testified to some of your training

9    about drug trafficking, essentially?

10   A.    Generally, yes.

11   Q.    Okay.  And can you tell me a little bit more about

12   that training?  So where was -- tell me about the last time

13   you had training on drug trafficking.

14   A.    It was in Newport Beach --

15   Q.    Okay.

16   A.    -- California.

17   Q.    In Newport Beach --

18   A.    I don't know the exact date.

19   Q.    Okay.  Can you tell me, who was your instructor in

20   that?

21   A.    There were many, many instructors.  And I -- off the

22   top of my head, I -- there's no way for me to accurately

23   give you that information.

24            I can tell you that one was Joe Lever.  He

25   teaches train interdiction.

1    Q.    He teaches -- so is the bulk of where you get your

2    information on train interdiction, what training is that

3    from?

4    A.    Well, INIA.  It's also from experience.

5    Q.    Okay.  And so INIA.  And that's the organization

6    that you testified about on direct examination?

7    A.    Yes.

8    Q.    Okay.  And did they provide you, for example, an

9    interdiction manual?

10   A.    Some classes they provide material.  But I wouldn't

11   call it a manual.

12   Q.    Okay.  Do you have material that you rely on in

13   terms of investigating drug interdiction?

14   A.    I'm sure I do.  I can't speak specifically of it.

15   Q.    Okay.  Part of your job then is to -- on this task

16   force, to investigate and arrest people travelling on

17   Amtrak with drugs?

18   A.    It's not -- not the way you word it.  It's to locate

19   folks transporting illegal drugs and drug contraband.

20   Q.    I'm sorry.  I didn't understand.  It's okay folks?

21   A.    To locate.

22   Q.    Oh, to locate folks.

23         So part of your job is, though, to find people

24   who are transporting drugs on --

25   A.    Yes.

162

1    Q.    -- Amtrak?

2    A.    Yeah --

3    Q.    Okay.

4    A.    -- that's part of it, yes.

5    Q.    And when people are transporting drugs, you arrest

6    them usually?

7    A.    Very often, yes.

8    Q.    Okay.  So you look at ticket information to decide

9    who to target for investigation?

10   A.    That's part of it, yes.

11   Q.    Okay.  Well, that would be the manifest that you

12   discussed with the prosecutor on direct examination?

13   A.    Correct.

14   Q.    Okay.  So for your indicators, one of the indicators

15   you look for are cash purchases of tickets?

16   A.    Yes.

17   Q.    Okay.  And that's because cash is not traceable?

18   A.    It --

19   Q.    Is that right?

20   A.    It could be.

21   Q.    It could be traceable?

22   A.    Yes -- no, I mean, that could be a reason, yes.

23   Q.    So is the reason you look for cash as an indicator

24   because cash is not traceable?

25   A.    Yes.  And it's also a common travelling -- a

1       characteristic that we encounter often with these folks

2       that are transporting contraband.

3       Q.    So drug traffickers often purchase tickets in cash?

4       A.    Yes, they do.

5       Q.    Okay.  And another indicator is purchase of tickets

6       prior -- immediately prior to boarding?

7       A.    Yes.  That's one of the travelling characteristics.

8       Q.    Okay.  And maybe fictitious information on a ticket?

9       A.    Correct.

10      Q.    Okay.  And those are the biggest indicators, would

11      you say?

12      A.    They're very common.  I wouldn't necessarily say

13      they're the biggest because we do talk to people who we

14      don't find anything on them.  And they do have those

15      travelling characteristics.  So --

16      Q.    So you wouldn't say that fictitious information,

17      cash ticket, and immediate prior to boarding purchase are

18      the biggest indicators?

19      A.    I wouldn't say anything is the biggest.  Those are

20      very common, and that is what we look for.

21      Q.    Okay.  So, Detective Moore, I'm just going to direct

22      you to Exhibit 110.  And specifically to page 31.

23      A.    Okay.

24      Q.    Okay.  So actually starting on page 30 in the middle

25      of the page -- well, first of all, turning to the front of

1    that exhibit, can you tell me what that is?

2    A.    Front of the exhibit.

3    Q.    And you might still be looking for it.  So it's

4    Exhibit 110.

5    A.    Okay.  This is -- appears to be a record of

6    deposition, my statement --

7    Q.    So it's --

8    A.    -- from a deposition.

9    Q.    -- a deposition of you?

10   A.    Yes.

11   Q.    Okay.  Can you tell me when it was taken?

12   A.    It looks like 8/5 of 2014.

13   Q.    So about four months before this incident?

14   A.    Correct.

15   Q.    Okay.  So isn't it true that you identify -- and

16   I'll give you a chance to read through the second half of

17   page 30.  But those are the indicators you have identified

18   as the biggest indicator as what you're looking for; is

19   that right?

20   A.    Let's see.  Which line are you discussing?

21   Q.    Okay.  And I'll give you a moment to read from the

22   middle of page 30.

