1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEVADA
2         BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4    UNITED STATES OF AMERICA,          :
                                        :
5          Plaintiff,                   :
                                        :No. 3:15-cr-00015-LRH-VPC
6       vs.                             :
                                        :
7    SHAUN JERMAINE ESTES,              :
                                        :
8          Defendant.                   :
     _____   :
9

10

11        TRANSCRIPT OF EVIDENTIARY HEARING (Day 2)
                  (Pages 175 through 295)
12
                      March 31, 2016
13

14                    Reno, Nevada

15

16

17

18

19

20
     Court Reporter:          Donna Davidson, RDR, CRR, CCR 318
21                            Certified Realtime Reporter
                              400 South Virginia Street
22                            Reno, Nevada  89501
                              (775) 329-0132
23

24

25

176

1                         A P P E A R A N C E S

2

3     FOR THE PLAINTIFF:

4     MEGAN RACHOW
       Assistant United States Attorney
5     100 West Liberty Street
       Suite 600
6     Reno, Nevada 89501
       (775) 784-5438
7     megan.rachow@usdoj.gov

8

9

10    FOR THE DEFENDANT:

11    LAUREN D. GORMAN
       Assistant Federal Public Defender
12    201 West Liberty Street
       Suite 102
13    Reno, Nevada 89501
       (775) 784-5369
14    lauren_gorman@fd.org

15

16    BIRAY DOGAN
       Assistant Federal Public Defender
17    201 West Liberty Street
       Suite 102
18    Reno, Nevada 89501
       (775) 321-8486
19    Biray_dogan@fd.org

20

21

22

23

24

25

```
 1              RENO, NEVADA, MARCH 31, 2016, 8:42 A.M.

 2                            --oOo--

 3              P R O C E E D I N G S

 4

 5              THE COURT:  Good morning.  Have a seat, please.

 6              All right.  The record will show we are

 7    reconvened in this hearing at this time.  And I see that

 8    Detective Moore is on the stand.  And I don't recall who

 9    was questioning when we concluded yesterday.

10              MS. RACHOW:  Good morning, Your Honor.  We were

11    mid through Detective Moore's cross-examination.  But an

12    issue arose so we recessed earlier.  I'd like to address

13    that with the Court.  And I do have the -- I'd like to

14    renew my objection to the phone records.

15              THE COURT:  Okay.  Go ahead, please.

16              MS. RACHOW:  Thank you, Your Honor.  As Your

17    Honor recalls, last night it came up that there may have

18    been a second screen that the detectives reviewed prior to

19    making contact with Mr. Estes.

20              I asked Amtrak to pull the complete reservation

21    details for Mr. Estes and had this officer review them as

22    well as the other Amtrak officer.

23              Now, this reservation detail is not in the same

24    format that they could see it.  But this was provided to

25    defense as soon as I got it last night via email.
```

1              The only additional information that they drew

2     from the reservation, the totality of the reservation

3     history, was the date of the initial purchase, which was

4     11/29, that they had handwritten on to the sheet that was

5     discussed in court yesterday.  That was provided in two

6     separate documents to defense counsel.  An actual printout

7     that was Bates stamped number 8, and then a photocopy that

8     was Bates stamped number 10, both of these clearly have the

9     date written on it.

10             And Detective Moore is expected to testify he is

11    the one who wrote that date on those notes.

12             Moving on to the phone records, the

13    representation was made to the Court yesterday that none of

14    the phone records contained --

15             MS. GORMAN:  Your Honor, I'm going to -- the

16    Court asked that the government address this in writing,

17    unless I'm mistaken.

18             THE COURT:  Yes, I've reserved your right to

19    object to that.  I conditionally entered -- admitted the

20    phone records.  I don't need new argument on it.  You'll

21    have time to submit written points and authorities.

22             MS. RACHOW:  Thank you, Your Honor.  I just

23    wanted to be clear about that.

24             THE COURT:  All right.  And is there an

25    objection with regard to the additional record, Ms. Gorman?

1          MS. GORMAN:  No, Your Honor.  I don't believe

2     it's been sought to be admitted at this point.

3          THE COURT:  That's correct.  And you've had an

4     opportunity to review it?

5          MS. GORMAN:  Yes, Your Honor.  And just one

6     slight additional kind of similar housecleaning matter.  It

7     also -- it came to our attention -- I was under the

8     impression that we weren't able to get the full reservation

9     details from this train.  We had gotten the manifest, but

10    it just had names.

11         But it appears we could get full reservation

12    details for every single passenger to see whether or not

13    any others had these indicators.  I don't know if that's

14    relevant at this point, but I'm just -- and I think we can

15    continue with cross-examination.  But I anticipate there

16    might be a point in this hearing where they became

17    relevant.

18         The government, according to their opposition,

19    isn't going on a theory of reasonable suspicion, just clear

20    consent.  So they may not become relevant unless the Court

21    maybe sees that as an avenue for relief for the government.

22         THE COURT:  Okay.

23         MS. GORMAN:  But they haven't raised it.  So --

24         THE COURT:  It strikes me that that's getting

25    out there into issues of relevancy that this hearing is not

1    focused upon.

2              But, in any event, it sounds like it's not a

3    problem at this time.  So why don't we --

4              MS. GORMAN:  No.  I think --

5              THE COURT:  Pick it up --

6              MS. GORMAN:  -- unless the government goes on a

7    theory of reasonable suspicion, then --

8              THE COURT:  Right.

9              MS. GORMAN:  Yes.  Okay.

10                        TONY MOORE

11             recalled as a witness on behalf of the

12            Government, having been previously sworn,

13             was examined and testified as follows:

14                   CROSS-EXAMINATION (RESUMED)

15    BY MS. GORMAN:

16    Q.    Good afternoon, Detective Moore.  Or good morning.

17             So, Detective Moore, we discussed yesterday that

18    you are part of the High Intensity Drug Trafficking Area

19    Task Force.

20    A.    Yes.

21    Q.    Is that right?

22    A.    Yes.

23    Q.    So part of your job is investigating and then

24    arresting people if they're transporting narcotics?

25    A.    Yes.

1    Q.    Okay.  Or money from the sale of narcotics?

2    A.    Yes.  Or large amounts of currency.

3    Q.    Well, you look at ticket information to decide who

4    to target for your investigations?

5    A.    Yes.

6    Q.    And one of the indicators you look for is purchasing

7    a ticket in cash?

8    A.    Correct.

9    Q.    And that's because cash is not traceable?

10   A.    Yes.

11   Q.    Okay.  Now, Estes did not have that indicator; is

12   that correct?

13   A.    That's correct.

14   Q.    Okay.  Now, another indicator is purchase of ticket

15   immediately prior to boarding.  Now, Estes did not have

16   that indicator; is that right?

17   A.    By "immediately," do you mean minutes? hours?  A few

18   days prior is of interest to me.

19   Q.    So I'm just going to ask you whether or not Estes

20   purchased his ticket nearly immediately prior to boarding?

21   A.    What do you mean by "immediately"?

22          MS. GORMAN:  Your Honor, Court's indulgence?

23          THE COURT:  Yes.

24   BY MS. GORMAN:

25   Q.    So, Detective Moore, I'll rephrase.

1          Would you say that a purchase of a ticket of

2    somebody -- of a passenger purchasing a ticket just prior

3    to boarding, or just prior to travelling, would be an

4    indicator for you?

5    A.    Yes.

6    Q.    Okay.  Now, in your opinion, Estes had that

7    indicator?

8    A.    Just prior to, no.

9    Q.    Okay.  And another indicator would be fictitious

10   information on a ticket?

11   A.    Fictitious, yes.

12   Q.    Okay.

13   A.    That would be something we're interested in.

14   Q.    Yes.  So you have previously testified in a

15   deposition under oath that cash purchase, purchase of

16   ticket just prior to boarding, and fictitious information

17   are the three biggest indicators; is that correct?

18   A.    That was in my deposition, yes.

19   Q.    Okay.  And Estes had none of these three?

20   A.    (No audible response.)

21   Q.    Now, Estes didn't also start his trip at an unmanned

22   station, did he?

23   A.    No, he did not.

24   Q.    Okay.  So Estes didn't have that indicator?

25   A.    That's correct.

1   Q.    Okay.  Now, you also observe people on trains and
2   platforms for indicators; is that right?
3   A.    That's correct.
4   Q.    And an indicator might be excessive nervousness?
5   A.    Yes.
6   Q.    Okay.  Now, Estes didn't have that indicator?
7   A.    Not that I observed.
8   Q.    Okay.  And Estes wasn't evasive as he walked through
9   the train station, was he?
10  A.    Not that I observed.
11  Q.    Okay.  And Estes didn't react strangely to the
12  presence of a drug canine?
13  A.    No.
14  Q.    Okay.  So I want to talk to you about the source of
15  these indicators.  So are you aware of any research that
16  actually connects people's ticket purchasing behavior with
17  their likelihood of being a drug courier?
18  A.    I'm aware that, based on experience of other drug
19  interdiction detectives, those indicators are what we look
20  for.
21  Q.    So I'm just going to ask you, Officer, if you're
22  aware of any actual research --
23  A.    No.
24  Q.    -- about the connection?  Okay.
25          Are you aware of any statistics about this

1    connection?

2    A.    No.

3    Q.    Okay.  To your knowledge, does Amtrak keep

4    statistics?

5    A.    I do not know.

6    Q.    Okay.  To your knowledge, does Reno Police

7    Department?

8    A.    We do not.

9    Q.    Okay.  And you don't keep statistics?

10    A.    No.

11    Q.    Okay.  And you have identified, in the past, people

12    as suspicious who have some of these indicators to find

13    evidence of no criminal activity?

14    A.    That's correct.

15    Q.    Now, you singled out Mr. Estes because of some

16    indicators on his reservation?

17    A.    That's correct.

18    Q.    Okay.  And those indicators were different from the

19    ones we just discussed?

20    A.    Yes.

21    Q.    So the first indicator was that he booked his ticket

22    on November 29th for travel beginning December 2nd?

23    A.    Yes.  That's what I observed on the reservation.

24    Q.    Okay.  And that's three days prior to travel?

25    A.    Yes.  Which is of interest to us.

1    Q.    Okay.  So I'm just going to ask that you answer my

2    questions.

3    A.    Okay.

4    Q.    Now, could we agree that there's many reasons why

5    you would buy a ticket three days before travel?

6    A.    Yes.

7    Q.    It could be a family emergency?

8    A.    Yes.

9    Q.    It could be not getting money together on time?

10   A.    Yes.

11   Q.    Okay.  Now, the second indicator was that somebody

12   else paid for Mr. Estes' ticket?

13   A.    Yes.

14   Q.    Okay.  And you knew that someone else paid for the

15   ticket because his ticket was bought with a credit card?

16   A.    That's correct.

17   Q.    And, now, you testified that purchasing tickets in

18   cash is considered suspicious?

19   A.    Yes.

20   Q.    But a credit card is traceable; right?

21   A.    Yes.

22   Q.    And when you see a credit card reservation, you see

23   the name of the credit card owner?

24   A.    That's correct.

25   Q.    And their credit card number?

1   A.    That's correct.

2   Q.    And their billing ZIP code?

3   A.    Yes.

4   Q.    And all that is information about the purchaser.

5         Now, the purchaser here was Christina Rogers?

6   A.    I believe so.

7   Q.    Okay.

8   A.    I would need to review the reservation to --

9   Q.    You're welcome to do so.  The reservation would be

10  Exhibit 115, if you have that in front of you and you need

11  it.

12  A.    Yes, Christina Rogers.

13  Q.    So you don't know if Christina Rogers is Mr. Estes'

14  wife?

15  A.    No.

16  Q.    You don't know if it's his mother?

17  A.    Correct.

18        MS. RACHOW:  Objection.  Asked and answered.

19  This line of questioning was exactly asked yesterday

20  afternoon.

21        THE COURT:  I believe it was.  Sustained.

22        MS. GORMAN:  So I'll move on, Your Honor.

23  BY MS. GORMAN:

24  Q.    Now, the third indicator that you and Detective

25  Kurup used was that Estes was travelling from the eastern

1   part of the United States to California?

2   A.    Yes.

3   Q.    Okay.  Now, the logic of that being an indicator was

4   that the entire state of California is a source of drugs?

5   A.    It's -- yes.

6   Q.    Okay.  So it's your testimony the whole state of

7   California is a source of drugs?

8   A.    It could be, yes.

9   Q.    Okay.  And all drugs get more expensive as you go

10  east?

11  A.    No.  That's, I would say, not correct.

12  Q.    Okay.  Detective, I'm going to just direct you to

13  your probable cause affidavit.  That would be Exhibit 101.

14          So you prepared a probable cause affidavit in

15  this case?

16  A.    Yes, I did.

17  Q.    And you signed it under penalty of perjury?

18  A.    Yes.

19  Q.    Okay.  And in it you discuss some of the indicators

20  at issue?

21  A.    Correct.

22  Q.    So did you or did you not write, "It is common for

23  persons to use the Amtrak train for transporting illegal

24  drugs and other contraband between California, which is a

25  known source area for illegal drugs, and the Eastern United

1   States, where drugs can be sold for larger profit"?

2   A.    I did write that.

3   Q.    Okay.  But it's your testimony now that not all

4   drugs are more expensive as you go east?

5   A.    It's the word "all."  I don't agree that all drugs

6   are.

7   Q.    Okay.

8   A.    I -- may I explain?

9   Q.    So you'll have a chance to explain on redirect

10  examination.

11  A.    Okay.

12  Q.    So but that is what you wrote in your sworn

13  deposition?

14  A.    I --

15  Q.    Or in your sworn affidavit?

16  A.    I did not write that all drugs were.

17  Q.    Did you write the word "drugs"?

18  A.    Yes.

19  Q.    Did you qualify which drugs?

20  A.    No.

21  Q.    Okay.  So and that was the logic of this being an

22  indicator.

23          Now, you've been to trainings on international

24  drug interdiction; is that right?

25  A.    Yes.

1    Q.    Okay.  So you're aware that there's multiple drug

2    trafficking organizations that traffic drugs?

3    A.    Yes.

4    Q.    Okay.  There's Colombian drug trafficking

5    organizations; right?

6    A.    I'm sure there are.

7    Q.    Are you aware that there are Colombian drug

8    trafficking organizations?

9    A.    I -- yes.

10   Q.    Okay.  Are you aware that there are Mexican drug

11   trafficking organizations?

12   A.    Yes.

13   Q.    Dominican drug trafficking organizations?

14   A.    Yes.

15   Q.    And different organizations use different

16   trafficking methods?

17   A.    That's correct.

18   Q.    And how the drugs move depend on what kind of drug

19   is at issue?

20   A.    I don't necessarily think I can agree with that.  I

21   think they're transported in all different ways, depending

22   on who's doing it and how far it's going.

23   Q.    So depending on who the drug trafficking

24   organization is, that would impact how the drugs flow?

25   A.    Not -- not on all occasions, no.

1    Q.    Okay.  So is it your testimony that all drugs are

2    trafficked the same way?

3    A.    No.  I think all drugs could be trafficked numerous

4    different ways.

5    Q.    So all drugs could be trafficked numerous different

6    ways.  Yes?

7    A.    Correct.

8    Q.    And they come from different parts of the world?

9    A.    That's right.

10   Q.    Okay.  And you received training on what cities are

11   source cities?

