RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
LAUREN GORMAN
Assistant Federal Public Defender
Nevada State Bar No. 11580
201 W. Liberty Street, Ste. 102
Reno, Nevada 89501
(775) 321-8451/Phone
(775) 784-5369/Fax
Lauren_Gorman@fd.org

Attorney for SHAUN JERMAINE ESTES

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SHAUN JERMAINE ESTES,<br><br>　　　　　Defendant. | Case No. 3:15-cr-15-LRH-VPC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES** |

Certification: This memorandum is timely filed.

　　　　Defendant SHAUN JERMAINE ESTES ("Estes"), by and through his attorney of record, LAUREN D. GORMAN, Assistant Federal Public Defender, hereby files this memorandum in support of Exhibits 125-128.

　　　　Defendant notes, as an initial matter that this Court has heard from live witnesses and examined other evidence in this case.  Even if this Court elects not to consider Exhibits 125-128, the record still provides the Court ample evidence demonstrating that officers seized Mr. Estes before finding the firearm at issue and Mr. Estes did not provide free and voluntary consent to a search.  But, in this memorandum, Defense asserts Exhibits 125 – 128 should be

1  admitted because, as impeachment evidence, they assist the trier of fact in weighing the
2  testimony of the witnesses who appeared before the Court.

3  In preparation for writing this memorandum, counsel reviewed the sealed order filed
4  pursuant to a 17(b) motion that pertained to Mr. Estes's phone records. In that review, counsel
5  discovered a sentence in a court order (#34) that she had not read until this review of the record.
6  Though this has not been raised by either the government of the court and it appears neither is
7  aware this issue exists, in the interest of candor to opposing counsel and the court, and in order
8  to complete this record it is important to counsel that this issue be addressed.

9  As this court knows, counsel filed a 17(b) motion (CR#33) under seal for her client's
10 phone records in this case. That motion was granted on October 22, 2015 and the subpoena and
11 order were served on T-Mobile.

12 What counsel did not do back in October, 2015 was review the order #34. Instead, she
13 saw the subpoena was issued and requested that her investigator serve T-Mobile with the order
14 and subpoena. The order included language that ordered T-Mobile to deposit the records with
15 the clerk of the court who shall inform the parties permitting counsel *for both sides* to inspect
16 them. T-Mobile provided Mr. Estes's phone records to the court but it appears the Court
17 provided them to defense counsel and may not have provided them to the government. Defense
18 counsel attaches as Exhibit A, the copy of the Compact Disc of T-Mobile records provided by
19 the court to defense counsel.

20 Defense counsel did not realize until this week that the records were to be distributed
21 by the court to both parties. Counsel asserts that, had she any reason to believe the government
22 was entitled to but had not received a copy of the records provided to the defense by the court,
23 she would have contacted the court and the government as a courtesy, at least.

24 The T-Mobile legal department provided a copy of Mr. Estes's phone records directly
25 to defense counsel by email when she contacted them to discuss obtaining a business record

2

affidavit for Mr. Estes's subpoenaed records that conformed to 803(6). The authenticated records T-Mobile provided by email were conditionally admitted as evidence (126) along with the 803(6) business record affidavit (125). The authenticated emailed records are responsive to the same subpoena as the ones provided by CD but were produced by T-Mobile in a different format. Most notably, the emailed records (126) are in U.S. Time Zones. The records T-Mobile sent to the court are in Universal Standard Time (UTC) and do not have an accompanying 803(6) business records affidavit and thus were not properly authenticated to be moved into evidence.

Though the government's brief on this issue presents a separate evidentiary question which the defense contests in this memorandum, the defense acknowledges that the government *should* have received the records from the Court, according to its order, or from the defense as a matter of courtesy.

Below, counsel addresses the evidentiary issues briefed by the government, and explains that the failure to provide notice to the government should not preclude the admissibility of the evidence at issue.

### I. THE EXHIBITS AT ISSUE WERE INTRODUCED FOR IMPEACHMENT PURPOSES AND THEREFORE THE HEARSAY EXCEPTIONS DO NOT APPLY.

Mr. Estes's telephone records were introduced during the cross-examination of a government witness – Detective Kurup -- after he testified that Mr. Estes was not on the telephone during the inception of this police encounter nor were calls being made to his telephone. The records were extrinsic evidence introduced for the purpose of impeachment and not for the truth of the matter asserted. Moreover, both the relevance and admissibility of this impeachment evidence could not be anticipated before the testimony of the government's witnesses. Having heard the testimony of Detective Kurup, evidence that his recollection is demonstrably false is certainly relevant and worthy of weight.