23         And you can just look up when you're done.

24   A.    Okay.  So I understand where the word biggest is

25   coming from.

1    Q.    So I'm just going to -- I'm going to -- I'm sorry.

2    But the way this goes, generally I'll ask questions, and

3    just answer my questions.

4    A.    Okay.

5    Q.    So did you identify cash purchases of ticket and

6    fictitious information on tickets as the biggest indicators

7    that you look for?

8    A.    I'm quoted saying that here, yes.

9    Q.    So you're quoted saying that.  Is that your

10   deposition transcript?

11   A.    That's accurate.

12   Q.    Okay.  That's accurate.

13         So moving from there, another indicator,

14   Detective Moore, might be carrying little or no baggage?

15   A.    Yes.

16   Q.    Okay.  Or starting a trip at an unmanned station?

17   A.    Yes.

18   Q.    Okay.  And you also observe people on trains and

19   platforms?

20   A.    Correct.

21   Q.    Okay.  And an indicator might be excessive

22   nervousness?

23   A.    Yes.

24   Q.    Okay.  Or being evasive as they walk through the

25   train station?

**1**    A.    Can you clarify being -- avoiding?

**2**    Q.    Evasive of things like canines or officers when

**3**  they're walking through --

**4**    A.    Yes.

**5**    Q.    -- the train station?

**6**    A.    Yes.

**7**    Q.    Okay.  So, Detective, are you aware of any research

**8**  that connects people ticket-purchasing behavior with the

**9**  likelihood of them being a drug mule?

**10**    A.    No.

**11**    Q.    Okay.

**12**    A.    If you mean transporting, no.

**13**    Q.    Yeah, transporting.

**14**       And, to your knowledge, does Amtrak collect data

**15**  on people who have one or more of these indicators whether

**16**  or not they're carrying drugs?

**17**    A.    Not that I'm aware of.

**18**    Q.    Okay.  And, to your knowledge, does Reno Police

**19**  Department keep these statistics?

**20**    A.    Not that I'm aware of.

**21**    Q.    Okay.  And you don't personally?

**22**    A.    No.

**23**    Q.    Okay.  And you've identified people in the past with

**24**  these indicators who have -- and found no evidence of

**25**  criminal activity?

1    A.    Yes, we've contacted people in the past based on

2    these indicators.

3    Q.    And found no evidence?

4    A.    That's correct.

5    Q.    Okay.  But you singled out Mr. Estes in this case

6    because of the indicators on his reservation; is that

7    right?

8    A.    That's why we wanted to speak to him, yes.

9    Q.    Yes.  So that's why you singled out Mr. Estes to

10   talk to him are these indicators; is that right?

11   A.    Yes.

12   Q.    Okay.  So I want to talk to you about those

13   indicators.

14         So the first indicator was that Mr. Estes booked

15   his ticket on November 29 for travel beginning on December

16   2nd?

17   Q.    My understanding is that's when the reservation was

18   made, yes.

19   A.    Okay.

20   Q.    Okay.  So that's a yes.  Okay.

21         Now, I'm going to show you Exhibit 115 if you

22   could turn to that.  Do you have it?

23   A.    (No audible response.)

24   Q.    Is that the information you had about Mr. Estes

25   before you targeted him?

1    A.    Yes.

2    Q.    Okay.  And that shows an emergency exchange voucher;

3    correct?

4    A.    It does show an exchange.

5    Q.    Okay.  And that was issued because of a late train?

6    A.    I don't know that.

7    Q.    So this was the information you had available to

8    you; is that right?

9    A.    Yes, it is.

10   Q.    So I'm going to direct you towards the top where I

11   believe it says "late train."

12             And, Your Honor, I could use the Elmo if that

13   might be easier.

14   A.    You know, it's a -- I'm looking, and it's actually

15   kind of a tough copy to read.  Okay.  I do read -- I do see

16   that.

17   Q.    Okay.  So he was issued an emergency exchange

18   voucher because there was a late train; is that right?

19   A.    That's what it says, yes.

20   Q.    So this isn't even the original, like, ticketing

21   information for Mr. Estes, is it?

22   A.    This is the -- this is the information we have

23   available --

24   Q.    So that's --

25   A.    -- to us.

1    Q.    -- all the information that you had?

2    A.    Well, there's other screens also, you know, that

3    would show when the reservation was made.

4    Q.    Okay.  Well, were there other screens that you

5    looked at, then, in this case?

6    A.    Yes.

7    Q.    So you looked at -- okay.  So you looked at other

8    screens in addition to this?

9    A.    It's basically the reservation history screen.  And

10   when you say "you," I don't believe I'm the one who printed

11   or looked at this originally.

12   Q.    So did you -- so do you know who looked at -- who

13   printed this out originally?