12   A.    Not necessarily.

13   Q.    So you attended a conference on international drug

14   trafficking.  Is that right?

15   A.    Yes.

16   Q.    So you're -- are you saying that at your training

17   you were never trained on what cities are considered source

18   cities?

19   A.    We're just trained on case-by-case basis and what

20   indicators to look for, experiences of other interdiction

21   investigations.

22   Q.    So you never specifically touched on what parts of

23   the country are considered sources of drugs?

24   A.    Well, cities -- in my opinion, it could be any city.

25   Q.    Any city could be a source of drugs?

1    A.    Yes.

2    Q.    So and is -- okay.  So you testify -- or you wrote

3    in your probable cause affidavit that California

4    specifically is a source of drugs?

5    A.    Yes.

6    Q.    And in contrast to the Eastern United States --

7    A.    It's a known --

8    Q.    -- where drugs can be sold for profit?

9    A.    It's a known source for drugs.  And there could be a

10   lot of different known sources.

11   Q.    So in your sworn affidavit you did talk about

12   California -- you isolated California as the source of

13   drugs.

14   A.    They are what we deal with most.

15   Q.    Okay.  But there's other source cities out there?

16   A.    I'm sure there are.

17   Q.    Okay.  But in your training, you don't know which?

18   A.    It -- in my opinion, it could be any -- any large

19   city could be a source city.

20   Q.    Well, you're aware that Miami is a source city for

21   drugs; right?

22   A.    Yes.

23   Q.    And that's because of Colombian drug cartels?

24   A.    It --

25   Q.    Generally?

```
 1   A.    It could be numerous different drug trafficking

 2   organizations.

 3   Q.    Well, it's a point of arrival for South American

 4   cocaine and heroin?

 5   A.    It --

 6             MS. RACHOW:  Objection --

 7             THE WITNESS:  Sure.

 8             MS. RACHOW:  -- relevance.

 9             THE COURT:  Sustained.

10   BY MS. GORMAN:

11   Q.    Would you consider New York a source city?

12   A.    Yes.

13   Q.    Okay.

14             THE COURT:  I think you've exhausted this

15   subject, Ms. Gorman.  I'd like you to move to something

16   else.

17             MS. GORMAN:  Well, Your Honor, may I ask one

18   other question about Little Rock here?

19             THE COURT:  Yes.

20   BY MS. GORMAN:

21   Q.    Is it your training that Little Rock, Arkansas, is a

22   source city?

23   A.    It -- no, it's not my training.

24   Q.    Okay.  So Little Rock is where Mr. Estes actually

25   started his travel from; is that right?
```

1    A.    That's correct.

2    Q.    Okay.  But you didn't know that at the time?

3    A.    No, I did not.

4    Q.    Okay.  And he was travelling to Emeryville,

5    California?

6    A.    Correct.

7    Q.    Okay.  And we now know that he was travelling from

8    Chicago on an emergency exchange voucher?

9    A.    Yes.

10   Q.    And Estes is travelling to California?

11   A.    Correct.

12   Q.    So under your theory of California being a source of

13   drugs, Estes would be travelling to the source; right?

14   A.    Correct.

15   Q.    Okay.  So by that theory, he wouldn't be carrying

16   drugs?

17   A.    Correct.

18   Q.    And now everyone on Mr. Estes' train is travelling

19   west?

20   A.    That's correct.

21   Q.    So everyone on that train has at least this one

22   indicator?

23   A.    That they're travelling to California?

24   Q.    Yes.

25   A.    Yes.

```
 1   Q.    Okay.  And to be clear, the ticket was in Mr. Estes'
 2   true name?
 3   A.    May I ask what you mean by "true name"?
 4   Q.    Was Mr. Estes travelling under an assumed name?
 5   A.    No.
 6   Q.    Okay.  Now, I want to talk to you about this
 7   encounter from the beginning.
 8               So Estes was the target of your investigation,
 9   based on these indicators, before he ever got off the
10   train?
11   A.    Yes.
12   Q.    Okay.  And you went and you looked for him in the
13   sleeper car at first?
14   A.    Yes.
15   Q.    Okay.  And that was in room number 10?
16   A.    Yes, it was.
17   Q.    And you did that alone?
18   A.    Yes.
19   Q.    Okay.  So did you knock on the door?
20   A.    No.
21   Q.    Okay.  So how did you know that nobody was in the
22   room?
23   A.    I don't recall if the door was open or if the door
24   was closed and the curtains were drawn, but I did not see
25   anyone in the room.
```

1    Q.    So you didn't knock?

2    A.    No.  The room appeared empty.

3    Q.    So you're testifying that the room appeared empty,

4    but you don't remember whether you tried to knock on the

5    door?

6    A.    I wouldn't knock if I could see that no one was in

7    there.

8    Q.    But you're testifying you don't know whether or not

9    the door was closed and the curtains were drawn?

10   A.    I don't recall if the door was open or closed.  If

11   it was closed, there's a window.  So I would still be able

12   to see through that window.

13   Q.    So you don't actually recall whether -- how you

14   found out that he wasn't in the room?

15   A.    I observed that the room did not have a person in

16   it.

17   Q.    But you don't know how you observed that?

18   A.    Either through an open door or through a window on

19   the door.

20   Q.    But you don't actually recall?

21   A.    No.

22   Q.    Okay.  And it happened a year and a half ago?

23   A.    That's correct.

24   Q.    Okay.  So were there, though, without Officer

25   Kurup?

1    A.    Correct.

2    Q.    And you didn't have a picture of Shaun Estes?

3    A.    No.

4    Q.    So you didn't know who you were looking for?

5    A.    No.

6    Q.    Okay.  So when you came out of the train then, you

7    saw Officer Kurup talking to what appeared to be a young

8    black man?

9    A.    Correct.

10   Q.    Okay.  To the best of your knowledge, did Officer

11   Kurup go and try that room with you?

12   A.    No.

13   Q.    So how did you know that Mr. Kurup was talk -- or

14   Officer Kurup was talking to Shaun Estes?

15   A.    I -- at the time, as you just said, he was talking

16   to a young African-American man.  So I -- at that point, I

17   did not know --

18   Q.    To the --

19   A.    -- that he was --

20   Q.    -- best of your knowledge, did Mr. -- or did Officer

21   Kurup have a picture of Mr. Estes?

22   A.    He did not have a picture.

23   Q.    So you don't know how he ended up talking to this

24   man over there?

25   A.    How exactly, no, I do not know.

1   Q.    Okay.  And you were not there when Officer Kurup

2   actually approached Mr. Estes?

3   A.    I was standing in the train when I observed him walk

4   up to him.

5   Q.    Okay.  So you observed him from the train?

6   A.    Yes.  The exit door.

7   Q.    Okay.  So then do you know how long they talked

8   before you got there?

9   A.    I -- it was all happening at the same time that I

10  was walking back down to the door.

11  Q.    Okay.  So were you not there then, would you say,

12  for the first few minutes of their conversation?

13  A.    Maybe the first few seconds.

14  Q.    Okay.  So you didn't see Mr. Estes smoking a

15  cigarette?

16  A.    I did see him smoking --

17  Q.    You did.

18  A.    -- a cigarette.

19  Q.    Okay.  And were you there when Officer Kurup

20  displayed his badge?

21  A.    Yes, I was.

22  Q.    Okay.  Did you hear how Officer Kurup was speaking

23  to Mr. Estes?

24  A.    No, I did not.

25  Q.    Okay.  Did you hear Officer Kurup explaining his

1    reasons for contacting Mr. Estes?

2    A.    No, I did not.

3    Q.    Okay.  Did you hear Officer Kurup asking for an ID

4    and ticket?

5    A.    No.

6    Q.    Okay.  Did you hear Officer Kurup asking Estes about

7    whether he was trafficking drugs or money?

8    A.    I did not.

9    Q.    Did you hear Estes decline consent?

10   A.    No.

11   Q.    Okay.  So, Detective Moore, I'm just going to point

12   you to your probable cause affidavit.

13         So you previously testified that you prepared

14   this probable cause affidavit?

15   A.    I did.

16   Q.    Okay.  So in your probable cause affidavit, did you

17   not write, "Detective Kurup contacted Estes after he exited

18   the train and was smoking a cigarette"?  Did you write

19   that?

20   A.    I did.

21   Q.    Okay.  Let's see.  "Detective Kurup explained his

22   reason for the contact and asked Estes if he was in

23   possession of illegal weapons, large amounts of drugs, or

24   large amounts of currency."

25   A.    I did write that.

1    Q.    So, now, you just testified you didn't actually

2    hear.

3    A.    I specifically asked, when I was writing the

4    statement, about the circumstances of the contact.

5    Q.    So you got the information for your sworn affidavit

6    from talking to the other officer?

7    A.    Yes, I did.

8    Q.    So you didn't personally observe any of this?

9    A.    I did observe him.  I did not hear him.

10   Q.    So you wrote in your affidavit, "Estes advised he

11   was not in possession of any of these items but declined to

12   give consent for his sleeper room on the train to be

13   searched"?

14   A.    Those are facts related to me from Detective Kurup.

15   Q.    Okay.  So your probable cause affidavit is not based

16   on your personal knowledge?

17   A.    It's -- I would disagree.  It was based on

18   statements directly from Detective Kurup to me.

19   Q.    So I'm going to define personal knowledge for you.

20   And then you can tell me whether it was from your personal

21   knowledge.

22   A.    Okay.

23   Q.    Was it something that you actually personally heard?

24   A.    No, it was not.

25   Q.    Okay.  So but you did write it in your sworn

1    affidavit?

2    A.    Yes, I did.

3    Q.    So I'll ask you again.  Is your sworn affidavit

4    based on your personal knowledge?

5    A.    Those -- the statements, no.

6    Q.    Okay.  And you signed this statement under penalty

7    of perjury?

8    A.    I did.

9    Q.    So did you see Mr. Estes on the telephone?

10   A.    No, I did not.

11   Q.    Okay.  So, now, it was about 11:40 when you

12   approached Mr. Estes?

13   A.    It was about 11:40.  That's a -- are you asking

14   about the time that I wrote -- that's a general time that

15   we were there working.

16   Q.    Okay.  So you wrote this in your probable cause

17   affidavit, 11:40?

18   A.    Yes.

19   Q.    Do you have a reason now to doubt its accuracy?

20   A.    Not at all.

21   Q.    Okay.  So when you -- so Mr. Estes, was he alone

22   with Mr. Kurup when you walked up to him?

23   A.    Yes.

24   Q.    Okay.  Now, as part of police reports, officers

25   write down biographical information about people who they

1    arrest; is that right?

2    A.    That's correct.

3    Q.    Okay.  Part of that information is phone numbers?

4    A.    Correct.

5    Q.    Okay.  Can I direct you to Exhibit 102.  Actually,

6    I'll direct to you your own exhibit, Exhibit 101, on the

7    first page.

8    A.    Okay.

9    Q.    Can you just tell me what phone number you had

10   written down for Mr. Estes' phone number?

11   A.    Yes.  The phone number written here appears to be

12   702-272-8072.

13   Q.    So, Officer, you previously testified you have no

14   reason to doubt 11:40 is the accuracy of the time.  Did you

15   just testify to that?

16   A.    I have 11:40 for we were conducting drug

17   interdiction activities.

18   Q.    Okay.

19   A.    So we were conducting drug activities at 11:40.

20   Q.    Okay.  Do you remember if you spoke to anybody else

21   on that day?

22   A.    I do not.

23   Q.    Okay.  So I'm going to just direct you to line 6780

24   on Exhibit 127.

25   A.    You said Exhibit 127?

1    Q.    Yes.

2    A.    Where is this?  Okay.  And what line?

3    Q.    6780.

4          THE COURT:  It doesn't appear on -- at least on

5    the screen that you have up as far as I can tell.

6          MS. GORMAN:  Here.  I'll move it.

7          THE COURT:  All right.

8          THE WITNESS:  Okay.  I do see it.

9    BY MS. GORMAN:

10   Q.    Can you tell me what the calling number is?

11   A.    According to this record, the calling number is

12   702-272-8072.

13   Q.    Can you tell me if that matches the number you wrote

14   on your police report for Mr. Estes?

15   A.    I did not write this number.  But it does match the

16   phone number listed on his booking form.

17   Q.    Okay.  So can you then tell me who the called number

18   is?  What the called number is?

19   A.    Called number is 1-415-368-9164.

20   Q.    And can you tell me the date?

21   A.    The date is 12/4 of 2014.

22   Q.    Is that the date of your interaction with Mr. Estes?

23   A.    Yes, it is.

24   Q.    Can you tell me the time?

25   A.    The time says 11:43:10.

1    Q.    Okay.

2              MS. RACHOW:  Your Honor, again -- and I

3    appreciate that the Court has given the government the

4    opportunity to respond to the phone messages in writing.

5    But one of the points that I wanted to make is that with

6    these phone records, they natively use Coordinated

7    Universal Time.

8              By default that means a day of the call details

9    are taken from 00:00:01 to 23:59:59 UTC, which may differ

10   from your intended time range due to your time zone.  If

11   specific times other than our default are important to your

12   inquiry, please submit legal demands with the date range

13   timeframe --

14             THE COURT:  What's your point, Ms. Rachow?

15             MS. GORMAN:  So, Your Honor --

16             MS. RACHOW:  My --

17             MS. GORMAN:  -- I think I can address this.

18             THE COURT:  What's your point?

19             MS. RACHOW:  My point is I don't know if these

20   records were converted by the phone company to Universal

21   Time to Pacific Time --

22             THE COURT:  What does that have to do with her

23   right to ask the question?  Be seated.

24             MS. GORMAN:  And, Your Honor, I will comment on

25   the universal standard time because actually --

1              THE COURT:  You can comment on that in argument.

2    This witness doesn't know about how these records are kept

3    by the telephone company.  We're wasting time here.

4              MS. GORMAN:  That's true.  And, Your Honor, I'm

5    just going to ask the witness to read into the record the

6    time zone because you can specifically ask for times as

7    opposed to universal standard time.  And we have both

8    actually but --

9              THE COURT:  You can do that.

10   BY MS. GORMAN:

11   Q.    Specifically on this case, can you read when it says

12   "time zone" what it says?

13   A.    The time zone has the letters and numbers "PST8PDT."

14   Q.    Okay.  So are you aware that PST stands for Pacific

15   Standard Time?

16   A.    I've seen that before, yes.

17   Q.    You've seen that before.  Okay.

18              So is it still your testimony, by the way, that

19   Mr. Estes was not on the telephone when you approached him?

20   A.    It's my testimony I did not see him on the

21   telephone.

22   Q.    Okay.  Now, Mr. Estes provided Mr. -- or Officer

23   Kurup a ticket ID on -- ticket and ID upon request; is that

24   right?

25   A.    As related to me by Detective Kurup.

1    Q.    Okay.  So you didn't personally observe it?

2    A.    No.

3    Q.    Okay.  So Mr. Estes showed that he was -- showed his

4    identification.  Are you aware that he showed his an --

5    showed an identification from Arkansas?

6    A.    He actually provided me with his identification

7    later when we were downstairs.

8    Q.    Okay.  So he provided -- so you were not present

9    during the taking of the ID and ticket?