## II. THE GOVERNMENT'S FAILURE TO FIND ANY DEFECT IN THE AUTHENTICITY OF THE PHONE RECORDS DEMONSTRATES THERE IS NO PREJUDICE TO THE GOVERNMENT IN THE FAILURE TO PROVIDE NOTICE.

The government argues Mr. Estes's telephone records were introduced for the truth of the matter asserted and required notice under Rule 902(11). This argument is without merit. First, the relevance and admissibility of Estes's telephone records were dependent on the live testimony of the witnesses. Second, the rules of evidence don't apply with the same force at suppression hearings. Finally, to the extent that the government argues it should have had notice to consider the authenticity of the records, any such error has been cured by the Court's Order to brief this issue in writing.

"[I]t should be recalled that the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." *United States v. Matlock*, 415 U.S. 164, 172-73 (1974). Indeed, Federal Rule of Evidence 104(a) provides: "In General. The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104. The Supreme Court has interpreted Federal Rule of Evidence 104(a)'s scope to encompass criminal suppression hearings. *Matlock,* 415 U.S. 164 at 172.

Moreover, Federal Rule of Evidence 902(11) pertains to self-authenticating business records and requires notice to the adverse party in order to give the opposing party time to "test the adequacy of the foundation set forth in the business record declaration." Committee Notes on Rules (2000 Amendment). To the extent, if any, that the evidence was treated as rebuttal evidence as opposed to impeachment evidence, the Court's decision to allow the government the opportunity to review and evaluate the phone records and accompanying notarized affidavit and address any concerns regarding their authenticity has eradicated any alleged prejudice to the government.

4

### III. THE DEMONSTRATIVE EXHIBITS ARE NEITHER SUMMARIES NOR INACCURATE.

The government's argument regarding the accuracy of the demonstrative exhibits conflates several comments of defense counsel during this hearing with the integrity of the exhibits. Exhibits 127 and 128 contain identical information to Exhibit 126 (the complete records). Defense has no objection to 127 and 128 not being admitted as substantive evidence, as they are simply demonstrative in nature. However, in conjunction with the testimony offered at the hearing, they may be useful to the Court's interpretation of the remaining phone record evidence.

The government mischaracterized Exhibits 127 and 128 as "summaries," and proceeded from that erroneous premise. The Court has Exhibits 125 (Business Record Affidavit), 126 (Underlying telephone records), 127 (Records restricted to relevant date and time range and highlighted as to Estes's outgoing voice calls and Dean's incoming voice calls) and 128 (Records restricted to relevant date and time range with no highlights) in its possession. The demonstrative exhibits (127 and 128) contain identical information to page 81 of the phone records (126), but are restricted to the date and time relevant to the encounter at issue. Exhibits 127 and 128 were provided for convenience to the Court and printed in larger type to allow counsel to examine a witness regarding the record. Exhibit 126 (the complete phone record) is printed in very small type. Exhibits 127 and Exhibit 128 are identical to each other, with Exhibit 127 showing for demonstrative purposes the phone calls from Mr. Estes's telephone number highlighted in blue and the voice calls from Mr. Dean's telephone number highlighted in pink. As the government does not, and indeed cannot, argue the highlighted calls are text messages, it is unclear how either exhibit is objectionable on the basis of accuracy. As Exhibit 130 (T-Mobile codes) makes clear, the highlighted calls are indeed voice calls, not text messages.

Defense counsel's cross-examination focused on the period of time between 11:43 a.m. and 12:02 p.m.—the time between the first voice call from Mr. Estes's number to Erika Dean's

5

number and the last of Erika Dean's repetitive calls to Mr. Estes's number. This is also the time of Mr. Estes's interaction with the law enforcement officers in this case. In those 19 minutes, the phone records reflect that there was one voice call made from Mr. Estes's telephone number to Dean's telephone number at 11:43 a.m., and four voice calls made from Dean's telephone number to Mr. Estes's telephone number between 11:56 a.m. and 12:02 p.m. There was also one voice call made from an unknown number to Mr. Estes's phone number at 11:53 a.m., and between 11:45 and 11:51 a.m. there were six text messages from unknown numbers to Mr. Estes's phone. (Exhibits 126, 127, 128, 130).