14   A.    Detective Kurup.

15   Q.    Okay.  And so your testimony is that there are

16   other -- other information that he looked at beyond this?

17   A.    For?

18   Q.    In terms of Mr. Estes?

19            MS. RACHOW:  Objection.  Calls for speculation.

20            MS. GORMAN:  Your Honor, Detective Moore just

21   testified to it.

22            THE COURT:  That doesn't call for speculation.

23   You asked if that was his testimony.

24   BY MS. GORMAN:

25   Q.    Is that -- that was your testimony, right, that

```
1    there's other information that Detective Kurup would have

2    looked at or looked at?

3    A.    Yes.  And I can give an explanation if you would

4    like.

5    Q.    Well, at this point I'll -- we'll stick with this.

6              So there is other information that Detective

7    Kurup would have looked at.  Do you know if that

8    information was ever provided to the government in this

9    case?

10   A.    I don't know.

11   Q.    You don't know.  So but this is the information --

12   so this is some of the information, then, you're saying

13   that you had about Mr. Estes?

14   A.    Yes.

15   Q.    Okay.  But you believe that there's more information

16   that you had?

17   A.    May I give an explanation?

18             MS. GORMAN:  So, Your Honor, I'm going to move

19   for production of that information.

20             Detective Kurup testified this was all that

21   there was.  I think that this is really important

22   information in this case.  It wasn't provided to us.

23             MS. RACHOW:  And, Your Honor, this is the first

24   I've heard of there being other screens or other

25   information that Detective Kurup might have looked at.
```

1           Detective Kurup would actually be the one to

2    ask.  This witness keeps wanting to offer an explanation.

3    Maybe this would be the point for him to offer the

4    explanation.  Because the government has turned over --

5           THE COURT:  Well, if he's personally aware of

6    what Detective Kurup did, he's qualified to testify to it.

7    If he's not, then he isn't.  Because, first of all,

8    Detective Kurup has testified.  And as I recall his

9    testimony, he stated that this was the only information

10   gathered from.  I could be mistaken.

11          But I would urge you, Ms. Rachow, to check with

12   Detective Kurup to see if there was other information that

13   he referred to.  And perhaps it's just a common

14   misunderstanding.

15          MS. RACHOW:  Absolutely, Your Honor.  And, in

16   fact, I will call him at 5:00, since he's going to be on

17   his way to the airport.

18          THE COURT:  All right.

19          MS. GORMAN:  So, Your Honor, but I want to be

20   clear, can we have a court order that that information be

21   produced to both parties.

22          THE COURT:  Any information that he would have

23   referred to should be produced, definitely.

24          MS. GORMAN:  Okay.  And, Your Honor, and the

25   fact that the government doesn't know doesn't release them

1    of the obligation not to produce that.  And -- okay.

2              THE COURT:  Well, it all depends on the

3    circumstances.  But, in any event, I will order that if

4    there's other information that he referred to, that that be

5    produced by the government.

6              MS. GORMAN:  So, Your Honor, my only concern is

7    that we're in the middle of this hearing.  And so I don't

8    know if we can have it produced now, but I think it's

9    important for this hearing.

10             THE COURT:  Well, that's a reasonable request.

11   And we're within 15 minutes of shutdown time anyway; so I

12   will order that.

13             And, Ms. Rachow, if you can check on that.  And

14   then we'll resume in the morning at 8:30.  And hopefully if

15   there is such information, you'll have it by that time and

16   can be prepared.

17             Let's do that.  The admonitions concerning the

18   Rule of Exclusion continue.  And we'll start promptly in

19   the morning at 8:30.

20             The Court will be adjourned at this time.

21             COURTROOM ADMINISTRATOR:  Please rise.

22        (The proceedings adjourned at 4:45 p.m.)

23                        *   *   *

24

25

173

1                            -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6                                              __4/4/16__

7        Donna Davidson, RDR, CRR, CCR #318      Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    GOVERNMENT'S WITNESSES:                        PAGE

3    MADHU KURUP
         Direct Examination By Ms. Rachow              5
4        Voir Dire Examination By Ms. Gorman          12
         Direct Examination (Continued)              13
5        By Ms. Rachow
         Voir Dire Examination By Ms. Gorman          27
6        Direct Examination (Continued)              28
         By Ms. Rachow
7        Cross-Examination By Ms. Gorman              54
         Redirect Examination By Ms. Rachow          114
8        Recross-Examination By Ms. Gorman           123

9    TONY MOORE
         Direct Examination By Ms. Rachow            133
10       Cross-Examination By Ms. Gorman             160

11

12                       E X H I B I T S

13   GOVERNMENT'S                                 ADMITTED
     2                                                 28
14   3                                                 13

15   DEFENDANT'S                                  ADMITTED
     116B, 116I, 116J                                 113
16   125, 126, 127, 128                                83
     130                                             132

17

18

19

20

21

22

23

24

25