10   A.    When he presented them, no.

11   Q.    Okay.  You didn't choose to ask Mr. Estes why he was

12   travelling to California, did you?

13   A.    I don't believe I did.

14   Q.    Okay.  Would living in Arkansas explain to you why

15   Mr. Estes was coming from Arkansas?

16   A.    Yes.

17   Q.    Okay.  Did you ask him who he was planning to meet

18   in California?

19   A.    I don't recall.

20   Q.    Okay.  Did you ask him about who -- the person who

21   bought the ticket, ask who they were?

22   A.    I don't recall if I did.

23   Q.    Could those answers have provided some information

24   to you that was relevant to your suspicions?

25   A.    Yes.

```
 1    Q.    Okay.  So, now, the ID and ticket of Mr. Estes were
 2    taken as evidence; is that correct?
 3    A.    I'm not sure about the ID.  The ticket, yes.
 4    Q.    Okay.  Are you aware -- was the ticket jacket with
 5    Mr. Estes at the time?
 6    A.    I believe it was.
 7    Q.    Okay.  So that was preserved as evidence?
 8    A.    I believe so.  I would have to actually observe it.
 9    Q.    So you believe that the ticket jacket was
10    preserved --
11          MS. GORMAN:  So, Your Honor, at this -- we have
12    never received an actual ticket jacket of Mr. Estes in
13    evidence.  And we have testimony that it was preserved.
14          MS. RACHOW:  Your Honor, if I may?  I believe
15    that the physical evidence is still in Reno Police
16    Department evidence.  Defense has never requested to view
17    the evidence in the case.
18          THE COURT:  All right.  We don't have it here.
19    It can't be produced.  The witness has testified he doesn't
20    recall whether there was one or not or what became of it.
21    That's probably a better description.
22          So let's move on.
23    BY MS. GORMAN:
24    Q.    So, Officer, are you aware of when the ID and ticket
25    were collected as evidence?
```

1    A.    The exact time, I'm not.

2    Q.    Do you know who did it?

3    A.    I -- it was either me or Detective Kurup.

4    Q.    Okay.  Do you remember who took photographs of them?

5    A.    Detective Kurup.

6    Q.    Okay.  So, now, being a drug trafficker, Officer, is

7    a really serious crime; is that right?

8    A.    Yes.

9    Q.    And you're aware, at least through Kurup, that

10   Officer Kurup told Estes he was investigating him for being

11   a drug trafficker?

12   A.    I don't know if he used that terminology.

13   Q.    He made understood that he was investigating

14   Mr. Estes for transporting contraband?

15            MS. RACHOW:  Objection.  Beyond the scope of

16   this witness's knowledge.  He's testified he couldn't hear

17   the conversation.

18            MS. GORMAN:  Your Honor, he filled a probable

19   cause affidavit about this.

20            THE COURT:  You can ask him about what's in his

21   affidavit.

22   BY MS. GORMAN:

23   Q.    So you wrote in your probable cause affidavit

24   Detective Kurup explained his reasons for his contact; is

25   that right?

1    A.    Yes.

2    Q.    And he explained -- and he asked Estes if he was in

3    possession of illegal weapons, large amounts of drugs, or

4    large amounts of money?

5    A.    Correct.

6    Q.    Okay.  Would those be serious offenses, in your

7    mind?

8    A.    Yes.

9    Q.    Okay.  So, now, neither you nor Officer Kurup told

10   Mr. Estes he was free not to answer that question, did you?

11   A.    Not that I recall.

12   Q.    Okay.  Did you or Officer Kurup tell Mr. Estes he

13   was free to leave?

14   A.    No.

15   Q.    Okay.  Did you tell him he was free to end the

16   encounter?

17   A.    No.

18   Q.    Okay.  And in response to Officer Kurup's questions,

19   did you clearly hear Mr. Estes tell you that he was not in

20   possession of illegal contraband or the currency made from

21   the sale of illegal contraband?

22   A.    I did not hear him say that to me.

23   Q.    Okay.  Did you observe Mr. Estes acting nervous?

24   A.    No.

25   Q.    Okay.  And it's your testimony that it's not true

1    that Mr. Estes' phone was ringing throughout this

2    encounter?

3    A.    I did not hear it ring.

4    Q.    Okay.  So I'm just going to point you back to

5    Exhibit 127.

6    A.    Okay.

7    Q.    Starting at Exhibit 6787.

8    A.    I see it.

9    Q.    Can you tell me whether there is a call made to

10   Mr. Estes' telephone number at 11:53 p.m.?

11   A.    According to this there is a number in the Calling

12   Number column as well as the Called Number column.

13   Q.    Would that be a yes?

14   A.    I don't know if a call is being made or not.  I

15   don't have experience with this document.

16   Q.    Okay.  Can you just go to the next line then.  Can

17   you tell me the time that's listed on the next line?

18   A.    The next line says 11 -- the time is --

19   Q.    Time?

20   A.    -- 11:56:41.

21   Q.    And then the next line?

22   A.    12:00:05.

23   Q.    And then the next line?

24   A.    12:01:42.

25   Q.    And then the next line?

```
1    A.    12:02:04.

2    Q.    Okay.  And would that be around the time you were

3    with Mr. Estes?

4    A.    I believe so.

5    Q.    Okay.  So, now, after Mr. Estes told Officer Kurup

6    he wasn't trafficking drugs or drug money, did you end this

7    encounter?

8    A.    Yes.

9    Q.    You ended this encounter?

10   A.    Yes.

11   Q.    So you two walked away?

12   A.    No.  We contacted a canine officer.

13   Q.    So it's your testimony that you ended the encounter

14   with Mr. Estes by calling a drug dog?

15   A.    Yes.  I don't believe we asked him to stay with us.

16   I believe he stayed there on his own.

17   Q.    So I'm not asking what you believe Mr. Estes did.

18   I'm asking whether you ended this encounter.

19   A.    We moved on to the next logical step, which --

20   Q.    So, Officer, I understand that you think it's the

21   next logical step.

22            I'm just going to ask you whether you ended this

23   encounter?

24   A.    Generally speaking, we didn't.  We --

25   Q.    You didn't.
```

1    A.      -- were still there.

2    Q.      Okay.  You were still there.

3            So after he told you he wasn't trafficking

4    drugs, he was asked for consent to search through his room

5    and luggage?

6    A.      Yes.

7    Q.      Okay.  And he did not consent?

8    A.      That's correct.

9    Q.      Okay.  And he told you and Officer Kurup, "No, you

10   cannot search my room and luggage"?

11   A.      I don't know if that -- those were his words.

12   Q.      Well, Mr. Estes had the right to say no; right?

13   A.      Yes.

14   Q.      Okay.  He had -- that's his constitutional right?

15   A.      I agree.

16   Q.      Okay.  And Mr. Estes clearly asserted that

17   constitutional right?

18   A.      I agree.

19   Q.      Okay.  Now, when someone asserts a right, is it your

20   practice to again later ask them to waive the right?

21   A.      You know, under certain circumstances it might be.

22   Q.      Okay.  So it might be your practice.

23           So after Mr. Estes refused consent, you

24   testified he was free to end this encounter?

25   A.      Can you repeat that question?

1    Q.    After Mr. Estes refused consent, you just testified

2    you believed he was free to end this encounter?

3    A.    Yes.

4    Q.    Okay.  So his belongings, though, were still in his

5    sleeper car?

6    A.    Correct.

7    Q.    Okay.  And you were deploying a drug dog to his

8    sleeper car?

9    A.    In a common hallway.

10   Q.    Okay.  And he had a 5-minute stop here in Reno?

11   A.    I don't know the exact amount of time.  But it was a

12   short stop.

13   Q.    A short stop in Reno.

14         So after Mr. Estes denied consent, Officer Kurup

15   told him that you were going to deploy a police canine?

16   A.    Yes.

17   Q.    Okay.  And also told him that if the canine alerted

18   on his room, all of the items in that room would be seized

19   and a search warrant would be obtained to search the items?

20   A.    That is my understanding, yes.

21   Q.    Okay.  Well, then you guys contacted Officer Hill?

22   A.    I believe Detective Kurup did.

23   Q.    Okay.  It was Detective Kurup that contacted Officer

24   Hill.  Okay.

25         And Officer Hill and his canine were already at

1    the Amtrak station?

2    A.    Yes.

3    Q.    Okay.  So you boarded the train with Mr. Estes?

4    A.    I -- we boarded the train with our canine officer.

5    Q.    Okay.  And Mr. Estes was there?

6    A.    I believe by choice.  We --

7    Q.    So I'm going to ask you to please not speculate

8    about whether my client had a choice or not.  That's --

9    A.    Okay.

10   Q.    -- for the Court to decide.

11   A.    All right.

12   Q.    But I'm asking you if he was with you when you

13   boarded the train?

14   A.    He was present.

15   Q.    Okay.  He was present when you boarded the train?

16   A.    Yes.

17   Q.    Now, can you describe the hallway of the Amtrak

18   train?

19   A.    It's the hall -- the common hallway that we deployed

20   the dog in.

21   Q.    How big is that hallway?

22   A.    It's -- I'm estimating length.  Maybe 50 feet.  And

23   this is an abs- -- complete estimation.  But it's -- it

24   goes down to the middle of the car with rooms on both

25   sides.

214

1    Q.    How narrow is the hallway?

2    A.    It's narrow.  Maybe two to three feet wide.

3    Q.    Does it comfortably fit two people?

4    A.    No.

5    Q.    So Officer Hill deployed his canine along that

6    hallway?

7    A.    Yes.

8    Q.    And that was the hallway that had Mr. Estes' sleeper

9    car?

10   A.    Yes.

11   Q.    Now, the dog did not alert on the room; is that

12   right?

13   A.    That's correct.

14   Q.    Now, without an alert, legally you have nothing; is

15   that right?

16   A.    That's correct.

17   Q.    You have no probable cause?

18   A.    Correct.

19   Q.    And have you ever been able to get a warrant from

20   the interest of a dog?

21   A.    No.

22   Q.    So have you ever tried to?

23   A.    No.

24   Q.    But you went ahead and told Mr. Estes that the

25   canine was showing a lot of interest in his room; is that

1    right?

2    A.    That's correct.

3    Q.    Okay.  So you know that interest has no legal

4    relevance to your rights as an officer; correct?  Did you

5    just --

6    A.    Correct.

7    Q.    -- testify to that?

8    A.    Well, for probable cause, correct.

9    Q.    So that does not give you a right to search his

10   stuff?

11   A.    That's --

12   Q.    The interest?

13   A.    That's correct.

14   Q.    Okay.  But you chose to tell Mr. Estes that there

15   was dog interest in his room?

16   A.    I did.

17   Q.    And you did that because you wanted permission to

18   search his stuff?

19   A.    I was just stating a fact.

20   Q.    Just stating a fact.

21          So you wanted to tell Mr. Estes this legally

22   irrelevant fact.  Is that your testimony?

23   A.    Yes.

24   Q.    Now, you chose not to Mirandize Mr. Estes before

25   telling him a dog showed interest in his room?

1    A.    Correct.

2    Q.    Okay.  And, again, you didn't explain to him the

3    difference between an interest and alert?

4    A.    That's correct.

5    Q.    Okay.  Now, minutes before you told Estes that a dog

6    showed interest in his sleeper car, Detective Kurup told

7    Estes that if the dog alerted on his sleeper car, you both

8    could seize his things and get a warrant; is that right?

9    A.    Yes.

10   Q.    Okay.  And you learned about interest and alert

11   because you've received training as an officer?

12   A.    I do know the difference, yes.

13   Q.    And that's through your training as an officer?

14   A.    Yes.

15   Q.    Okay.  Now, it's at this point that Officer Kurup

16   asks Estes again to consent to the search?

17   A.    I did not hear that conversation.  I know that they

18   were talking.

19   Q.    Okay.  So you didn't actually hear Mr. Estes give

20   consent?

21   A.    No.

22   Q.    Okay.  So you wrote in your probable cause

23   affidavit, "Estes was advised of the circumstances and

24   subsequently gave voluntary consent for Detective Kurup to

25   search his room and its contents."

1          So are you testifying now that was not based on

2     your personal knowledge?

3     A.    It's what was related to me from Detective Kurup.

4     Q.    So this was related to you from another police

5     officer?

6     A.    Yes.

7     Q.    You did not personally hear any of this?

8     A.    Those specific words, no.

9     Q.    Okay.  But you wrote them in your probable cause

10    affidavit?

11    A.    Yes.

12    Q.    Okay.  Now, you're aware that Estes had asserted his

13    right not to consent to a search before you told him about

14    this canine interest; correct?

15    A.    Yes.

16    Q.    And you want your searches to be constitutional?

17    A.    Yes.

18    Q.    Okay.  And you know that a prosecutor may one day

19    have to be in a courtroom just like this and prove that

20    consent was freely given?  You're aware of that?

21    A.    Yes.

22    Q.    Okay.  And that a prosecutor may have to come in

23    here and prove to this Court that consent was completely

24    voluntary?

25    A.    Yes.

1    Q.    And not the product of threats?

2    A.    Correct.

3    Q.    And not the product of coercion?

4    A.    Correct.

5    Q.    And Mr. Estes had already told you once he didn't

6    want you to conduct that search?

7    A.    He told Detective Kurup, yes.

8    Q.    Okay.  Now, you work for the Reno Police Department;

9    right?

10   A.    Yes.

11   Q.    Okay.  And you're familiar with permission to search

12   forms?

13   A.    Yes.

14   Q.    Okay.  I'm going to show you Exhibit 112.

15         So you -- you're familiar with that form?

16   A.    Yes.

17   Q.    It's a permission to search form?

18   A.    Yes, it is.

19   Q.    Okay.  Now, you elected not to use that form; is

20   that correct?

21   A.    Correct.

22   Q.    Okay.  And you actually didn't have Mr. Estes

23   memorialize his consent in writing in any way?

24   A.    That's correct.

25   Q.    And that would be something, other than your word or

1    the word of another officer, that could be used to prove

2    that Mr. Estes actually consented to a search?

3    A.    Yes.

4    Q.    Okay.  And to prove consent was voluntary?

5    A.    Yes.

6    Q.    Okay.  Now, you also have an audio recording device?

7    A.    I do.

8    Q.    Okay.  And that device is there to record

9    police/citizen encounters?

10   A.    Yes.

11   Q.    Okay.  And if there's dispute about what was said or

12   happened, that's objective evidence?

13   A.    Correct.

14   Q.    Okay.  And that's why you have one?

15   A.    I have one.  I don't always have it with me.

16   Q.    Okay.  But you made a decision that day not to

17   activate your audio recording device?

18   A.    I don't believe I had it with me that day.

19   Q.    Do you clearly remember whether you had your audio

20   recording device with you?

21   A.    No.

22   Q.    So you don't know?

23   A.    (No audible response.)

24   Q.    But we do know that no audio recording was made of

25   this encounter?

1    A.    That's correct.

2    Q.    And do you have a cell phone?

3    A.    Yes.

4    Q.    Is it a smartphone?

5    A.    Yes.

6    Q.    What kind of phone is it?

7    A.    It is an iPhone.

8    Q.    Okay.  So can iPhones record?

9    A.    They can.

10   Q.    Okay.  So you chose not to record this encounter?

11   A.    That's correct.

12   Q.    Now, you were involved in a forfeiture action in

13   this courtroom a few months before this search?