The government relies upon an out-of-context comment by defense counsel to argue the demonstrative exhibits are inaccurate. Exhibits 127 and 128 speak for themselves, and the government's misuse of defense counsel's comments should be rejected. The Court has in its possession both the demonstratives and the phone records and can compare the two to confirm the accuracy of the demonstratives. Defense counsel noted to the Court that she requested and obtained a document from T-Mobile that provided some guidance for interpreting phone records (Exhibit 130) but noted Exhibit 130 did not originally come with Exhibit 126. She offered Exhibit 130 to opposing counsel and the court but noted she had found them unhelpful and remembered someone at T-Mobile explaining there weren't text messages in the records. (Transcript at 130:18-22) ("Sorry, your honor, we do actually have the codes. And we talked to T-Mobile, they said, there were like no text messages at all. We have the codes. I didn't think it was particularly helpful. But I have it. And I can provide it to everyone.") The government, in its memorandum, quotes only the part of defense counsel's comments referring to defense counsel's conversation with a T-Mobile representative and omits the context involving counsel offering the codes to the Court and government counsel. (*See* Government's Memorandum at 11). The Court should reject any suggestion by the government that defense counsel's reference to a comment made to her by a T-Mobile representative reflects some sort of bad faith on the

part of counsel, as opposed to a misunderstanding of the T-Mobile representative's comment. The Government also notes that, while cross-examining Detective Kurup, defense counsel used the word "call" while referring to several lines in the phone records that were actually text messages. The government is correct, as defense counsel's questions were posited upon defense counsel's understanding of the phone records at that time. However, defense counsel's questions are not evidence. That mistake in word choice is not repeated in the cross-examination of Detective Moore, which was restricted to only the six voice calls on the phone records between 11:43 a.m. and 12:02 p.m. (Transcript at 202:21-210:3). Regardless, the government's arguments pertain merely to weight and not the authenticity of the records.

Finally, because these records are demonstrative evidence, the Court need not admit them independently as they contain identical information to Exhibit 126.

## IV. THE RECORDS ARE CLEARLY NOT IN UTC BUT THAT ISSUE GOES TO THE WEIGHT NOT THE ADMISSIBILITY

The telephone records at issue are not set forth in UTC but in the actual geographic time zones. (*See* Exhibits 126, 127 and 128). As this Court has likely seen in the cases before it, and as Exhibit A (Mr. Estes's phone records in UTC time), phone records are *either* in UTC or in geographic time zones. When phone records are in UTC, the records do not show geographical time zones. Instead of referencing Pacific Standard or Daylight time ("PST&PDT"), the records are clearly marked in UTC time and require a calculation to figure out the corresponding geographic time zone. However, every call about which the defense questioned witnesses referenced "PST&PDT"—clearly Pacific standard or daylight time.

The government relies on a document entitled "Interpreting Call Detail" (Exhibit 130) to challenge this evidence. Exhibit 130 provides explanations for various columns in T-Mobile records. (Exhibit 130: "The columns present in your CDR may be: . . .") As defense counsel advised the Court, Exhibit 130 was not provided with Exhibit 126 but rather was obtained separately. Exhibit 130 provides a "description" for certain "column name[s]". Exhibit 130

7

provides a description for a column named "(UTC) Time" and describes it as "24 hour time format – hh:mm:ss in UTC." Exhibit 130. The records in this case (Exhibit 126) do not have a column named "(UTC) time" Instead they have two columns – one named "time" and one named "timezone."Not only does the exhibit clearly indicate that time is in geographic time zones, UTC by definition is not ever in time zones.

The Court should also examine closely the lines in the records that reflect either Central or Eastern Time. (Exhibit 127; lines 6794, 6797, 6798, 6799). Those lines are distinct from the other lines in the phone records. In those line items neither the called nor the calling number are Mr. Estes's telephone number. Rather his number is the queried number and the calls are forwarded calls. Mr. Estes's number is not the destination number in any of those out of time zone line items. (Exhibit 130) (Defining destination number as "The final destination number to which the network has connected the call (might be different from the one dialed by subscriber if network translation was applied)").

Regardless, the Court is the trier of fact in this case. It must decide the issue of weight in this case. Questions about weight, however, do not go to the inherent admissibility of the evidence.

## V.   CONCLUSION

There were missteps at the discovery portion of this case that resulted in the government not receiving evidence which the Court intended they should have. Neither the government nor the Court has raised this issue nor appears to be aware of it, but upon discovering it, counsel feels ethically bound to address it. That issue is discrete from the evidentiary admissibility of these exhibits but bears upon the general issue of notice.

This Court should admit Exhibit 126 for the limited purpose of impeachment. To the extent, if any, the evidence is deemed hearsay, the Court can choose to admit it under its broad

8

discretion as the finder of fact in a suppression hearing. Moreover, any prejudice to the government regarding challenges to the authenticity of the evidence have been cured.