14   A.    Yes.

15   Q.    Okay.  And that case had to do with whether or not

16   law enforcement could keep money they took from an Amtrak

17   passenger?

18           MS. RACHOW:  Objection, relevance.

19           MS. GORMAN:  Your Honor, this case happened four

20   months after.  And the Court specifically noted in their

21   order that Amtrak was choosing not to re-

22           THE COURT:  Well, you --

23           MS. GORMAN:  And RPD.

24           THE COURT:  You may ask about his knowledge

25   of that.

221

1              MS. GORMAN:  Thank you, Your Honor.

2    BY MS. GORMAN:

3    Q.    That case had to do with whether or not law

4    enforcement could keep money you took from an Amtrak

5    passenger?

6    A.    Correct.

7    Q.    And the issue in that case was consent?

8    A.    Yes.

9    Q.    Okay.  And actually the parties had very different

10   accounts of what happened than the officers in that case?

11   A.    Yes.

12   Q.    Okay.  And this Court found that the government

13   couldn't prove that the individual had freely consented to

14   a search?

15   A.    I believe that was the ruling, yes.

16   Q.    Okay.  Are you aware that the Court specifically

17   noted that officers had elected not to memorialize consent?

18   A.    I don't recall that.

19   Q.    Okay.  Well, did this investigation happen after the

20   Court made its ruling in that case?

21   A.    Yes.

22   Q.    Okay.  And you still made the decision not to

23   memorialize consent in this case?

24   A.    Yes.

25   Q.    Okay.  Now, just before Officer Kurup's search,

1    Officer Kurup directed Mr. Estes to retrieve his

2    personal-use marijuana out of his bag?

3    A.    I don't agree with that.

4    Q.    Okay.  Do you recall that conversation?

5    A.    I recall that -- yeah.  Yes, I do.

6    Q.    Okay.  So you testified before that you saw

7    Detective Kurup leading Mr. Estes to his room; is that

8    right?

9    A.    Yes.

10   Q.    Okay.  And then you testified they were both in that

11   sleeper car?

12   A.    Yes.

13   Q.    Okay.  Now, the sleeper car rooms, those are about

14   three-by-six feet?

15   A.    About, yes.

16   Q.    Okay.  And they were in that room alone?

17   A.    In the doorway --

18   Q.    Okay.

19   A.    -- of it.

20   Q.    Did you see what was happening?

21   A.    No.

22   Q.    Okay.  So, now, Officer Kurup finds a firearm in his

23   search; is that right?

24   A.    That's correct.

25   Q.    And after finding the firearm, neither of you

1    Mirandized Mr. Estes at that point; is that right?

2    A.    That's correct.

3    Q.    Okay.  And you have -- you actually affirmatively

4    represent to Mr. Estes no state laws have been broken?

5    A.    As specifically about the firearm, no --

6    Q.    So --

7    A.    -- there had not been.

8    Q.    So I'm going to just point you again.

9          So is it your testimony you didn't advise

10   Mr. Estes that no state laws had been broken?

11   A.    I did advise him.

12   Q.    Okay.  So that was not true at this point, was it?

13   You -- I mean, had -- there was marijuana that was found?

14   A.    I was specifically talking about the handgun.

15   Q.    So I'm not asking sort of what your intentions were

16   when you said it.  But you did advise Mr. Estes no state

17   law had been broken; is that right?

18   A.    About the handgun.

19   Q.    Did you -- so your testimony now is that you

20   specifically stated about the handgun?

21   A.    Yes.

22   Q.    Okay.  So I'll direct you to Exhibit 102.  That's

23   your partner's police report.

24          Now, it specifically says -- or Detective Kurup

25   specifically writes, "Detective Moore advised Estes that at

1    this time no state laws had been broken, but Estes was in

2    violation of Amtrak firearm policy."

3              Do you not recall saying that?

4    A.    I was speaking specifically of the handgun.

5    Q.    Do you recall saying generally that no state laws

6    had been broken?

7    A.    Yes.

8    Q.    Okay.  Now, you also didn't know at the time whether

9    the gun was legally possessed?

10   A.    No, I did not know.

11   Q.    But after telling Mr. Estes no state law had been

12   broken, you asked if Mr. Estes would speak to you in the

13   downstairs area of the car?

14   A.    Yes.

15   Q.    Okay.  And you did not advise him he had the right

16   not to speak with you?

17   A.    That's correct.

18   Q.    And all of Mr. Estes' belongings were removed from

19   his room; is that right?

20   A.    Yes.

21   Q.    Do you remember who removed his belongings?

22   A.    Detective Kurup.

23   Q.    Okay.  And where was Mr. Estes at this point?

24   A.    We were downstairs.

25   Q.    Okay.  So you, Kurup -- or Officer Kurup, and

1    Mr. Estes were together in the entry area of the lower

2    level?

3    A.    Yes.

4    Q.    Okay.  And in front of Mr. Estes you called Reno

5    Police dispatch?

6    A.    It was Reno Police records.

7    Q.    Reno Police records.  And that was in front of

8    Mr. Estes?

9    A.    Yes, it was.

10   Q.    Okay.  And they advised that Mr. Estes had a prior

11   felony?

12   A.    Yes.

13   Q.    Okay.  And then one of you placed Mr. Estes in

14   handcuffs?

15   A.    I did.

16   Q.    Okay.  So after placing Mr. Estes in handcuffs, you

17   chose not to immediately read him his Miranda rights?

18   A.    That's correct.

19   Q.    Okay.  And your testimony is while in the handcuffs,

20   but before Miranda, he made this unsolicited statement

21   about where he purchased a firearm?

22   A.    Yes.

23   Q.    Okay.  So, now, while Mr. Estes is in handcuffs on

24   the train, one of you takes photographs of him; right?

25   A.    Yes.

1    Q.    Okay.  Do you remember who that was?

2    A.    I -- I believe it was Officer Kurup.

3    Q.    Okay.  So I'm going to show you what's been marked

4    as Exhibit 16 -- 116.  So specifically B, I, and J.

5              So, now, some of these photo -- or one of these

6    photographs depicts Mr. Estes' arms in handcuffs.  Is it

7    true that Exhibit 116J depicts Mr. Estes in the train in --

8    on the train and in handcuffs?

9    A.    I do see that.

10   Q.    Okay.  And do you remember what Officer Kurup took

11   that photograph with?

12   A.    I do not recall.

13   Q.    Okay.  So all of this was done while you weren't

14   Mirandizing him --

15   A.    Correct.

16   Q.    -- is that correct?

17   A.    That's correct.

18   Q.    Okay.  Do you know why those photographs were taken?

19   A.    All of them or one in particular?

20   Q.    Why was this photograph taken of Mr. Estes in

21   handcuffs on the train?

22   A.    I don't know why.

23   Q.    Okay.  So then Mr. Estes is not actually Mirandized

24   until after he leaves this train in Verdi; is that right?

25   A.    That's correct.

1    Q.    And after the transport unit arrives?

2    A.    I don't know if the -- I don't recall if the

3    transport unit was there or not.

4    Q.    Okay.  Do you remember who Mirandized him?

5    A.    I did.

6    Q.    You did?

7    A.    Yes.

8    Q.    And you elected not to record that Miranda warning?

9    A.    That's correct.

10   Q.    And you elected to have Estes not sign a waiver of

11   his Miranda rights?

12   A.    That's correct.

13   Q.    Okay.  And when he spoke to you after that, he told

14   you the same thing he had told you pre-Miranda?

15   A.    Yes.

16         MS. GORMAN:  I have no further questions, Your

17   Honor.

18         THE COURT:  All right.

19         Redirect examination?

20                    REDIRECT EXAMINATION

21   BY MS. RACHOW:

22   Q.    Sir, with the area that the train is in, is it

23   commonly referred to as the train trench in Reno?

24   A.    Yes, it is.

25   Q.    And you've been working there approximately four

228

1    years?

2     A.    Yes.

3     Q.    Have you had reason to use your cell phone to try to

4     make phone calls while you've been down in that train

5     trench?

6     A.    Many times.

7     Q.    And can you tell us about the availability of

8     service while you're down in the train trench?

9     A.    The service in the train trench is very

10    inconsistent.

11    Q.    And what do you mean by very inconsistent?

12    A.    At times where --

13         MS. GORMAN:  Your Honor, I'm going to object.

14    This is, A, beyond the scope of cross-examination; and

15    unless he knows something specifically about the carrier

16    that we have at issue here, I don't think this is --

17         THE COURT:  I --

18         MS. GORMAN:  I don't think he's the witness to

19    say.

20         THE COURT:  I don't think it's beyond the scope.

21    But I fail to see the relevancy.

22         MS. RACHOW:  Your Honor, the relevance would be

23    that there's been much made that Mr. Estes is on the phone.

24    I think it's important to point out that in that area cell

25    phone service is very spotty.

1              With that I'll move on.

2              THE COURT:  All right.  Move on, please.

3    BY MS. RACHOW:

4    Q.    Now, sir, one of the indicators regarding whether or

5    not you want to speak to someone is if a third party

6    purchases; is that correct?

7    A.    Yes, it is.

8    Q.    And if that third party uses a credit card, why

9    would that be of interest?

10   A.    In our experience we've seen credit card fraud

11   indicators where a person will purchase a ticket using

12   someone else's credit card information.

13   Q.    And you're not saying that because Mr. Estes had

14   these certain indicators on his ticket that you had

15   reasonable suspicion to approach him; is that correct?

16   A.    No.

17   Q.    What was your purpose in approaching him?

18   A.    It was to ask to speak to him.

19   Q.    And this is -- is this something you commonly do?

20   A.    Yes.

21   Q.    Do people tell you no?

22   A.    Yes, they do.

23   Q.    And what happens when people tell you "No, I don't

24   want to speak with you"?

25   A.    We will normally end the contact.  We might even

1    deploy a canine through that common hallway where the

2    person's room is.

3    Q.    Is it common to deploy the canine regardless of what

4    answer you get?

5    A.    More often if the answer is no, we'll deploy canine

6    in a common area.

7    Q.    And in this specific case, when the decision was

8    made to deploy the canine, did you tell Mr. Estes he had to

9    stay with you?

10   A.    No.

11   Q.    Did you tell Mr. Estes he was not free to leave?

12   A.    No.

13   Q.    Did you tell Mr. Estes he specifically needed to be

14   upstairs where his items were?

15             MS. GORMAN:  Your Honor, leading.

16             THE COURT:  Sustained.

17   BY MS. RACHOW:

18   Q.    What, if anything, did you tell Mr. Estes about if

19   his presence was required during the dog sniff?

20   A.    I don't -- I don't recall telling him anything.

21   Q.    Did you ever threaten Mr. Estes?

22   A.    No.

23   Q.    Do you feel you used coercion with Mr. Estes?

24   A.    No.

25             MS. GORMAN:  Asked and answered.  Your Honor,

1    those are also legal conclusions.

2              MS. RACHOW:  Your Honor, they were directly

3    asked to this witness on cross-examination, did you -- you

4    know, if you used threat, if you coerced.

5              MS. GORMAN:  Your Honor, those questions were

6    never asked whether --

7              THE COURT:  I don't recall that those were

8    asked.

9              It's clear that the officer has personal

10   feelings that he didn't use coercion.

11   BY MS. RACHOW:

12   Q.   Do you know if you had your audio recorder that day?

13   A.   I do not.

14   Q.   Were you the primary officer for this contact?

15   A.   No.

16   Q.   Do you feel that you misled Mr. Estes about the

17   canine's --

18             MS. GORMAN:  Well, Your Honor --

19   BY MS. RACHOW:

20   Q.   -- behavior?

21             MS. GORMAN:  -- that calls for --

22             THE COURT:  That --

23             MS. GORMAN:  That's beyond --

24             THE COURT:  Sustained.

25             MS. GORMAN:  -- inappropriate.

232

1    BY MS. RACHOW:

2    Q.    Did you ever tell Mr. Estes the dog alerted on --

3            MS. GORMAN:  Leading.

4    BY MS. RACHOW:

5    Q.    -- his --

6            THE COURT:  Sustained.

7    BY MS. RACHOW:

8    Q.    What did you tell Mr. Estes about the canine?

9    A.    I told him that the dog showed a lot of interest on

10   his room.

11   Q.    Did you tell him anything else?

12   A.    No.

13   Q.    Did Mr. Estes ask you any questions?

14   A.    No.

15   Q.    With your probable cause statement, you testified

16   during cross that that is a combination of your

17   investigation and your partner's investigation; is that

18   correct?

19   A.    That's correct.

20   Q.    Is that common --

21           MS. GORMAN:  Your Honor, that misstates the

22   testimony.

23           MS. RACHOW:  I'll rephrase.

24           THE COURT:  Sustained.

25           That will be stricken.

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1    BY MS. RACHOW:

2    Q.    When you fill out a probable cause declaration, as

3    you did in this case, what type of information do you use

4    to put in that probable cause affidavit?

5    A.    The facts known to me.

6    Q.    And are those just facts known of your own personal

7    observation?

8    A.    No.

9    Q.    What else do you include?

10   A.    Information from other officers, victims, suspects.

11   Q.    Is that common?

12   A.    Yes, it is.

13   Q.    And why do you do this?

14   A.    It's to be thorough and complete.

15   Q.    Now, there's been much discussion about a small

16   amount of marijuana in this case.  Was that booked into

17   evidence?

18   A.    Yes, it was.

19   Q.    And with a small amount of marijuana, how do you

20   typically handle that?

21   A.    It could be a number of ways.  It could be with an

22   arrest, a citation, submitting for a warrant later.

23   Q.    What makes you determine whether or not you're going

24   to arrest someone for a small amount of marijuana or if

25   you're going to give them a citation?

1    A.    History of FTA or no history of FTA.  Just the,

2    basically, indicators that this person will show up to

3    court.

4    Q.    And with an FTA, is that a failure to appear?

5    A.    Yes, it is.

6              MS. GORMAN:  Your Honor, this is getting way

7    beyond the scope of cross-examination.

8              MS. RACHOW:  Your Honor, this goes to the

9    questions about whether or not Detective Moore advised the

10   defendant if the state law had been broken.

11             THE COURT:  Whether he's arrested, he's cited,

12   or the officers say, "You're free to go," it doesn't have

13   anything to do with whether or not there in fact was a

14   small amount of marijuana.  You can ask about the small

15   amount of marijuana.

16             I think the subject matter of what the officers

17   did or didn't do has been covered.  It was seized and

18   placed in evidence.  He was arrested on the gun charge not

19   on the marijuana charge.

20             So let's move on.

21   BY MS. RACHOW:

22   Q.    At the time that you knew that Mr. Estes was in

23   possession of a firearm, had you made the decision to

24   arrest him at that point?

25   A.    No.

1    Q.    Why?

2    A.    He could be in legal possession of that firearm.

3    Q.    And you chose not to give him his Miranda rights at

4    that time.  Why?

5    A.    Because I didn't know a crime was committed, and he

6    was, you know, free to leave.

7    Q.    And when you say you didn't know a crime was

8    committed, in what are you referring to?

9    A.    The firearm.

10              MS. RACHOW:  Nothing further.

11              MS. GORMAN:  Court's indulgence, Your Honor.

12                    RECROSS-EXAMINATION

13   BY MS. GORMAN:

14   Q.    Officer, you were asked on redirect examination

15   about credit card purchases.