Finally, it should be remembered that the Court has heard testimony from four live witnesses and has had an opportunity to observe them and make credibility determinations and examine other evidence presented in this hearing. The Court does not require Mr. Estes's telephone records to make its determination, and, if it elects not to consider the records, it has sufficient evidence to decide on the issues of seizure, consent and custody without this evidence.

The government cannot sustain its burden regarding the lawfulness of Mr. Estes's warrantless search and seizure regardless of whether this Court admits or even considers evidence regarding the phone records. The government argues Mr. Estes's consent to a search was both not the fruit of a seizure and was completely voluntary. However, the evidence at the hearing showed that officers singled Mr. Estes out and advised him he was under suspicion based on "indicators" that the government did not even argue amounted to reasonable suspicion. Officers asked Mr. Estes for consent to search:  Mr. Estes unequivocally denied consent. Officers then advised Mr. Estes a drug canine would be deployed and, if the canine alerted, officers would seize all of Mr. Estes's belongings pending a warrant. A canine was then deployed and it did not alert, which left the officers with no consent to search from Mr. Estes and no probable cause to get a search warrant. Instead of leaving Mr. Estes alone at this point, Officer Moore elected to confront Mr. Estes with the canine's legally irrelevant "interest":

> Q. Okay. So you know that interest has no legal
> relevance to your rights as an officer; correct? Did you
> just --
> A. Correct.
> Q. -- testify to that?
> A. Well, for probable cause, correct.

1  Q. So that does not give you a right to search his
2  stuff?
3  A. That's --
4  Q. The interest?
5  A. That's correct.
6  Q. Okay. But you chose to tell Mr. Estes that there
7  was dog interest in his room?
8  A. I did.
9  Q. And you did that because you wanted permission to
10  search his stuff?
11  A. I was just stating a fact.
12  Q. Just stating a fact.
13  So you wanted to tell Mr. Estes this legally
14  irrelevant fact. Is that your testimony?
15  A. Yes.
16  (Transcript, 215:3-23)
17  Officer Kurup then attempted again to extract consent but Detective Moore testified he
18  did not hear that conversation:
19  Q. Okay. Now, it's at this point that Officer Kurup
20  asks Estes again to consent to the search?
21  A. I did not hear that conversation. I know that they
22  were talking.
23  Q. Okay. So you didn't actually hear Mr. Estes give
24  consent?
25  A. No.
26

10

(Transcript, 216:15-21)

Whether the government carried its burden of proving officers obtained viable consent from Mr. Estes is an issue for the Court to decide. There was only one witness to the alleged consent—Officer Kurup.[1] No consent to search was put in writing or recorded. Regardless, any consent given would have not been voluntary under the circumstances in this case.

These core facts are at the heart of the issues this Court must decide in this case and these facts are clearly established by unrefuted testimony of witnesses. This Court has discretion to consider the challenged exhibits but, if it elects to disregard them in light of the notice issue briefed by the parties, it still has ample evidence on which it can base its determination to grant Mr. Estes's suppression motion.

DATED this 15th of April, 2016.

RENE L. VALLADARES  
Federal Public Defender

By: */s/ Lauren D. Gorman*  
LAUREN D. GORMAN  
Assistant Federal Public Defender  
Attorney for Shaun Jermaine Estes

---

[1] Notably, Moore and Kurup's testimony differed significantly about key parts of this encounter. While Kurup testified that Moore was present at the inception of this encounter and did not testify that Moore checked Estes's sleeper car before Kurup approached Estes (Transcript. 37:1-5) (Q. Now, when you made contact with this individual, who is later identified as Mr. Estes, did you know where Detective Moore was? A. Yes. He was about several feet back and off to the side"), Moore testified he was standing in the train when Kurup first approached Estes. (Transcript 197:1-10). While Kurup testified that Estes led Kurup to his sleeper car and then Estes opened the door himself (Transcript, 46:4-18), Moore testified that Kurup led Estes to Estes's sleeper car (Transcript, 149:18-19) ("Q. Did you see who was leading? A. It was Detective Kurup.").

11

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Law Offices of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on April 15, 2016, she served an electronic copy of the above and foregoing MEMORANDUM OF POINTS AND AUTHORITIES by electronic service (ECF) to the person named below:

>DANIEL G. BOGDEN
>United States Attorney
>MEGAN RACHOW
>Assistant United States Attorney
>100 W. Liberty Street, Suite 600
>Reno, Nevada  89501

>*/s/ Bonnie S. Bell*
>_____
>Employee of the Federal Public Defender

# EXHIBIT A
# CD FILED MANUALLY