16   A.    Yes.

17   Q.    Okay.  So you previously testified that cash

18   purchases are one of the biggest indicators for you; is

19   that right?

20   A.    Yes.

21   Q.    And credit card is another way to pay for a ticket?

22   A.    Yes.

23   Q.    Okay.  So in this case, did you ever find any

24   indication that the credit card used was fraudulent?

25   A.    No.

1    Q.    Okay.  So did you check to see if the card had been

2    reported stolen?

3    A.    No.

4    Q.    Okay.  Now, you testified that after you -- you just

5    testified on redirect that after you found the firearm

6    Mr. Estes was free to leave?

7    A.    He could have walked away from me, yes.

8    Q.    So you're testifying that you would have been

9    prepared to let him -- I mean, so the train is moving at

10   this point; right?

11   A.    Yes.

12   Q.    And he's on the train with the officers --

13   A.    Yes.

14   Q.    -- including you?

15         Okay.  And so you were prepared if he said, "You

16   know, I want to go," to not call Reno dispatch and find out

17   about his priors?

18   A.    Well, we could have -- at that point, had he chosen

19   to leave, I may have detained him.  But he never chose to

20   leave.

21   Q.    Okay.  So you just testified he was free to leave;

22   and now you're testifying you may have detained him if he

23   tried?

24   A.    Yes.

25   Q.    Okay.  So you also testified on redirect about the

237

1    source of information on your probable cause affidavits?

2    A.    Yes.

3    Q.    So you -- again, you signed those under penalty of

4    perjury?

5    A.    I did.

6    Q.    So when you're taking information from witnesses and

7    police officers, do you believe it's not important to write

8    the source of your information in your probable cause

9    affidavit?

10   A.    I believe I did.

11   Q.    You believe in your probable cause affidavit you

12   wrote the source of information?

13   A.    Well --

14   Q.    So I'm going --

15   A.    -- I think --

16   Q.    -- to just direct you to your -- to Exhibit 101.

17   And I'll give you a minute to read over it.  You can take

18   your time.

19   A.    Go on, please.

20   Q.    Have you read it?

21   A.    I do -- I have read it.

22   Q.    Can you tell me where -- so you previously testified

23   that you got the information on what happened during the

24   conversation between Detective Kurup and Mr. Estes from

25   Detective Kurup?

1    A.    Yes.

2    Q.    Not because you personally observed it; right?

3    A.    Correct.

4    Q.    Can you tell me where in your probable affidavit you

5    wrote the source of your information?

6    A.    Well, I don't -- I don't specifically state the

7    source of my information --

8    Q.    So you don't --

9    A.    -- in here -- in this probable cause statement.  But

10   it did come from Detective Kurup.

11   Q.    Okay.  So do you believe it's important information,

12   as a person who investigates crime, where you get your

13   information?

14   A.    Yes.

15   Q.    From what source?

16   A.    Yes.

17   Q.    That's an important piece of information for a

18   prosecutor to know?

19   A.    Yes.

20   Q.    Okay.  And for a defense attorney to know?

21   A.    Yes.

22   Q.    Okay.

23         MS. GORMAN:  I have no further questions, Your

24   Honor.

25         THE COURT:  All right.

1           Any further direct examination?

2           MS. RACHOW:  No, Your Honor.

3           THE COURT:  All right.

4           Detective Moore, you may step down.  Thank you.

5           MS. GORMAN:  And, Your Honor, my client needs a

6   few-minute break to go to the bathroom.

7           THE COURT:  All right.  We'll take a break for

8   10 to 15 minutes as may be necessary.  Thank you.

9           COURTROOM ADMINISTRATOR:  Please rise.

10       (Recess from 9:45 a.m. until 9:59 a.m.)

11          THE COURT:  Have a seat, please.

12          All right.  Next witness, please.

13          MS. RACHOW:  No further witnesses from the

14   government.

15          THE COURT:  All right.

16          MR. DOGAN:  Your Honor, the defense would call

17   Officer Jayson Hill.

18          THE COURT:  All right.

19          COURTROOM ADMINISTRATOR:  Good morning.  Can you

20   please come around here and remain standing.

21          Raise your right hand to be sworn, please.

22          You do solemnly swear that the testimony you

23   shall give in the cause now before the Court shall be the

24   truth, the whole truth, and nothing but the truth, so help

25   you God?

1           THE WITNESS:  I do.

2           COURTROOM ADMINISTRATOR:  Please be seated.

3           Please state your name and spell your name.

4           THE WITNESS:  It's Jayson, J-a-y-s-o-n.  Last of

5    Hill, H-i-l-l.

6           COURTROOM ADMINISTRATOR:  Please tell us your

7    city and state of residence.

8           THE WITNESS:  Sparks, Nevada.

9           THE COURT:  All right.

10          Go ahead, please, Mr. Dogan.

11                     JAYSON HILL

12           called as a witness on behalf of the

13        Defense, was examined and testified as follows:

14                 DIRECT EXAMINATION

15   BY MR. DOGAN:

16   Q.   Sir, what do you do for a living?

17   A.   I work for the Reno Police Department --

18   Q.   And --

19   A.   -- Canine Division.

20   Q.   And how long have you worked for the Reno Police

21   Department?

22   A.   September 2005.

23   Q.   And how long have you been a canine officer?

24   A.   Since 2008.

25   Q.   And is there specific training that you receive as a

1    canine officer?

2    A.    There is.

3    Q.    And what kind of training have you received?

4    A.    I went through a 30-day handler course in Sanford,

5    North Carolina.

6    Q.    Is there any other training that you receive in

7    terms of being a canine handler?

8    A.    There is.  Once a week we train as a canine unit.

9    Q.    So aside from nationally attending the seminar in

10   North Carolina, have you attended any other seminars or

11   training for canines?

12   A.    Yes.

13   Q.    And what are those?

14   A.    The HITS Conference, which is a national canine

15   officer's conference.  It's usually about a three- or

16   four-day training.

17   Q.    When was that?

18   A.    The last one was actually about six months ago.

19   Q.    And how long was that course?

20   A.    I believe it was a four-day course.

21   Q.    How often do you attend?

22   A.    Once every couple years.

23   Q.    Okay.  And the one in North Carolina, when was that?

24   A.    That was back in 2008.

25   Q.    Aside from those two, is there anything else?

1    A.    No.  Just weekly training.

2    Q.    Okay.  And you have a canine dog?

3    A.    Correct.

4    Q.    And what kind of dog is it?

5    A.    German Shepard.

6    Q.    How large is the dog?

7    A.    He's approximately 76 pounds I believe is what his

8    weight is.

9    Q.    What is the dog's sex?

10   A.    Male.

11   Q.    And where was the dog acquired?

12   A.    In Sanford, North Carolina.

13   Q.    Okay.  Now, I want to direct your attention to

14   December 4, 2014.  Were you on duty that day?

15   A.    Correct.

16   Q.    And do you recall receiving a call from dispatch to

17   report to the Amtrak terminal?

18   A.    Yes.

19   Q.    And what time was that at?

20   A.    That was around 11:00.

21   Q.    And do you know specifically the time?

22   A.    I believe the dispatch log was around 11:13 or

23   somewhere in there.

24   Q.    Okay.  And would it refresh your recollection if you

25   were able to look at the dispatch log in this case?

1    A.    Absolutely.

2    Q.    And would you please look at Defense Exhibit 107.

3    A.    Okay.

4    Q.    Let us know what time did you receive the call to go

5    out?

6    A.    I arrived on scene at 11:13, Amtrak, 280 North

7    Center.

8    Q.    Once you arrived on scene, what did you do?

9    A.    The train wasn't there; so I waited on scene.

10   Q.    While waiting on scene, did you enter the Amtrak

11   building?

12   A.    Yes.

13   Q.    Did you speak to anyone?

14   A.    I saw Madhu and Tony.

15   Q.    And did you speak to them?

16   A.    Yes.

17   Q.    Concerning what?

18   A.    Just everyday stuff that -- we didn't speak anything

19   specific about anything.

20   Q.    Were you there as part of a drug interdiction team?

21   A.    Yes.

22   Q.    And both Detectives Kurup and Moore were part of

23   that team?

24   A.    Correct.

25   Q.    And you were a piece of that team?

1    A.    Correct.

2    Q.    Okay.  All three of you are in that building.  Are

3    you discussing certain individuals that you would be

4    investigating?

5    A.    No.

6    Q.    No conversation about an investigation?

7    A.    No.  I don't get involved with their investigation.

8    I don't run tickets.  I don't handle that side.  I strictly

9    handle a dog.

10   Q.    Were you waiting for the train?

11   A.    Yes.

12   Q.    Once the train arrived, what did you do?

13   A.    I walked back outside, retrieved my dog while the

14   other two went downstairs.

15   Q.    Downstairs -- what do you mean by downstairs?

16   A.    Because the upper level of the Amtrak is where kind

17   of a -- where the employees' area is.  That's where we

18   wait.  And then once the train arrives, you proceed

19   downstairs and go out to the platform where the train is

20   because we have a trench.

21   Q.    Did they direct you to go get your canine?

22   A.    No.

23   Q.    Were you directed to run your dog?

24   A.    I was asked to -- at a later point, to run my dog

25   down a hallway.

1    Q.    And at what point were you asked to run your dog?

2    A.    Whenever the train arrived.  It was shortly after

3    the train arrived, several minutes after the exact time

4    Amtrak arrived.

5    Q.    And you use your dog --

6    A.    Because they board the train.  I stay outside.  And

7    I walk my dog up and down the platform.  And I'll go in and

8    out of the luggage cars until they contact me and say,

9    "Hey, can you run a hallway?"  Or a certain piece of

10   luggage.

11   Q.    And why do you use your dog?

12   A.    What's that?

13   Q.    Why do you use the dog?  What is the dog's purpose

14   in all of this?

15   A.    He's a narcotic drug dog.  He's trained to detect

16   drugs.

17   Q.    And dogs -- your canine can also be used for other

18   purposes as well; right?

19   A.    Patrol, yeah.

20   Q.    And it can be used for -- as a show of force?

21          MS. RACHOW:  Objection --

22          THE WITNESS:  No.

23          MS. RACHOW:  -- calls for a leading -- or legal

24   conclusion.  Also is leading.

25          THE COURT:  Overruled.

1    BY MR. DOGAN:

2    Q.    Your canine can be used as a show of force?

3    A.    If somebody wants to perceive it that way.  But he's

4    a pretty friendly dog.  We do public demonstrations,

5    school, preschools.

6    Q.    For example --

7    A.    He's a very friendly dog.

8    Q.    -- canines can be used for crowd control; correct?

9    A.    Could.  But he's not used as that.

10   Q.    But canines are used for crowd control?

11   A.    I'm sure some canines are.  My dog is not.

12   Q.    Okay.  And they can also be used to catch suspects?

13   A.    Correct.

14   Q.    And using canines, there's always a risk that a

15   canine will bite a person?

16   A.    Could.  He's an animal.

17   Q.    And canines are intimidating?

18         MS. RACHOW:  Objection.  Leading.

19         THE COURT:  Sustained.  Please limit the leading

20   questions.

21         MR. DOGAN:  Your Honor, at this point I'm going

22   to request leave of the Court under Federal Rule 611(c):

23   Generally leading questions are not permitted on direct

24   examination; however, the Court should allow leading

25   questions when a party calls a hostile witness, an adverse

247

1    party, or a witness identified with an adverse party.

2            I think it is clear that Officer Hill was part

3    of the arrest team and, therefore, part of the

4    government's --

5            THE COURT:  Cut to the chase here.  He's not a

6    hostile witness.

7            I'll allow you to ask some limited questions

8    because they help to move the case along.  But I don't

9    expect that your examination should be based on all leading

10   questions.

11           MR. DOGAN:  Okay.

12   BY MR. DOGAN:

13   Q.   When you were at the stat- -- train station, did you

14   see who contacted Mr. Estes?

15   A.   No.

16   Q.   Let's talk about when you ran your dog.  How many

17   sleeper cars did you run your dog through?

18   A.   There's quite a few.  I don't exactly know.  There's

19   probably five or six approximately down a hallway.

20   Q.   How long is the hallway?

21   A.   I would say approximately 30 feet, 35 feet.

22   Q.   And how wide are the hallways?

23   A.   What are they, about three feet maybe?

24   Q.   When you entered the train, was anyone with you?

25   A.   No.

1    Q.    When you were running the dog, were the other

2    detectives with you?

3    A.    Usually the detectives stand on each side of the

4    hallway at the end of each -- each of the hallways, and so

5    nobody's in the middle so nobody can interfere with myself

6    nor my dog.

7    Q.    And in this case specifically do you recall where

8    the other detectives were standing?

9    A.    They were standing on one side of the hallway or the

10   other.  Not -- I am not -- I don't know specifically.

11   Q.    Okay.  So you don't recall whether they were on --

12   or in the hallway on December 4, 2014, when you were

13   running your dog?

14   A.    I don't recall.  When I run my dog, it's usually

15   just me and my dog in the hallway.

16   Q.    And do you --

17   A.    It's narrow.

18   Q.    And do you recall seeing Mr. Estes at all in the

19   train?

20   A.    I remember seeing him when we went to Verdi to pick

21   him up.

22   Q.    And when you ran your dog, was there anything of

23   interest to you?

24   A.    No.  There was no alert.  So when there's no alert,

25   there's no PC.  And so once my dog runs, there's no alert,

1    we leave.  If there is, he can show interest.  But interest

2    doesn't mean anything.  Interest with him doing a head snap

3    or going back to something, courts have deemed that that is

4    nothing.

5         It is something that we can be, okay, why did he

6    do that?  And sometimes we'll consensually contact somebody

7    and ask, "Hey, my dog sniffed twice at your room and went

8    back to your room but no alert, but we were just curious

9    why is the dog showing interest."

10        But neither here nor there, they can simply say,

11   "I don't know" or "There's nothing," and we continue on our

12   way.  But with no alert that's no PC to detain anybody.

13   Q.   So in this case did the dog show interest in

14   anything?

15   A.   I remember him going back to the room, to a room,

16   when I was running down a hallway, and he showed some

17   interest.

18        But, like I said, it does not mean nothing.

19   There was no alert.

20   Q.   So interest --

21   A.   So there's no PC.

22   Q.   So interest means nothing?

23   A.   Nothing.

24   Q.   And did you advise Detective Moore or Detective

25   Kurup anything about interest?

1    A.    I believe it was Detective Kurup.  I told him, "Hey,

2    at this room there was some interest."  He kept -- he went

3    back several times to that room but continued on.  It

4    doesn't mean anything.  And they know that does not mean

5    anything.

6              They can, like I say, consensually talk to

7    somebody and ask, "Hey, why would our dog show interest in

8    something, but it doesn't mean nothing?"

9    Q.    Did you speak to Detective Kurup about this matter

10   yesterday?

11   A.    No.

12   Q.    Did you speak to Detective Moore about this matter?

13   A.    No.

14   Q.    After I had spoken to you?

15   A.    No.  I --

16   Q.    Did you read Detective Moore's probable cause sheet?

17   A.    Not his probable cause sheet.  I reviewed my Tiburon

18   report.

19   Q.    I'm sorry?

20   A.    I reviewed the Tiburon report.

21   Q.    Whose Tiburon report?

22   A.    Madhu Kurup's.

23   Q.    Before testifying.  When did you review those

24   reports?

25   A.    I've reviewed them several times since I got

1    subpoenaed about a week ago.

2    Q.   And did you meet with the government pertaining to

3    this case?

4    A.   What do you mean?

5    Q.   Did you meet with the government --

6    A.   Who?

7    Q.   -- pertaining to this case?  The government

8    prosecutor.

9    A.   Yes.  I went to her office yesterday.

10   Q.   Okay.  And at what time did you go to her office?

11   A.   About 5:30.

12   Q.   And who was present when you spoke?

13   A.   The two right here.

14   Q.   Okay.  Were Detectives Moore or Kurup present?

15   A.   Moore was.  He was -- he was still there while I met

16   with her, yes.

17   Q.   And did you all have a conversation about this case?

18   A.   No.  We talked very briefly, and I left.

19   Q.   And Detective Moore was present?

20   A.   Yes.

21   Q.   What was -- and you were discussing the facts and

22   the circumstances surrounding this case with Detective

23   Moore present; correct?

24   A.   No specifics about the case.  She told me that I

25   could not discuss anything in front of Detective Moore.

1    Q.    And did Detective Moore --

2    A.    And so I left.

3    Q.    -- discuss anything with you --

4    A.    No.

5    Q.    -- about this case?

6    A.    Absolutely not.

7    Q.    And were you all in a conferences room?

8    A.    No.

9    Q.    Where was this at?

10   A.    In, I believe it was, one of their offices.

11   Q.    With Detective Moore present?

12   A.    Yes.

13   Q.    Do you remember whether any of the doors to the

14   sleeper cars were open?

15   A.    No.  Because I always -- before I run my dog, I

16   advise the detectives to make sure doors are either

17   closed -- they were closed enough to where my dog could not

18   get inside.  Because I don't want my dog going inside.

19   Q.    Okay.  And is your testimony that none of the doors

20   were open?

21   A.    No.  They're either partially open or closed enough

22   to where my dog could not get inside.

23   Q.    Why would the doors be partially open?  Who does

24   that?  Who decides that?

25   A.    I don't know.

1  Q.   Why would you want the door to be partially open?

2  A.   So my dog cannot go inside.

3  Q.   How about --

4  A.   I don't want my dog disturbing --

5  Q.   -- why not have the door fully -- go ahead.

6  A.   I don't want the dog disturbing people.

7  Q.   How about not -- why not have the door fully closed?

8  A.   It's -- I would actually prefer that.

9  Q.   But you just said partially open.

10  A.   Yeah.  Whether -- I want the door -- I said I want

11  the detectives to have the doors either partially opened or

12  closed all the way.  I don't like an open door.  So I just

13  don't want my dog going inside.

14  Q.   Do you recall whether you wrote a police report in

15  this case?

16  A.   No.  There was no alert.

17  Q.   But your canine was deployed; right?

18  A.   He was ran.  There is -- I log out at dispatch that

19  I'm there every day with my canine.

20       If there's -- it's simply I had my dog out, no

21  alerts, and there's nothing.  If my dog does alert or does

22  do some type of activity with a PC, an alert, I document

23  it.

24  Q.   But you're required to document -- your general

25  order requires you to document whenever the dog is removed

1      from your vehicle; isn't that correct?

2      A.    At Amtrak -- we have an exception at Amtrak that I

3      am there every single day my full work week, and I have my

4      dog on lead with me all the time.

5            If he does engage and he is alerted to

6      something, a report will be generated.  That's why I log

7      out with dispatch so there's a record of me and my dog out

8      at dispatch.

9      Q.    You operate and conduct your police responsibilities

10     under the general orders of the Reno Police Department?

11     A.    Correct.

12     Q.    And you do not follow the orders of the Amtrak?

13     General orders of the Amtrak, any policies?

14     A.    I don't know what Amtrak's --

15     Q.    So the --

16     A.    -- general --

17     Q.    -- exception that you're speaking of, is this an

18     exception to you writing a police report under Reno Police

19     Department policies?

20     A.    Yeah.  If my dog would have alerted, it would have

21     been under Reno Police Department.

22     Q.    And what policy is that?

23     A.    That my dog alerted.  There would have been a report

24     generated.  But my dog did not.

25            MR. DOGAN:  Your Honor, if I can have the

1    Court's indulgence?

2    BY MR. DOGAN:

3    Q.    Sir, I'm going to direct your attention to Exhibit

4    Number 113.

5              I'm going to ask you to go to page number 12.  I

6    don't believe the pages are numbered.  So if you can just

7    count to page number 12.

8              THE COURT:  There should be a Bates stamp in the

9    lower corner that would be numbered, Mr. Dogan.  Can you

10   give him that Bates stamp.

11             MR. DOGAN:  Your Honor, I don't have the Bates

12   stamp.  If I could have the Court's indulgence.

13             THE COURT:  That's okay.  I'm just trying to

14   move this along.

15             MR. DOGAN:  Okay.

16   BY MR. DOGAN:

17   Q.    So we're on the same page then, the Bates stamp is

18   number -- page 12.  And your general order says that

19   when -- canine deployment is defined as, "Any time the

20   police canine is removed from the police vehicle for any

21   legitimate law enforcement purpose"; correct?

22   A.    Correct.

23   Q.    And report writing, it requires you to write a

24   report.  "Canine handlers will enter all canine deployments

25   into the authorized records keeping system.  All

1    deployments shall be entered into the records system within

2    10 working days.  If a deployment is not entered within 10

3    working days, the handler will notify the canine sergeant

4    as to why."

5            Is there -- that exception that you speak of, is

6    it contained in this general order?

7    A.    No.  This is just strictly between me, the canine

8    unit, and my supervisor.  Every time we're at Amtrak, my

9    dog is always out there.  And we're consistently out every

10   single day that we work there.

11           If there is an issue or anything that arises

12   with my dog pertaining to whether -- if he did bite

13   somebody or if he did alert on to something, we will

14   document that.  But there was no alert.  There was no -- he

15   didn't do anything.  He was simply there scanning up and

16   down the train.

17           If he would have alerted to something or if he

18   would have caused an incident, then, yes, we would have

19   documented it.  That's why I log out with dispatch that me

20   and my canine are out at Amtrak, and it's logged that way.

21   Q.    How long were you on the train for?

22   A.    Probably less than a minute.

23   Q.    After you had spoken -- you spoke to Detective

24   Moore, correct, in this case?

25   A.    When?

1    Q.    When you were leaving the train, did you speak to

2    Detective Moore?

3    A.    No.  I usually get on the train, I go run my dog,

4    and I get off the train.  I try not to have any

5    conversation.  They're in plainclothes; I'm in uniform.

6    Q.    Okay.

7    A.    When they operate and work the train, we separate.

8    I don't want nothing to do with what they're doing, and

9    they don't do anything what I'm doing.  They will simply

10   call or ask, "Can you run something?" and I will go do it.

11   And then I'd leave.

12         If there's no alert, I let them know no alert.

13   Because if there is an alert, there could be probable cause

14   to apply for a search warrant.  Which in this case there

15   was not.

16         So I simply boarded the train, and I got off the

17   train.  And I left the train; the train left.

18         MR. DOGAN:  Okay.  Nothing further, Your Honor.

19         THE COURT:  All right.

20         Cross-examination?

21              CROSS-EXAMINATION

22   BY MS. RACHOW:

23   Q.    Just very briefly.

24         Do you recall on December 4th letting either

25   Detective Kurup know or Detective Estes know that your dog

1    had shown interest?

2    A.     I believe to Kurup or -- they were both right there.

3    And they usually watch.  And they pick up, hey, why did my

4    dog turn around and go sniff something twice or three

5    times.

6               But in my -- as a handler, I have to advise them

7    did he alert or did he not alert.  He did not alert.

8    Q.     Did you advise him, and is it common for you to

9    advise, if the dog shows interest?

10   A.     It is.

11   Q.     Now, in this particular case, did you have any

12   contact with Mr. Estes?

13   A.     No.  Not until the train arrived in Verdi is when

14   I -- first time I met him.

15   Q.     Did you have any idea who Mr. Estes was?

16   A.     No.

17   Q.     Is it common for the train interdiction team to ask

18   you to run your dog along a hallway?

19   A.     Yes.

20   Q.     Can you give an estimate of how often that occurs?

21   A.     My dog is almost daily on the train.

22   Q.     Thank you.

23             MS. RACHOW:  I don't have anything further.

24             THE WITNESS:  Okay.

25             THE COURT:  Officer Hill, I'm curious.  Why

1    would you then be dispatched out to Verdi after the train

2    is stopped --

3              THE WITNESS:  I was not dispatched.  I put

4    myself en route.  Because I was at the train station.  And

5    I ran my dog, got off the train.  The train departed.  And

6    then several minutes later I get a call from the detectives

7    stating, "Hey, we located a firearm, and we're going to

8    need patrol to meet us in Verdi, because we're going to

9    stop the train, and meet us in Verdi."

10             THE COURT:  So going to Verdi --

11             THE WITNESS:  So we had to go obviously pick up

12   Mr. Estes.

13             THE COURT:  Is it more correct -- is it correct

14   to say that the primary reason for going to Verdi was --

15   had nothing to do with the dog?

16             THE WITNESS:  No, absolutely not.  There was

17   nothing in this whole entire case to do with the dog.

18             THE COURT:  All right.  I was just curious as to

19   why you would have gone out there.

20             THE WITNESS:  Yeah.  They contact me because I

21   assist them -- I'm a marked patrol unit, so --

22             THE COURT:  Okay.  Thank you.

23             THE WITNESS:  -- since they were stopping the

24   train.

25             THE COURT:  Any further questions, Mr. Dogan?

1              MR. DOGAN:  Just one, Your Honor.

2                      REDIRECT EXAMINATION

3     BY MR. DOGAN:

4     Q.    From the time you got to the Amtrak station to the

5     time you left the Amtrak station, how long was that?

6     A.    I arrived -- I mean, if you go back to this, I

7     arrived -- it says 11:13.  We waited, because the train was

8     delayed, and so it was like another 15 minutes, another 15

9     minutes.  The train only arrives for a short period of

10    time, whether it was approximately 10 minutes.

11             So however long the train was there and I was

12    there, I get on, do my thing, and I get off.  And then the

13    train leaves.  So however long the dispatch log is.

14    Q.    Would it refresh your recollection to look at the

15    dispatch log --

16    A.    Yeah.

17    Q.    -- to determine when you left?

18    A.    Yeah.

19    Q.    Can you take a look at that --

20    A.    Which one was it?

21    Q.    -- Exhibit 113 again?  Or 107.  I'm sorry.

22    A.    Yeah.  Yeah.  Shows me on scene at Amtrak at 11:13.

23    The train was delayed even further.  And then at 12:19 it

24    states me going to Verdi.

25    Q.    So you were there from 11:13 to 12:19?

1    A.    Correct.

2    Q.    At the Amtrak station?

3    A.    Correct.  And towards -- I would say around just

4    prior to 12:19 is when the train left.  And it was there

5    for however long it stops, around 10 minutes.  And so as

6    soon as the train departs, the train was leaving, I get a

7    call several minutes later stating that they had located a

8    firearm.

9    Q.    So you were at the train station for a little over

10   an hour?

11   A.    Correct.

12             MR. DOGAN:  Court's indulgence.

13             Nothing further.

14             THE COURT:  All right.

15             Any further questions?

16             MS. RACHOW:  No, thank you, Your Honor.

17             THE COURT:  All right.

18             Officer Hill, you may step down.

19             THE WITNESS:  All right.

20             THE COURT:  Thank you.

21             MS. GORMAN:  So, Your Honor, the defense will

22   call Erika Dean.

23             MS. RACHOW:  And, Your Honor, may this witness

24   be excused?

25             THE COURT:  Yes, he may be.

1           MS. GORMAN:  Yes.

2           COURTROOM ADMINISTRATOR:  Please raise your

3    right hand.

4           You do solemnly swear that the testimony you

5    shall give in the cause now before the Court shall be the

6    truth, the whole truth, and nothing but the truth, so help

7    you God?

8           THE WITNESS:  I do.

9           COURTROOM ADMINISTRATOR:  Thank you.  Please be

10   seated.

11          Please state your name and spell your name for

12   the record.

13          THE WITNESS:  My name is Erika Renee Dean,

14   E-r-i-k-a R-e-n-e-e D-e-a-n.

15          COURTROOM ADMINISTRATOR:  Please tell us your

16   city and state of residence.

17          THE WITNESS:  San Francisco, California.

18          THE COURT:  Could you move the microphone a

19   little closer to her, please.

20                    ERIKA RENEE DEAN

21            called as a witness on behalf of the

22        Defense, was examined and testified as follows:

23                    DIRECT EXAMINATION

24   BY MS. GORMAN:

25   Q.   So, Ms. Dean, I know you speak really softly.  And

263

1   so we'll just ask you to speak up a little more if that's

2   okay.

3   A.    Okay.

4   Q.    So, Ms. Dean, just basics.  Where are you from?

5   A.    San Francisco, California.

6   Q.    Okay.  And do you know Mr. Estes?

7   A.    Yes.

8   Q.    Okay.  How do you know Mr. Estes?

9   A.    From high school.

10  Q.    Okay.  Now I'm just going to jump right to do you

11  remember anything happening on December 4, 2014, that

12  was -- do you remember having a phone call with Mr. Estes

13  on December 4, 2014?

14  A.    Yes.

15  Q.    Okay.  Do you remember who called who?

16  A.    He called me.

17  Q.    Okay.  I'm just going to stop for a second and ask

18  you, Erika, what's your phone number?

19  A.    My number is 415-368-9164.

20  Q.    Okay.  415-368-9164?

21  A.    Yes.

22  Q.    And do you have your cell phone with you today?

23  A.    Yes, I do.

24  Q.    Okay.  So can you tell me about what time you

25  received that phone call?

1    A.    Around 11:30, noonish.

2    Q.    Okay.  11:30, noonish.  It's okay.  It was a long

3    time ago.

4          So can you tell me how long that phone call

5    lasted?

6    A.    It was very brief.  It was like a couple minutes.

7    Q.    Okay.  And do you remember what happened on the

8    telephone to make it brief?

9    A.    Yes.  As we were talking someone approached

10   Mr. Estes, and they asked him -- or I guess they asked him

11   to get off the phone.  And then so he told me that it was

12   the police and then he needed to call me back.

13   Q.    Okay.  So who hung up the phone?

14   A.    He did.

15   Q.    Okay.  So what did you do after that?  Were you

16   worried?

17   A.    Yes.

18   Q.    Okay.  What was the tone of the -- so I know you

19   were talking to Mr. Estes.  Were you able to hear another

20   person in the background?

21   A.    Yes.

22   Q.    Okay.  Do you remember if there was a certain kind

23   of tone?

24   A.    All I remember was a male, and it kind of sounded

25   like authority figure or something.

1    Q.    Okay.  So what did you do after that, Erika?

2    A.    I waited a little while, and then I called him back.

3    Q.    Okay.  Do you remember how many times you called him

4    back?

5    A.    Several times.

6    Q.    Okay.  So, Erika, did you -- did somebody -- anybody

7    pick up the phone any time that you called?

8    A.    Yes.  After I called, I repeatedly called, I just

9    pressed, like, redial.  And then again, like I said, it was

10    about several times that I called.  And then some -- a man

11    picked up the phone, and he said at that point that

12    Mr. Estes was not going to be detained and that he would

13    have him call me back.

14    Q.    Okay.  So, Ms. Dean, so you stated your phone number

15    was 415-368-9164?

16    A.    That's correct.

17    Q.    Do you have your ringer on today?

18    A.    I don't think so.

19    Q.    Okay.

20    A.    I turned it off in the hall earlier.

21    Q.    Would you like to put on your -- I mean, just so

22    this Court has some evidence that this is Ms. Dean's phone

23    number.  Would you mind putting your ringer on?

24    A.    Not at all.

25    Q.    Okay.

1          MS. GORMAN:  Court's indulgence.

2          THE WITNESS:  Okay.

3          MS. GORMAN:  Your Honor, I'm just going to put

4     my phone on the Elmo, if that's okay, so that anybody can

5     see what I'm doing so the record can so reflect.

6          I would like the record to reflect I'm dialing

7     415-368-9164.

8          THE COURT:  It will so show.

9          (Cell phone ringing.)

10         THE COURT:  The record will show that Ms. Dean's

11    telephone alerted, and she turned it off as a result of the

12    call.

13    BY MS. GORMAN:

14    Q.    So, Ms. Dean, I'm going to show you what's been

15    marked as Defense Exhibit 127.

16         So, Ms. Dean, I'd like to direct you to line

17    6780, and the second column.

18    A.    Okay.

19    Q.    Can you tell me whether that's your number that was

20    the number that was called?

21    A.    Yes, that's my number here and number -- or in B?

22    Q.    Yes.  And do you recognize the number before that?

23    A.    Yes.

24    Q.    Okay.  And who do you recognize that number to be?

25    A.    This should be Mr. Estes' number.

1    Q.    Okay.  And can I direct you to the date that that

2    call was made.

3    A.    Okay.

4    Q.    Okay.  Do you recall that call being made

5    December 4th, 2014?

6    A.    Yes.

7    Q.    Okay.  And does 11:43 -- according to your

8    recollection, is that accurate?

9    A.    Yes.

10   Q.    Okay.  Skipping down to line 6788.

11   A.    Okay.

12   Q.    Is that your number that's the calling number?

13   A.    Yes.

14   Q.    Okay.  And the line below that, is that your number

15   still?

16   A.    Yes.

17   Q.    And below that?

18   A.    Yes.

19   Q.    And below that?

20   A.    Yes.

21   Q.    Okay.

22         MS. GORMAN:  Your Honor, we have no further

23   questions.

24         THE COURT:  Okay.

25         Cross-examination?

1                        CROSS-EXAMINATION

2      BY MS. RACHOW:

3      Q.    Good morning.

4      A.    Good morning.

5      Q.    Now, obviously this call was quite a long time ago;

6      is that correct?

7      A.    Yes.

8      Q.    And you stated you spoke to Mr. Estes for a few

9      minutes; correct?

10     A.    That's correct.

11     Q.    What did you talk about?

12     A.    Basically, in that moment I was trying to get some

13     advice from him.  That's the best I can remember.  I was

14     trying to get some advice from Mr. Estes.  So he had called

15     me, but I remember that I was speaking to him.

16     Q.    Do you remember exactly what you were talking to him

17     about?

18     A.    Yeah.  It was -- I was trying to find an auto

19     mechanic.

20     Q.    And you were living in San Francisco at the time?

21     A.    Yes, that's correct.

22     Q.    Did you know where Mr. Estes was living?

23     A.    No.

24     Q.    You had no idea where Mr. Estes was living at this

25     time?

1  A.    No.  I mean --

2  Q.    Would it surprise you that he was living in

3  Arkansas?

4  A.    I'm sorry?

5  Q.    Would it surprise you that he was living in

6  Arkansas?

7          MS. GORMAN:  Your Honor, this is beyond the

8  scope of direct examination.

9          THE COURT:  No, it's --

10          MS. RACHOW:  Your Honor, it's cross-examination.

11          THE COURT:  It's certainly --  the conversation

12  is certainly in the subject matter that fell within the

13  scope.

14  BY MS. RACHOW:

15  Q.    So it's your testimony that you were speaking to

16  Mr. Estes about finding a mechanic?

17  A.    Uh-huh.

18  Q.    Is that -- I'm sorry.  You have to answer --

19  A.    Yes, that's --

20  Q.    -- yes or no for the record.

21  A.    Yes, that's correct, ma'am.

22  Q.    But you didn't know where Mr. Estes was living at

23  the time?

24  A.    No.

25  Q.    What else did you ask him about?

1    A.    That was pretty much it as far as my conversation

2    with him.

3    Q.    Do you remember what else he said to you?

4    A.    Well, he at some point -- like I said, there was

5    someone that approached Mr. Estes.  I heard a male approach

6    him --

7    Q.    I'm going to stop you right there.

8          You're on the phone with Mr. Estes; correct?

9    A.    Uh-huh.  That's correct.

10   Q.    Do you know where he is physically at this point in

11   time?

12   A.    Yes, ma'am, I did know.

13   Q.    And how did you know that?

14   A.    Because he told me.

15   Q.    Okay.  Now, you're on the phone, and you said you

16   heard somebody approach him?

17   A.    Yeah.

18   Q.    How did --

19   A.    Yes.

20   Q.    How did you hear somebody approach him?  Did you

21   hear footsteps?  What did you hear?

22   A.    I heard a voice.  I heard the person's voice.

23   Q.    So you just heard a person's voice.  You can't

24   really testify if that person was right -- was approaching

25   or was just there; correct?

1    A.    Well, again, ma'am, I was on the phone with him.

2  And he stopped the conversation with me to speak with

3  whoever was speaking with him.

4    Q.    And it was your testimony on the stand that you

5  heard, "Get off the phone."  Is that correct?

6    A.    I -- I don't remember that.

7    Q.    Do you remember when the defense attorney asked you

8  what you overheard this voice saying?

9    A.    Yes, I do remember that.

10   Q.    And what did you say?

11   A.    I didn't -- I don't remember saying or hearing that

12  I heard someone say, "Get off of the phone."

13   Q.    Then that -- then I apologize.  What did you hear?

14   A.    I -- again, like I said, I heard a voice approaching

15  Mr. Estes.  I can't be a hundred percent sure because

16  Mr. Estes' voice was more dominant than the other voice,

17  though.  It -- again, it's like that voice was in the

18  background.

19   Q.    So --

20   A.    And --

21   Q.    -- you just heard a background voice?

22   A.    Yes.

23         THE COURT:  Would you let the witness answer --

24  complete her answer before you go to your next question.

25         MS. RACHOW:  I'm sorry.

1    BY MS. RACHOW:

2    Q.    Are you finished?

3    A.    Can you repeat the question again?

4    Q.    What exactly did you hear?

5    A.    I heard a man in the background speaking with

6    Mr. Estes.

7    Q.    Now, you just testified that Mr. Estes was the

8    dominant voice; correct?

9    A.    That's correct.

10   Q.    What did you hear the male voice say?

11   A.    I believe they were asking him to search his person.

12   Q.    You believe?

13   A.    Yes, ma'am.

14   Q.    Or are you sure that's what you heard?

15   A.    I'm certain, ma'am.

16   Q.    Did you hear anything else?

17   A.    I heard Mr. Estes, he told me that he needed to get

18   off the phone, and then he hung up pretty fast so...

19   Q.    And that is the only thing you heard?

20   A.    That's correct.

21   Q.    Now, you testified that you called Mr. Estes back

22   several times; correct?

23   A.    Yes.

24   Q.    Did you ever get through?

25   A.    Not with Mr. Estes.

1    Q.    What would happen?

2    A.    Some -- an officer answered the phone.  I believe it

3    was an officer because it was a man.

4    Q.    You don't know that it was an officer, you just know

5    that it was a man; is that correct?

6    A.    Well, Mr. Estes said that it was the police when we

7    ended the call so...

8    Q.    But you don't know who answered Mr. Estes' phone --

9    A.    No.

10   Q.    -- personally, do you?

11   A.    I was not there.  I could -- no.

12   Q.    Now, you testified you called him several times and

13   nobody answered; is that correct?

14   A.    Someone answered, it just wasn't Mr. Estes.

15   Q.    Then did you only call Mr. Estes' phone once?

16   A.    No.

17   Q.    So what happened on the other times you called

18   Mr. Estes' phone?

19   A.    It rang, and I immediately pressed redial.

20   Q.    So nobody answered?

21   A.    No one answered.

22   Q.    Did his voicemail come on?

23   A.    Again, I didn't allow it a chance to come on, ma'am,

24   I just pressed redial after I didn't get a response.

25   Q.    How many times would the phone ring?

274

1    A.    I can't remember the duration of the rings.

2    Q.    Do you remember how many times you would let it ring

3    before hanging up to press redial?

4    A.    No.

5    Q.    Are you familiar with Defendants' Exhibit 106?  I

6    believe it should be in a binder in front of you.

7    A.    Yes.

8    Q.    And are you familiar with that statement?

9    A.    Yes.

10   Q.    Did you write that statement?

11   A.    It's typed.  But yes.

12   Q.    So you wrote this statement?

13   A.    This is my statement, ma'am.

14   Q.    But I'm asking if you actually drafted this

15   statement yourself?

16   A.    It's been typed.  I don't recall writing a

17   statement.  I remember signing this.

18   Q.    You signed this statement; correct?

19   A.    Yes.

20   Q.    But you don't remember writing a statement?

21   A.    No.

22   Q.    Do you know how this statement got to you?

23   A.    I believe through email.

24   Q.    From who?

25   A.    I can't remember the person's full name that was

1    helping me at that time.  But I remember his first name was

2    Dan.

3    Q.    So somebody named Dan drafted this statement and

4    sent it to you and for your signature?

5    A.    That's correct.

6    Q.    Because I'd note -- is your first name spelled

7    correctly?

8    A.    No, it's not.

9              MS. RACHOW:  I don't have any further questions.

10             THE COURT:  All right.

11             Redirect?

12                    REDIRECT EXAMINATION

13   BY MS. GORMAN:

14   Q.    Ms. Dean, do you recall speaking with our

15   investigator, Larry Hoffman?

16   A.    Yes, I do.

17   Q.    Okay.  And did you tell Larry Hoffman about the

18   phone call incident with Mr. Estes?

19   A.    Yes.

20   Q.    Okay.  And were you advised by Mr. Hoffman that he

21   was going to prepare a statement using your words?

22   A.    Yes.

23   Q.    And were you also advised by Mr. Hoffman that if

24   there were any corrections to be made, you could correct

25   them?

1    A.    Yes.

2    Q.    Okay.  And then do you recall Mr. Hoffman flying to

3    San Francisco to see you?

4    A.    Yes.

5    Q.    Okay.  And do you recall reviewing this statement?

6    A.    Yes.

7    Q.    And do you recall reviewing it for accuracy?

8    A.    Yes.

9    Q.    Do you recall making any changes to the statement?

10   A.    Yes, I do.  When I saw it in person, I saw the

11   bottom where my name is -- well, at the top too, obviously,

12   but it's -- my name is spelled with a K every time it

13   appears and -- well, with a C, but they -- I spell it with

14   a K, and they spell it with a C so --

15   Q.    So you made that correction?

16   A.    -- that was my correction.

17         Yes, that was my correction.

18   Q.    And if there were any other corrections to be made,

19   would you have felt comfortable making them?

20   A.    Yeah.

21   Q.    And did you?

22   A.    Yes.  Oh, did I feel comfortable --

23   Q.    Did you make any other changes?

24   A.    Not that I could -- no.

25   Q.    So the statement was accurate?

1   **A.**   Yes, that's correct.

2   **Q.**   And do you have any doubt about the accuracy today

3   of the statement?

4   **A.**   No.

5   **Q.**   And now, Ms. Dean, I understand it's been a year and

6   a half since this happened; right?

7   **A.**   Yes.

8   **Q.**   And are you trying, as you sit here today, to

9   recollect what happened as best you can?

10  **A.**   Yes, I am.

11  **Q.**   In terms of fundamental details, do you remember

12  receiving a call between 11:30 and noon from Mr. Estes

13  December 4, 2014?

14  **A.**   Yes.

15  **Q.**   Do you remember that call being interrupted?

16  **A.**   Yes.

17  **Q.**   Do you remember calling back repeatedly?

18  **A.**   Yes.

19  **Q.**   Do you remember calling back repeatedly because you

20  were scared for him?

21  **A.**   Yes.

22  **Q.**   Okay.  Do you remember that the person who picked up

23  was not Mr. Estes?

24  **A.**   Yes, I'm sure.

25  **Q.**   Is the reason that you believe it was a police

1    officer because they told you that they were not detaining

2    Mr. Estes but needed to ask him questions?

3                MS. RACHOW:  Objection, leading.

4                MS. GORMAN:  Your Honor, at this point --

5                THE COURT:  I'll allow the question.

6                THE WITNESS:  Yes.

7    BY MS. GORMAN:

8    Q.    Is that the reason you believed it was a police

9    officer?

10   A.    Yes.

11   Q.    Okay.  In your experience, do nonpolice officers

12   talk about detaining people?

13   A.    No.  I've never even used that word until now, so,

14   yeah.

15   Q.    Thank you so much, Ms. Dean.

16   A.    You're welcome.

17                     RECROSS-EXAMINATION

18   BY MS. RACHOW:

19   Q.    Ma'am, did you just testify that you've never used

20   the word "detaining" until your testimony today on the

21   stand?

22   A.    No, I didn't mean it as it pertains to the

23   testimony.  I mean as far as dealing with this whole

24   situation.

25   Q.    But "detaining" is not a word you would have used?

```
1    A.    No.

2    Q.    Thank you.

3              MS. RACHOW:  I have nothing further.

4              THE COURT:  Any further questions?

5              MS. GORMAN:  No, Your Honor.

6              THE COURT:  All right.

7              Ms. Dean, that will complete your testimony, and

8    you may step down.  Thank you.

9              THE WITNESS:  Thank you.

10             MS. GORMAN:  Your Honor, we rest.

11             THE COURT:  All right.  Thank you.

12             Is there any further evidence on behalf of the

13   government?

14             MS. RACHOW:  No, Your Honor.

15             THE COURT:  All right.  So this matter will

16   stand submitted.

17             There's one issue concerning the conditional

18   admission of the phone records.  I'd like to have some

19   written points and authorities concerning the government's

20   objection to that.

21             What amount of time would you be comfortable

22   with, Ms. Rachow?

23             MS. RACHOW:  Your Honor, I'd like to order the

24   transcript so I can point to specific instances in the

25   transcript about the objections.  Because I believe there
```

1    are some inaccuracies with the phone records as

2    represented.

3              I do have an additional suppression hearing with

4    Your Honor this afternoon, and I anticipate that case going

5    to trial next week starting Tuesday.

6              Is there any way I could get until next Friday,

7    a week from tomorrow?

8              THE COURT:  Yes.  There's no problem with that.

9              MS. RACHOW:  Thank you, Your Honor.

10             THE COURT:  And then I'll give the defense three

11   days to respond to it the following week.  So let's say

12   the Friday.

13             MS. GORMAN:  What would that Friday be?  I just

14   want to make sure.

15             THE COURT:  Well, let's make it a one-week

16   period from when it's submitted to you.  That way we don't

17   have to worry about counting weekend days or not.

18             MS. GORMAN:  And is this Court going to allow

19   argument on this?

20             THE COURT:  Would you like to argue?  I

21   understand each party's position.  But I'm certainly

22   willing to hear limited argument if you would like.

23             MS. GORMAN:  I think an argument would be

24   appropriate in this case.

25             THE COURT:  All right.  Actually it would be --

1      I'd allow you to go forward, Ms. Gorman.  You're requesting

2      the argument.

3                  MS. GORMAN:  Pardon me?

4                  THE COURT:  Do you want to -- it's your motion

5      to suppress.

6                  MS. GORMAN:  Yes.

7                  THE COURT:  It's the government's burden to show

8      it was a voluntary consent.

9                  MS. GORMAN:  So, Your Honor, I mean, as this

10     Court knows in the motion we put forth every possible

11     theory of suppression because obviously we don't know the

12     government's position.

13                 And in it we attacked this drug courier profile

14     that was used by Amtrak.  And this Court has heard lots of

15     testimony on this drug courier profile.  I mean, that

16     profile is deficient under every body of law.

17                 So I don't -- and I don't believe that the

18     government would argue, or at least didn't in their

19     opposition, that there's ever reasonable suspicion to

20     detain Mr. Estes.  The government specifically waived that

21     argument in their opposition.

22                 And their argument was that this was a

23     consensual encounter.  So from the inception of the

24     encounter until the moment this gun was found, this is

25     purely consensual.

1              And to do that -- if the government is going to

2    rely on consent, this consent has to be valid, it has to be

3    voluntary, and it can't be made the threat of -- it can't

4    be under threat of coercion or under duress.  And I think,

5    as so clearly demonstrated in this case, it was.

6              Mr. Estes was approached by a law enforcement

7    officer when he's on this -- the platform of a train

8    station.  He's alone.  I think we've heard a lot of

9    evidence that Mr. Estes was actually on the telephone,

10   although both officers have denied that throughout.

11             And, regardless, Mr. Estes is on this train

12   platform approached by these two officers.  We submit he

13   was ordered to get off the telephone.  And he was told that

14   he is the subject of an investigation.

15             There is a huge body of case law saying if

16   you're going to look at what a detention is, telling

17   somebody that they are the target or a specific interest in

18   terms of a criminal investigation is huge in terms of

19   whether a normal encounter escalates to a detention.  So

20   here he was singled out for suspicion.

21             You heard testimony that they advised him that

22   he had indicators on his reservation that he was a drug

23   trafficker.  These are really serious crimes.

24             And in response to that Mr. Estes is asked if he

25   will consent to a search.  And there was unanimous

1    testimony he was unambiguous.  He said, "No, I don't want

2    to be searched."  And he had that absolute right under the

3    Fourth Amendment of the Constitution.

4              And the government tried to bring in the stuff

5    with Amtrak and signs.  And the truth is Amtrak's policy

6    should be that he's offered a full refund if he doesn't

7    want to be searched.  And that's not what happened.  He

8    wasn't offered a refund and told he can take his bags and

9    go home.  And he was pretty close to where he was going

10   anyway.

11             But in this case instead he was advised that

12   they were going to deploy a canine, and if canine alerted

13   then all of his items are going to be seized and searched

14   and the search warrant obtained.

15             And then he goes on to the train with multiple

16   officers.  And he's separated from his belongings because

17   they're running a dog along this narrow hallway around his

18   sleeper car.  And then the dog doesn't alert.

19             So these two detectives who so clearly want to

20   search Mr. Estes' belongings, they know now that they don't

21   have probable cause.

22             So what they do is they trick Mr. Estes, who is

23   not a law enforcement officer.  And having just told him,

24   "If a dog alerts we're going to seize everything and we're

25   going to get a warrant," Detective Moore knowing absolutely

1    well from Detective Hill, from Officer Hill, from

2    everything that he has learned throughout his training and

3    experience in drug interdiction, he knows he has nothing

4    for probable cause.

5           But he chooses to go up to Mr. Estes, who

6    doesn't know these things, and say, "Hey, a dog showed a

7    lot of interest in your room," and to try to extract

8    consent from Mr. Estes that way.

9           Now, there's a dispute as to whether or not

10   there was ever a consent at all.  And I don't think the

11   government has even crossed the burden of showing that

12   there was a consent, valid or invalid.

13          These officers elected, they made a decision,

14   "We're not going to record this interdiction.  We have an

15   audio recording device, we have an iPhone, we have another

16   smartphone, we have pieces of paper, we have a permission

17   to search form."

18          There's an election to never memorialize

19   consent.  And especially in a case where someone has

20   unambiguously said, "I don't want you to search me," and

21   asserted that constitutional right, the decision to not

22   memorialize consent I think is absolutely fatal, especially

23   as consent is disputed in this case.

24          But, regardless, if Mr. Estes did consent, if

25   this Court believes the officers that he eventually said

1      okay, after, after Detective Moore says, "Well, this dog

2      shows a lot of interest," that consent is not freely given,

3      it is not voluntarily given, it is the product of coercion,

4      it is the product of duress, and it is invalid under the

5      law.

6              And everything flows from that consent.  His

7      search of his bag, his gun, everything flows from that

8      consent.  So that's one basis is the consent is invalid.

9              But the second basis, and an alternative totally

10     independent basis, is that if Mr. Estes is seized during

11     this encounter, if he's seized, because the government has

12     not argued there's reasonable suspicion on this ticket

13     stuff, the government elected not to make that argument in

14     their opposition, so if Mr. Estes was seized at any point

15     before this, then any consent would be invalid, finding the

16     gun would be invalid, and everything else would be a fruit

17     of it.  So there's multiple independent bases to suppress

18     this evidence.

19             And I think almost independently it's important

20     to note that you have this divergent set of facts.  And we

21     provided this notice to the government in the form of our

22     motion.  We don't often provide an affidavit from a client

23     or an affidavit from a witness.

24             But we're giving the government notice in

25     saying, "Hey, we believe that these two people were on a

1    phone call when your officers approached.  We believe that

2    the officer made this person hang up the phone.  We believe

3    that an officer picked up the phone."

4              Now, I didn't go and get consent from my client

5    to get his phone records.  Instead what I did is I went to

6    the Court and I said, "Hey, this is the story that we are

7    telling."  And before I had seen a record -- and this Court

8    knows because I had filed both a motion to suppress and a

9    motion to this Court, saying, "This is what we believe

10   happened and we believe there's going to be evidence in

11   here."

12             Now, the government has the same right to do

13   that as we do.  They can seek a court order.  And we had

14   definitely put this in issue in the case.  But we chose to

15   find out the truth, knowing we -- it's a huge risk, using

16   my client's information to get something from the Court.

17   The moment I don't have that in the court record, I'm sunk.

18             But the Court record -- or the records that we

19   requested and that we received under subpoena with a

20   business record affidavit from T-Mobile, they literally go

21   moment by moment to the information provided to the

22   government and provided to the Court.

23             And they show that these officers were not

24   telling the truth.  They just weren't.  I mean, the

25   evidence is at this point just overwhelming.  And it's

1    important that the Court have these records and the Court

2    consider the records because these are the only, at this

3    point, objective records that we have in this case.

4            So Your Honor has multiple, multiple bases on

5    which to suppress the evidence in this case.

6            In terms of the statements, both the statements

7    were in violation of Miranda.  I think that the escalation

8    of events in this case, the deployment of the dog, the

9    three armed officers with my one lone client, the fact that

10   they were on this cramped train, the fact that Mr. Estes is

11   told that he's the target of this investigation, all of

12   that rises to a circumstance which would be analogous to an

13   arrest, even though there was not a formal arrest.

14           And there was an interrogation throughout.  And

15   they elected not to Mirandize Mr. Estes.  They elected to

16   do so while taking pictures of him in handcuffs on a train,

17   taking pictures of his tattoos, making calls in front of

18   him.  That's a decision that they made in this case.

19           But even if they had, again, those statements,

20   they're still the fruit of an illegal seizure.  They're

21   still the fruit of this illegal search.  So there's three

22   independent bases to say that these statements don't come

23   in.

24           So Your Honor has multiple bases in the Fourth

25   Amendment, the Fifth Amendment, the due process clause to

1    say that what happened in this case was unconstitutional

2    and that the government did not and cannot carry their

3    burden in this case and that the evidence against

4    Mr. Estes, the firearm, his statements, that those should

5    be suppressed.

6              So Court's indulgence, Your Honor?

7              Your Honor, unless the Court has any additional

8    questions, that will -- we'll submit on that.

9              THE COURT:  No, I don't.  And I appreciate your

10   argument.

11             Ms. Rachow?

12             MS. RACHOW:  Your Honor, just very briefly.  I

13   know Your Honor is very aware of the case law and has

14   reviewed the briefs and has obviously heard the testimony.

15             The one thing I do want to point out is the

16   defendant was not subject to cross-examination, and he did

17   not submit an affidavit.  It's a statement.  The Court

18   should give no weight to that statement because the

19   government did not have the opportunity to cross the

20   defendant.

21             And with the phone records, the one thing they

22   can't tell you is they can't tell you if the phone ringer

23   was on.  So there is no way to say that the officers are

24   lying, that they didn't hear the defendant's phone ring

25   because there's no evidence the phone ringer was on.

1           The government believes those phone records

2    actually show that several of those were text messages, not

3    phone calls.

4           Your Honor, the government has submitted that

5    this is not an encounter where the defendant was seized, it

6    was a consensual encounter.

7           THE COURT:  Well, let me ask you the one

8    question.  Let's assume that the witness was being

9    completely truthful.  She said that at one point in time

10   she called and the officer, who she didn't know who he was,

11   answered the phone, told her that it appeared that

12   Mr. Estes was okay and that she would be able to talk to

13   him later.

14          Now, if the phone's not ringing, how would the

15   officer know to answer that phone?

16          MS. RACHOW:  Your Honor, from the timeline, I

17   believe that was after Mr. Estes -- the gun had been found,

18   and he was detained at that point because he was going to

19   be removed from the train due to the firearms policy.  But

20   they chose not to Mirandize him, and they didn't ask him

21   any questions regarding his --

22          THE COURT:  No, but I'm just --

23          MS. RACHOW:  -- possession of the gun.

24          THE COURT:  -- asking you the simple question.

25          It suggests to me that the phone was ringing and

1      that's why the officer picked it up, if you believe the

2      witness.

3              MS. RACHOW:  And, Your Honor, that is certainly

4      the Court's decision regarding the witness' credibility.

5              But the Court also needs to take into account

6      where the initial contact with Mr. Estes was.  It was down

7      in the train trench.  You have the train coming in.  You're

8      having people.

9              If the Court wants to believe that the officers

10     were not truthful in their statement that they didn't hear

11     the phone ringing, that is the Court's decision.  But the

12     officers clearly testified that they did not see Mr. Estes

13     on the phone at the time they approached him, which can

14     easily be reconciled with Mrs. -- or Ms. Dean's testimony

15     regarding when the phone call happened.

16             And it's the government's recollection that she

17     waffled on the stand as to what she said in her direct, as

18     to her cross and in her statement.

19             But, again, credibility is up to the Court.

20             But, Your Honor, there is no indication from

21     either of the officers that they heard the defendant's

22     phone ring.  They clearly testified they did not take his

23     phone, they were not going through his phone.

24             And so with that, unless the Court has any other

25     questions, I'm going to submit on the briefs and the

1    testimony.

2              THE COURT:  All right.  That's fine.

3              Although I do want to say for the benefit of

4    Detective Moore, he did not testify that he heard at any

5    time a consent from Mr. Estes; is that correct?

6              MS. RACHOW:  That is correct, Your Honor.

7              THE COURT:  And so the issue of consent rests

8    solely and exclusively upon the testimony of the Amtrak

9    Detective Kurup; is that correct?

10             MS. RACHOW:  That would be correct.  Detective

11   Moore testified that he was not close enough to hear the

12   conversation between Mr. Estes and Detective Kurup.

13             THE COURT:  All right.  Thank you.

14             MS. GORMAN:  Your Honor, may I reply briefly?

15             THE COURT:  Yes.

16             MS. GORMAN:  So I'm just -- I think that two

17   pieces of evidence were misstated.  And I have an

18   obligation to correct them.

19             So Ms. Rachow just said she believed that it was

20   after the arrest of Mr. Estes --

21             MS. RACHOW:  Objection.  I did not say arrest.

22   I said detention.

23             MS. GORMAN:  After the detention of Mr. Estes

24   that these phone calls were received?

25             THE COURT:  Well --

1              MS. GORMAN:  I just want to direct the Court --

2              THE COURT:  I understand your point.

3              MS. GORMAN:  Okay.  I just think the Court

4      should actually take note of the times on the police report

5      and also the times on these phone records, which contradict

6      that.

7              I also think that it's important to know that

8      there was essentially no evidence of why these officers

9      contacted Mr. Estes to begin with, which is of concern.

10             We have Detective Moore, who is going in to look

11     for Mr. Estes in his sleeper car, and he comes out and he

12     sees his partner talking to essentially a young black male,

13     and they're -- nobody is saying that they have a picture of

14     Mr. Estes.  Nobody knows how this would be Mr. Estes.  He's

15     not in his sleeper car.  And that, I think, should also be

16     of some concern.

17             And I think even though the government is

18     arguing that this is consensual from beginning to end, I

19     still think it's important to the general credibility of

20     these officers to note that there were really no real

21     indicators here.

22             We have a credit card purchase.  They have an

23     emergency exchange voucher.  The biggest indicators aren't

24     even present in this case.  So I think really the entire

25     investigation is very questionable to begin with.

1          So I think those are important issues to note,

2     even though the government is going on a theory of pure

3     consent.

4          THE COURT:  All right.  Thank you.  All right.

5          I'll take this matter under submission.  I'll

6     await the points and authorities challenging the

7     admissibility of the phone records.  And when I'm able to

8     rule on that, I'm sure that I can give you a decision on

9     the substantive issues which are before the Court.

10         Thank you very much.

11         COURTROOM ADMINISTRATOR:  Please rise.

12         (The proceedings concluded at 11:01 a.m.)

13                    *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

294

1                              -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6    _____    _____
                                          4/5/16

7    Donna Davidson, RDR, CRR, CCR #318    Date
     Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

295

1                          I N D E X

2    GOVERNMENT'S WITNESSES:                          PAGE

3    TONY MOORE
         Cross-Examination (Resumed)                  180
4        By Ms. Gorman
         Redirect Examination By Ms. Rachow           227
5        Recross-Examination By Ms. Gorman            235

6
     DEFENDANT'S WITNESSES:                            PAGE
7
     JAYSON HILL
8        Direct Examination By Mr. Dogan              240
         Cross-Examination By Ms. Rachow              257
9        Redirect Examination By Mr. Dogan            260

10   ERIKA RENEE DEAN
         Direct Examination By Ms. Gorman             262
11       Cross-Examination By Ms. Rachow              268
         Redirect Examination By Ms. Gorman           275
12       Recross-Examination By Ms. Rachow            278

13

14

15

16

17

18

19

20

21

22

23

24

25